UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

*Plaintiff,*

v.                                                   Case No. 3:21-cr-00092-jdp

BAHRULLAH NOORI,

*Defendant.*

**OMNIBUS MEMORANDUM IN SUPPORT OF PRETRIAL MOTIONS**

Bahrullah Noori, by counsel, has simultaneously filed three pretrial motions attacking the use of his statement. They are, as follows:

- Motion to Suppress based on a *McNabb/Mallory* violation.

- Motion to Suppress based on coercive tactics producing Noori's statement.

- Motion to Suppress based on an invalid *Miranda* waiver.

For the reasons stated below, the defense believes that an evidentiary hearing is necessary as to certain aspects of the motion. Hopefully, *most* of the facts contained in discovery can be stipulated to, shortening the need for testimony. This memorandum contains the relevant facts for the various motions, presenting them as a narrative. After that, each motion is dealt with separately setting out the facts and legal arguments in support.

## I.     Factual overview supporting the defense's various motions.

Most of the facts proffered below come from the government's discovery and are cited to the Bates stamp, with the relevant pages filed in Exhibit C and under seal. The majority of the personal background about Noori comes from his Affidavit, which is Exhibit A. The defense has also attached an affidavit from Ehsanullah Safi, a former Judge in Afghanistan, which provides a brief overview of Afghanistan's culture and that of Noori's rural home, as well as an understanding of how the criminal justice system operates there. It is Exhibit B. The interrogation and the initial police calls are attached as Exs. D and E—and also filed under seal because they identify the alleged victims.

### A.  Noori spends his entire life in Afghanistan and has no exposure to American culture or the criminal justice system.

Noori was born and raised in a rural area in Afghanistan.[1] He does not know his age or birthdate—a fact that is common in Afghanistan.[2] But he is probably around 18 or 19 years old, possibly younger (maybe a year older) but likely within that range. His upbringing centered on his family and Islam.[3] He was faithful to the tenets of Islam attending services, praying—at least five times and at specified times throughout the day—and reading the Quran.[4] He had some education, including classes on the English language, and he graduated from the twelfth grade.[5]

---

[1] Ex. A ¶ 2.
[2] *Id*. at ¶ 1.
[3] *Id*. at ¶ 3, 5.
[4] *Id*. at ¶ 5-8.
[5] *Id*. at ¶ 1, 11.

Despite taking some classes on the English language, he had no familiarity with American culture.[6] He had never seen an American movie or TV show and never learned about our justice system.[7] In Afghanistan, his interaction with Americans was limited to occasionally helping soldiers in the region.[8] It was that aid to soldiers that put his life in danger and allowed him to come to the United States.[9] In late August, as Afghanistan fell to the Taliban, he was able to escape to America.[10] At Fort McCoy, people who understood his culture surrounded him, everyone spoke Dari or Pashto, and he never left the military base.[11]

## B. Noori is arrested and housed at Fort McCoy Jail while the FBI completes its investigation.

On September 11, 2021, in the evening, one of the refugees in the barracks made an accusation about Noori—that he had seen Noori sexually assault his son and nephew.[12] The report was made to an interpreter, who then relayed it to the military police.[13] A minute-by-minute timeline is provided in a few pages, but here's a narrative overview of what happened. At 8:51 p.m., a Staff Sergeant reports what he's been told, and the military police quickly jump into action.[14] Within minutes, officers are dispatched to the scene.[15] Around 9:00 p.m., dispatch says it will call the FBI—the FBI had kept a post

---

[6] *Id*. at ¶ 12.
[7] *Id*.
[8] *Id*. at ¶ 13-14.
[9] *Id*. at ¶ 14-16.
[10] *Id*. at ¶ 17-21.
[11] *Id*. ¶ 22.
[12] Bates 39.
[13] Ex G at 0:00-1:46, Bates 455.
[14] Ex. G at 00:00-3:32, Bates 455.
[15] Bates 455.

on base.[16] By 9:23 p.m., it's clear that the FBI has been informed of the allegations, and at 9:30 p.m. the father gave a sworn statement.[17] At 9:32 p.m., Noori was arrested and transported to Fort McCoy police station; at that point, the FBI takes over.[18] Shortly after 1:00 a.m., the military approves an FBI request for Fort McCoy police to watch Noori.[19]

That night is the first time that Noori ever had police contact.[20] He had never been in a jail cell before, and he had no cultural knowledge of the American criminal justice system.[21] That is, while a typical American would (by their late teens) have seen scores of movies and shows about what happens when a person is arrested and the protections that come with an arrest and the process it entails, Noori had none of that.[22] Not only did he have no cultural knowledge of the American criminal justice system, he also had no concept of his rights.[23] As laid out in Exhibit B, in the past four decades, Afghanistan's legal system has gone through upheaval after upheaval. There is no stability and no understanding of basic constitutional rights—either with the police or the populace. Adding to Noori's ignorance of the situation, when he was brought to the station, he was not told about his rights or even what the allegations were against him.[24]

---

[16] Ex. G 10:36-10:53.
[17] Bates 179-81, 455.
[18] Bates 176, 455.
[19] Bates 456.
[20] Ex. A at ¶ 24, 27.
[21] *Id.* at ¶ 12, 24, 36-39.
[22] *Id.*
[23] *Id.*
[24] *Id.* at ¶ 25, 27.

Instead, he was stripped of his watch and shoes, and placed in a cell with the clothes he was wearing.[25] The cell had one bed, a toilet, and no window.[26] This is a photo of the cell he was housed in.



The officers gave him a sheet but no blanket.[27] And since they took away his watch and did not give him a Quran or a prayer rug, he could not complete his ritual prayers—the prayers he had been reciting five times a day, for over a decade; the prayers that are the cornerstone of his life.[28] He was alone in solitary confinement.

Noori's first night in the cell was, in his own words, terrifying.[29] Again, this is a young man (maybe 18 or 19) who has just fled his country, who has never interacted with

---

[25] *Id.* at ¶ 26.
[26] *Id.*
[27] *Id.*
[28] *Id.* at ¶ 9, 29.
[29] *Id.* at ¶ 27.

police before, and is now locked in a cold cell unsure of why he's there or when he'll leave or if he'll leave or if he's being sent back to Afghanistan.[30] Again, no one told him what was going on or why he was there.[31] Given the anxiety that would attach to such a situation, he doesn't sleep and he spends most of the night shivering and crying.[32]

At 3:40 p.m. during the second day of isolation, he is given an extra sheet, which he converts to a prayer rug.[33] No one speaks to him; he's alone in his cell, completely isolated.[34] He doesn't have prayer books, and he doesn't know if the food is halal, so he doesn't eat much—the report notes he "doesn't touch his chow."[35] Given his background, these limitations on Noori's religious practice deeply troubled him.[36] Eventually, sometime in the afternoon, the military police set a clock outside of his cell, so he was able to look through a small hole in the door to tell the time.[37] But he still hadn't been told why he was arrested, when he'd be able to leave, or any of his various rights.[38] He's just locked in the cell. The isolation, silence, and confusion persisted for a second evening and into the third day, September 13, 2021.[39] At that point, he is still unsure if the food is halal and he still without his prayer books and he is still without any human contact, he is simply terrified and exhausted.[40]

---

[30] *Id*. at ¶ 1, 21, 24, 27.
[31] *Id*. at ¶ 25.
[32] *Id*. at ¶ 27.
[33] Ex. A at ¶ 30, Bates 456.
[34] Ex. A at ¶ 28.
[35] Ex. A at ¶ 28-29, Bates 456.
[36] Ex. A at ¶ 32.
[37] *Id*. at ¶ 31.
[38] *Id*. at ¶ 33.
[39] *Id*. at ¶ 33-34.
[40] *Id*. at ¶ 32-34.

### C. As Noori sits in isolation, the FBI gathers the information and works with the U.S. Attorney to complete the criminal complaint.

After Noori was brought to the station at 9:32 p.m. on September 11 and as Noori sat in isolation for over forty hours, there was a lot going on behind the scenes.[41] First, the military police at Fort McCoy will testify that they have strict regulations on detaining civilians.[42] Military police are only allowed to detain a civilian in a cell for 12 hours.[43] The regulations are plain on that and the police chief will testify that rule is ironclad. The police may, however, hold a person for an outside agency—like the FBI. But the person is in the FBI's custody, not the military's. The military police are only allowing the FBI to use their cell to house the civilian. And the military agreed to hold Noori for the FBI.[44]

Second, September 12 was a busy day for the FBI and the U.S. Attorney's Office. Both complaining witnesses were taken for forensic interviews with the agents.[45] After these, the U.S. Attorney's Office duty attorney started receiving emails about the case, including the police reports.[46] The first arrived at 3:30 p.m., and two hours later the duty attorney sent the FBI agent a draft affidavit, a criminal complaint, and a warrant for Noori's arrest.[47] He added this note: "Since there is less corroboration for this case, I think we should add a paragraph about the interviews of the children you did today."[48] A follow up affidavit with additional language arrived two hours later.[49]

---

[41] Bates 455-457.
[42] Bates 458-462, Ex. F.
[43] Bates 460.
[44] Bates 456.
[45] Bates 44-51, 64-73, 481.
[46] Bates 368.
[47] Bates 368, 366.
[48] Bates 366.
[49] Bates 449.

The next morning, September 13, as Noori has been held for 36 hours, the U.S. Attorney's Office reaches out to the Courts about getting the criminal complaint signed.[50] The email (sent at 8:31 a.m.) is clear: "the subject is in custody."[51] A little while later, FBI agents request a recorded interview room at Fort McCoy to interrogate Noori.[52] At 11:05 a.m., the duty attorney sends the FBI agents another email asking them to review the revised affidavit and arrest documents.[53] And forty minutes later, the duty attorney requests another revision.[54] Shortly after noon, an updated affidavit is sent to the Court and over the next hour, there are emails and phone calls about the affidavit with a final email from the duty attorney making clear that the updated affidavit "should address the Judge's concern."[55] That took place at 1:10 p.m.[56]

At that point, Noori had been in custody just shy of 40 hours. And he was also only an hour-and-forty-seven-minute drive to the federal courthouse. Here is a snap shot from Google Maps:

[50] Bates 444.
[51] *Id.*
[52] Bates 481.
[53] Bates 391.
[54] Bates 387.
[55] Bates 427-429.
[56] Bates 429.



Taking a less than two-hour drive that morning would have allowed Noori to see a judge, to be arraigned and advised of his rights—along with all of the other critical protections that Rule 5 provides. Instead of being brought to the federal courthouse, Noori stayed in his cell, cold, scared, and after two-and-a-half days in custody still having not spoken to another person or having any idea of the accusations against him or (importantly) his rights.[57]

---

[57] Ex. A at ¶ 23-34.

**D. Forty hours after his arrest and rather than taking Noori to Court, the FBI interrogates him.**

Finally, at 1:30 p.m. the recorded interview room was ready for Noori's interrogation.[58] And he is eventually led into the room, where he signs a Pashto advice of rights form at 2:00 p.m. and agrees to speak with the FBI.[59] Noori's first reaction to being brought in the room is tears.[60] He is exhausted and shaken and scared—overwhelmed by it all.[61] Believing that he has no other options and fearing a return to his cell or worse, he agrees to speak to them.[62] While the FBI gives him the *Miranda* warnings, he is confused: he protests that he doesn't know a lawyer or have money for one.[63] The agent assuages his concern and then Noori signs the form and begins answering their questions.[64] Over the course of the next two-and-a-half hours, he answers the agent's questions.[65]

After the interrogation ends, and as the clock ticks at 43 hours without him seeing a judge, the FBI finally takes Noori to the Dane County Jail.[66] He arrives there a little before 7:00 p.m.[67] The next day, the court requests confirmation that "there is an immediate need for an interpreter for two pending cases."[68]  But Noori would not see a judge or an attorney that day—nor the next. It would not be until two days later that he

---

[58] Bates 481.
[59] Bates 98.
[60] Ex. D 1:00- 9:00.
[61] Ex. A at ¶ 35.
[62] Ex. A at ¶ 37.
[63] Ex. D.
[64] *Id*.
[65] *Id*.
[66] Bates 396.
[67] *Id*.
[68] Bates 411.

would make his initial appearance.[69] Almost 110 hours after he was arrested, and only then was he finally advised of the charges and his rights.[70] Given the delay in arraigning Noori, the defense was never entitled to a probable cause hearing. Instead, the government secured an indictment.[71]

Within that relatively short narrative, it can be confusing placing the timing of everything. It's clear that Noori was arrested at 9:30 p.m. on Saturday night and it's clear that he was released to (or held for) the FBI by 10:00 p.m—probably even earlier.[72] While the interstitial details can be lost in narrative form, to help the Court see the overview of what happened and the precise timing of each event, the next two pages provide a helpful timeline of each day's events.

---

[69] Dkt. 10.
[70] *Id*.
[71] Dkt. 13.
[72] Bates 175.

| Date & Time | | Event | Bates |
|---|---|---|---|
| 9/11 | 8:15 pm | SK reports incident. | 170 |
| | 8:51 | Staff Sgt. Ramirez calls Ft. McCoy PD dispatch to report incident. | 170 |
| | 8:55 | Calls other officers to scene. | Ex. E |
| | 9:00 | Ft. McCoy dispatch calls. CID to report sexual assault. CID asks if dispatch has notified FBI "my next call." | Ex. E |
| | 9:04 | Ft. McCoy officers respond to report of sexual assault. | 38-39 |
| | 9:23 | Dispatch calls FBI. | 383 |
| | 9:30 | SK gives sworn statement to officers through unofficial interpreter. | 375-377 |
| | 9:32 | Noori in custody, transported to Station. FBI decides to take over investigation | 176, 383 |
| | 10:02 | Noori in cell. | 171, 383 |
| | | | |
| 9/12 | 1:12 am | FBI request Fort McCoy PD watch Noori. | 456 |
| | 1:50 pm | Forensic interviews of minors | 44-51, 481 |
| | 3:30 | Duty attorney receives an email with the police reports | 368 |
| | 5:40 | Duty attorney sends agent a draft affidavit, complaint, and warrant for Noori. | 366 |
| | 7:56 | Duty attorney sends out updated affidavit based on SA Meyer's interviews | 449 |
| | 10:00-:30 | HK sexual assault kit taken at Gundersen. | 43 |
| | | | |
| 9/13/21 | 8:31 am | Duty attorney emails the court "The subject is in custody." | 444 |
| | 9:08 | AK's and HK's medical kits collected by SA Meyers. | 41 |
| | 10:40 | FBI contacted CID requesting a recorded interview room for interview with Noori. | 481 |
| | 11:05 | Duty attorney sends email for agents to review documents. | 387 |
| | 11:49 | Duty attorney sends updated affidavit, criminal complaint, and arrest warrant to agents for review. | 387 |
| | 12:21pm | Duty attorney sends criminal complaint and arrest warrant to court. | 427 |
| | 12:56 | Chambers emails to speak with the duty attorney. | 428 |
| | 1:10 | Duty attorney emails chambers with updated affidavit that "should address the Judge's concern." | 429 |

| | | | |
|---|---|---|---|
| | 1:30 | CID provided FBI with interview room, assisted with using recording equipment. | 481, 92-97 |
| | 2:00 | Noori signs Pashto advice of rights. | 98 |
| | 5:37 | Duty attorney notified that FBI interviewed Noori. | 348 |
| | 6:50 | FBI drops Noori off at Dane County Jail. | 396 |
| | | | |
| 9/14/21 (Tuesday) | 11:46 am | Duty attorney confirms "an immediate need for an interpreter for two pending cases." | 411 |
| | 12:01 pm | Duty attorney confirms Noori is in custody. | 406 |
| | | | |
| 9/15/21 | All Day | Noori at DCJ. | |
| | | | |
| 9/16/21 | 11:19 am | Initial appearance. | Dkt. 10 |

That's the timeline of how things broke down, here is a separate chart with the specific timestamps and the clock that was running on each. Hopefully, it is a little clearer.

| Date | Time | Event | Clock |
|---|---|---|---|
| Saturday, September 11 | 9:32 pm | Noori taken into custody. | 0:00 |
| Sunday, September 12 | 9:30 pm | Noori remains in custody. | 24:00 |
| Monday, September 13 | 9:30 am | Noori remains in custody. | 36:00 |
| September 13 | 1:30 pm | Noori moved from cell to interview room to meet with FBI. | 40:00 |
| September 13 | 2:00 pm | Noori signs Pashto advice of rights. | 40:30 |
| September 13 | 4:17 pm | Noori is taken out of Fort McCoy. | 42:45 |
| September 13 | 6:50 pm | Noori arrives at DCJ. | 45:30 |
| Tuesday, September 14 | 9:30 pm | Noori at DJC all day. No action. | 72:00 |
| Wednesday, September 15 | 9:30 pm | Noori at DCJ all day. No action. | 96:00 |
| Thursday, September 16 | 11:19 am | Noori's initial appearance hearing begins. | 109:50 |

## II.    The three pretrial motions and their legal bases.

Based on that factual backdrop the defense has filed three pretrial motions. The first is probably the easiest: the government's decision to interview Noori forty hours after his arrest violated the Supreme Court's *McNabb/Mallory* Rule and it's various protections contained in § 3501(c) and Rule 5(a). Second, Noori's statement was the product of police coercion—the forty hours he spent isolated in solitary confinement *before* giving his statement combined with his particular vulnerabilities make his statement involuntary. Third, Noori's *Miranda* waiver was not knowing and voluntary. That's the general overview of each claim, what follows is the supporting case law.

### A. The government violated *McNabb/Mallory* when it interviewed Noori outside the six-hour window.

Few things are clearer than the timing *McNabb/Mallory* and its statutory embodiments prescribe. "In the wake of *Mallory*, Congress established a six-hour 'safe harbor' for post-arrest statements."[73] And the principles governing its application are equally straight-forward: the "clock begins to run for purposes of § 3501(c) when the individual is arrested or otherwise detained for a violation of federal law, not when he is taken into federal custody."[74] Indeed, "[i]f a person is arrested and held on a federal charge by 'any' law enforcement officer—federal, state, or local—that person is under arrest or other detention for purposes of § 3501(c) and its 6-hour safe harbor period."[75]

---

[73] *United States v. Mansoori*, 304 F.3d 635, 660–61 (7th Cir. 2002); *see also United States v. McDowell*, 687 F.6-hour3d 904, 908–09 (7th Cir. 2012).
[74] *Id*. at 660.
[75] *United States v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994).

Here, the clock began to run upon Noori's arrest on Saturday at 9:32 p.m.[76] He is a civilian arrested on federal property for a federal offense. The military would not (and could not) hold him for a violation of its laws after 12 hours: "*In no case will detention exceed 12 hours*."[77] But here, Noori was immediately turned over to the FBI. Recall Officer Schwartz's report from Saturday night:

- "The FBI was notified and decided on taking over the investigation. A decision was made to take custody of Noori and transport him to Ft. McCoy PD."[78]

- "A decision was made to place him in D cell until the FBI was able to come in the morning to conduct an interview and follow up investigation with the children."[79]

And the CAD report makes clear that at 1:00 a.m., on September 12, the Fort McCoy police agreed to hold Noori for the FBI.[80] The emails Sunday afternoon center on the arrest warrant, the criminal complaint, and the supporting affidavit. In other words, there was no further investigation being done to determine *if* Noori would be charged. Instead, the delay in bringing Noori to the federal courthouse and to see a federal judge was so the government could interrogate him at its leisure.

But that's precisely what the Supreme Court has made clear that the law does not allow: "Again, we repeated the reasons for the rule and explained, as we had before and have since, that delay for the purpose of interrogation is the epitome of unnecessary delay."[81] That delay eviscerates the rule's purpose and the protection it affords. The

---

[76] Bates 383.
[77] Army Regulation 190–47, Policy 16–3.
[78] Bates 176
[79] Bates 176.
[80] Bates 456
[81] *Corley v. United States*, 556 U.S. 303, 308–09 (2009).

Supreme Court has made that point abundantly clear: "One might not care if the prompt presentment requirement were just some administrative nicety, but in fact the rule has always mattered in very practical ways and still does. As we said, it stretches back to the common law, when it was 'one of the most important' protections 'against unlawful arrest.'"[82] As stressed above, this is not a mere technicality or point of procedure: "presentment is the point at which the judge is required to take several key steps to foreclose Government overreaching: informing the defendant of the charges against him, his right to remain silent, his right to counsel, the availability of bail, and any right to a preliminary hearing; giving the defendant a chance to consult with counsel; and deciding between detention or release."[83] Those are not administrative niceties but the core protections of the criminal-justice system.

Consistent with those rights and those protections, the inquiry is two-fold: did the interrogation take place within the six-hour safe harbor? It didn't. If not, then the question is "whether delaying that long was unreasonable or unnecessary under the *McNabb–Mallory* cases, and if it was, the confession is to be suppressed."[84] Here, there is no good reason for delay. The only reason for keeping Noori on the base and away from the federal court was to extract a confession. And the case law is clear: "the delay must not be of a nature to give opportunity for the extraction of a confession."[85] Thus, Noori's statement must be suppressed.

---

[82] *Id.* (citing *County of Riverside v. McLaughlin*, 500 U.S. 44, 60–61 (SCALIA, J., dissenting)).
[83] *Corley*, 556 U.S. at 320.
[84] *Id.* at 322.
[85] *Mallory v. United States*, 354 U.S. 449, 455 (1957); *see also McDowell*, 687 F.3d at 908–10.

### B. Noori's statement was the product of coercion and violated the due process clause.

Before pivoting to a separate (but related) doctrine, it's worth quoting the rationale behind the *McNabb/Mallory* rule and its six-hour safe harbor. "In a world without *McNabb-Mallory*, federal agents would be free to question suspects for extended periods before bringing them out in the open" which empirical evidence has shown "can induce a frighteningly high percentage of people to confess to crimes they never committed."[86] Isolating a person has a coercive effect on their will and can lead to false confessions.[87] That point can't be denied, and it plays a huge role in this case.

It's with that background that the defense raises its second pretrial motion to suppress—namely, that Noori's statement was involuntary and violated the Due Process Clause. The Supreme Court has been clear: "certain interrogation techniques either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment."[88] To find that a statement is involuntary, the defense has to point to *some* coercive behavior on the part of the government—it is an indispensable ingredient of an involuntary-statement claim.[89] Here, the coercive element of the police action is subjecting Noori to forty hours of isolation, where he did not sleep, ate little, and was told nothing; and all of that was done *before* he was interrogated.

---

[86] *Corley*, 556 U.S. at 320-21.
[87] *Id.* (citing Drizin & Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 906-907 (2004)).
[88] *Miller v. Fenton*, 474 U.S. 104, 109-10 (1985); *see also Lentz v. Kennedy*, 967 F.3d 675, 691 (7th Cir. 2020).
[89] *Colorado v. Connelly,* 479 U.S. 157, 167 (1986); *see also United States v. Outland*, 993 F.3d 1017, 1021-22 (7th Cr. 2021).

Once the defense has pointed to some coercive behavior by the police, then the Court looks at the totality of the circumstances, including the accused's personal characteristics to determine whether the statement was involuntary.[90] Relevant here, Noori's particular circumstances include his education and intelligence, his prior experience with law enforcement, and as the Supreme Court has put it, any unique characteristics that would impair his "powers of resistance to overbearing police tactics."[91] To be clear, the issue isn't whether the prolonged detention would (as a matter of law) break any (and every) suspect and compel them to make an involuntary statement. That's not the standard. Rather, it's whether those elements are coercive (they are), and coupled with Noori's vulnerable state rendered his statement involuntary.

In reaching that conclusion, it's important to stress Noori's individual circumstances. First, he is a young man, possibly as young as seventeen likely as old as nineteen—no one knows for sure. While he's not a juvenile, he's not far removed from being one and even at whatever tender age he is, his brain has not fully formed. While many cases stress the coercive force applied to juveniles, some courts have extended the reasoning to teenagers and older.[92] After all, there is no magic cut-off date when a child's mind has formed; instead, society has settled (for better or worse) on eighteen. Yet that doesn't preclude the court from considering how young Noori actually is.

---

[90] *See, e.g. Dassey v. Dittman*, 877 F.3d 297, 303 (7th Cir. 2017) (en banc).
[91] *Reck v. Pate*, 367 U.S. 433, 442 (1961); *see also Dickerson v. United States*, 530 U.S. 428, 434 (2000).
[92] *United States v. Preston*, 751 F.3d 1008, 1028 (9th Cir. 2014) (involving an 18-year-old who was also intellectually disabled); *United States v. Blocker*, 354 F. Supp. 1195, 1201–02 (D.D.C. 1973).

Second, whatever his age, the Court must also consider his experience with the criminal justice system.[93] He has none. He spent his entire life in a country with a radically different justice system than America.[94] In that country, he had *no* exposure to the law or to the police and as the affidavit makes clear: he would have no reason or ability to understand his rights. Rather, he assumed that one must always cooperate with the police.[95] Not only is that his frame of reference, he had *no* exposure to the American system for challenging that understanding. He had never seen an American movie or TV show and he had no experience on the base that would have given him an understanding of the rights (or process) that follows an arrest.

Third, the Supreme Court has noted that there is not a set list of factors, but that courts look at a defendant's particular circumstances.[96] Here, the Court has to weigh the effects of coming from a different culture, one where people do not resist those in authority. Instead, they are cooperative and most disputed matters are settled with an apology after a discussion.[97] That is, Noori would have it culturally ingrained in himself to speak with authorities and work the problem out—to talk it through. He was not, in other words, working within the paradigm of an adversarial criminal-justice system. He

---

[93] *Reck,* 367 U.S. at 441–42; *see also Fare v. Michael C.,* 442 U.S. 707, 725-29 (1979) (dictum) (prior "experience with the police" is relevant to assessment of the voluntariness of Miranda waivers); *see also Dassey,* 877 F.3d at 304.

[94] *See* Ex. B.

[95] *Id.*

[96] *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973); *see also Janusiak v. Cooper,* 937 F.3d 880, 893-94 (7th Cir. 2019).

[97] *See* Ex. B.

did not and could not conceive of this as an adversarial system, where he could refuse to speak to the authorities.

Fourth, he did not know what would follow if he didn't cooperate with the FBI and give a statement. He had no frame of reference to understand that eventually he'd see a judge and get a lawyer. He had nothing to guide him other than the real fear (played out over the last forty hours) that he would remain in that cell indefinitely. Or, as he states in his Affidavit, that he might be returned to Afghanistan and to the certain death that awaited him there.[98]

Taking those four points together, the Court has on the one side the coercive effect of forty hours in solitary confinement, where Noori slept little, ate little, could not pray as he was accustomed. Such confinement was an inherently coercive environment that he legitimately thought he would be returned to, if he didn't cooperate. It's worth adding that this forty hours of isolation took place *before* being told of a person's rights and meeting an attorney—behavior that the Supreme Court and Congress have condemned. Six hours—that's how long it should be before a suspect learns of the charges and his rights, not 40 hours. And to be forthright, Noori would actually have to wait 110 hours before he was afforded those guarantees.

Balanced with that coercive atmosphere in the totality-of-the-circumstances analysis, the Court has a very young man—at best a shade over 18. That young man had no experience with the criminal-justice system in America. And his entire paradigm

---

[98] Ex. A at ¶ 37.

revolved around a justice system centered on cooperation with authority. Indeed, it can't be overlooked that he came from an occupied country where U.S. soldiers were his protectors and he could not risk running afoul of them, in any way—they, after all, held his life in their hands.

Those realities made it so he would have no idea what to expect would happen if he refused to talk with the FBI or asked for a lawyer. His only assumption was: I would go back to my cold cell, with no one to talk to, and with no Quran and no certainty that the food he was getting is halal, and no end in sight. He was faced with an impossible choice: refuse to speak and go on in uncertain and indefinite solitary confinement or maybe be sent back to the Taliban, or talk to the FBI and apologize and help this all go away. Put differently, the coercive effects of his forty hours of solitary confinement when coupled with his age, lack of experience with the criminal-justice system, and his own cultural paradigm quashed his ability to understand (and exercise) his right to refuse to speak to the FBI. And thus, his statement was not the product of a voluntary choice but a coerced statement that violates the Due Process Clause and must be suppressed.

## C. Noori's *Miranda* waiver was not knowing and voluntary.

The final challenge to Noori's statement rests on his waiver of *Miranda*. Much of the same reasoning sketched above applies to this challenge—the remedy for the violation is, of course, slightly different. When it comes to a *Miranda* waiver, the waiver must be made voluntarily, knowingly and intelligently. The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.[99]

There is little reason to belabor the point by copy-and-pasting from above. The decision for Noori to waive his *Miranda* rights was not knowing and voluntary. It was the product of forty hours without human contact—he was tired and scared and he had not eaten. That much is patent. But beyond that, he did not understand his rights in order to knowingly waive his rights. The waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.[100] And Noori lacked that capacity. He had no concept of the rights he was giving up or the consequences. That's particularly true because he had not concept of the

---

[99] *Moran v. Burbine*, 475 U.S. 412, 421 (1986)
[100] *E.g., United States v. Short*, 790 F.2d 464, 469 (6th Cir. 1986) (noting limited ability to understand English may render a waiver of rights defective).

fact that *if* he refused to talk to the FBI, he would still get to escape solitary confinement. For all he knew, he was staying there, in that cell if he didn't cooperate. The concept of his rights to refuse answering questions was just as foreign to him as the consequences of waiving those rights. And his decision to waive those rights and sign that form and to speak to the FBI cannot be considered a knowing and voluntary waiver of those rights. As such, his statement should be suppressed.

### III.    Conclusion

Noori had been in this country for sixteen days when he was arrested and thrown into a jail cell. In that cell, he was left alone. No one talked to him. No one explained his rights to him. No one told him that he'd one day be able to leave. No one bothered to say, this is just temporary—you'll see a lawyer, you have rights in this country that we honor. He just sat there as the fear and the isolation, the loneliness, the hunger and the fatigue wore away at his will. It was only after forty hours in that condition that the FBI decided to interrogate him, instead of bringing him to federal court, where he could be told his rights and meet with an attorney. The Supreme Court and Congress have condemned that sort of deliberate delay. And the fruits of that delay (his statement) must be suppressed. The statement must also be suppressed because it violates the Due Process Clause. His statement was not free of coercion; instead, it was the product of that coercion. His decision to speak with the FBI was inextricably linked to that forty hours of isolation. Likewise, his decision to waive his *Miranda* rights was not a knowing and voluntary decision but one produced by that coercion. And for those reasons, his statement must be suppressed.

Dated at Madison, Wisconsin, this 1st day of July, 2022.

Respectfully submitted,

Bahrullah Noori, Defendant

*/s/Joseph A. Bugni*
Joseph A. Bugni
Emma J. Campion (legal intern)

FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
Joseph_bugni@fd.org