June 30, 2022



### Affidavit of Ehsanullah Safi

Re: United States v. Bahrullah Noori
    Case No: 21-cr-92-jdp

I, Ehsandullah Safi, the undersigned Afghan Legal and Culture Expert have been retained by Federal Defender Services of Wisconsin, to provide expert opinion in this proceeding.

1. I am over the age of eighteen (18) and am competent to attest to the matters contained in this Affidavit. I make this declaration based on my own personal knowledge, and legal and cultural expertise.

2. My name is Ehsanullah Safi I have lived in Afghanistan for 40 years. I was born in the Tagab district of Kapisa province, Afghanistan. I finished school in one of the high schools in Kabul city. I was successfully admitted to the Sharia Faculty of Kabul University through the national entrance exam, and eventually graduated with a bachelor's degree from the Department of Islamic Jurisprudence and Law of the said faculty, then after a one-year Professional Judicial Education Training Program, I graduated with a higher degree, and joined the judiciary branch as a judge in 2004.

3. During 13 years of my service as a Judge in Afghanistan (2004-2017), I worked in several courts such as Public Criminal, Public Security, Internal and External Security, Public Law, and Civil and Personal Status at the level of Primary and Appellate Courts at the center of provinces and districts in Afghanistan. I served as a Judge at the Justice Center in Parwan (special tribunal for terrorist cases), established by the U.S government. I adjudicated hundreds of terrorists such as the Taliban and Al-Qaeda during my service in this court from 2013 to 2017. And over my career, I have adjudicated thousands of other cases, giving me a thorough understanding of Afghan law and culture.

AO386-B
**DEFENDANT'S EXHIBIT**

CASE NO. 21-cr-92

EXHIBIT NO. B

4.  During my tenure as a judge, I have participated in various Continuing Legal Education (CLE) programs in criminal law and civil law, intellectual property rights, and fingerprints inside and outside the country. I have written hundreds of judicial decisions on different matters at both primary and appellate court levels. I have also achieved high-ranking judicial privileges and been honored with multiple certificates of appreciation.

5.  I was born in a Pashtun family, my parents are Pashtuns, I belong to the Safi tribe a major, ,Pashtun tribe and my mother tongue is Pashto. I also belong to a rural area of Kapisa province; my family was a farmer and I have land and a garden in that area.

6.  Afghanistan is a multi-ethnic country, in which major ethnicities are Pashtun, Tajik, Uzbek, Hazara, Arab, Aymaq, Bloch…etc. Each ethnicity is then divided into several tribes. Besides some differences, the people of Afghanistan, almost all its ethnicities, and tribes have common traditions, culture, and affiliations. I have been to dozens of provinces and districts including Laghman province to which Mr. Noori belongs. I have visited the people of these areas many times. I have had friends and colleagues in these areas, and most of my life has been spent with them. we were sharing the sorrow and joy of each other and during the duty, I have tried cases of these people, Therefore, I am very aware of their customs and traditions. Laghman is a province in eastern Afghanistan, the majority of its population speaks Pashto. Laghman is divided into six districts: Dawlat Shah, Qarghi, Alishang, Alingar, Mehtarlam, and Badbash. The capital calls Mehtarlam. The climate of Laghman province is relatively hot and the majority of its residents are busy with agriculture and livestock in all seasons of the year.

7.  The Afghanistan legal and court system is centralized. The courts are governed by the Supreme Court of Afghanistan. The courts divide into primary courts (at the district and provincial level), appellate courts (at the provincial level), and the supreme court and its divisions (national level). Each court operates based on subject matter jurisdiction and territorial jurisdiction. All courts are obliged to apply the same codified laws equally all over the country and follow the general tradition and the specific tradition of the people when dealing with cases. During 45 years of war, Afghanistan's political system has been changed almost ten times. As a consequence of political instability, all sectors including

rule of law were negatively affected and the legal system has either been damaged or destroyed completely. During this period, the police and law enforcement agencies were often involved in the war rather than their actual duties of law enforcement. Nothing significantly was done to grow their professional knowledge; they rather received short-term military training and were sent to war. The majority of Afghan police are illiterate, they could not read and write, and rarely know their duties and responsibilities or the rights of the people.

8. Moreover, the majority of the Afghan population is ignorant of the law and the individual's rights. Generally, they rarely know about their rights, particularly about their rights upon questioning by police, while the law has given them these rights, as stated in Article 31 of the Afghan Constitution [1]: "*Every individual can appoint a defense attorney, upon arrest, or to prove his right. Immediately upon arrest, the accused shall have the right to be informed of the nature of the accusation, and appear before the court within the time limit specified by law. In criminal cases, the state shall appoint a defense attorney for the indigent.*" It is clear from the content of this article that the arresting authority is obliged to inform the suspect that he has the right to hire a lawyer to defend himself and to inform him about the nature of the accusation. In practice, the government is not only unable to apply this law all over the country, but it also fails to provide legal awareness to the people about these rights. In addition, people have more access to laws and courts in the central provinces and relatively less in the districts and rural areas, and this is due to 45 years of war, lack of security.

9. As stated above, the ordinary Laghman residents especially those in rural areas are most likely unaware of the duty and responsibility of the police, prosecutor, and judges, as well as their rights in case of questioning or investigation by police. As legal awareness and access to information, are much lower, rule of law is weaker, insufficiency, and severe shortage of qualified legal experts, including judges, prosecutors, defense attorneys, and law enforcement cadres. Even in the area where government assigns judges, defense

---

[1] The current Afghan constitution was approved by the consensus in January 2004 after the 2003 loya jirga. This law is the supreme law of the state of Afghanistan, which serves as the legal framework between the Afghan government and Afghan citizens. (https://moj.gov.af/en/enforced-constitution-afghanistan)

attorneys, or prosecutors, it is less likely one will actually be available due to war, and insecurity. Thus, war, migration, displacement, and distance from school and education are other factors that prevent people like Mr. Noori to become aware of their rights. That is, even those who have been to school unless they are going to be trained as a lawyer, do not know their rights under the law.

10. The people of the villages and districts of Laghman province are all engaged in agriculture and livestock, men and women, and all members of the family are engaged in it. They prefer to resolve their disputes and conflict (civil and criminal) through the uncodified None-State Justice System [2] which govern their society, such as local councils "Jirgas and Shura" which is outside of the Formal State Justice System, outside of the state's direct control-though not necessarily beyond its influence in a manner perceived as legitimate by local communities. In this system the village elders, mullahs of mosques, local commanders, and prominent elders are disputer resolver and punishment is largely based on the concept of retribution, and the type of punishment can differ significantly, but typically it is decided in a manner that is equal to how the perpetrator injured the victim.

11. Mr. Noori grew up in a relatively rural area and an agricultural community in Laghman. As explained above, people in such rural areas infrequently have interaction with police in their communities. They have a misconception about police roles in their community, they see them as fighters, not law enforcement agencies. Mr. Noori, like other members of his community members, adheres to the traditional way of his community. They settle their disputes with an apology, compensation, or compensation in exchange for livestock. That is why Mr. Noori reiterated to the investigator during the investigation that he would apologize for whatever happens.

12. Another point is that people in such communities are less interested in knowing how the police treat a person after they get arrested, because this is a professional matter for lawyers and police and not part of the popular culture. In order to understand these rights, someone needs to be professional police or to get arrested by professional police so that he could

---

[2] https://harvardhrj.com/2014/11/the-merits-of-non-state-justice-an-effective-mechanism-for-a-stable-afghanistan/

learn what rights a defendant has after his arrest. Mr. Noori is not a professional person in legal matters, nor has he been arrested or questioned by the police before, so he had no knowledge about his rights to keep silents, to refuse to answer questions or to hire a defense attorney.

13. In Afghanistan, it is very unlikely that suspects and defendants will be able to access free or personal defense counsel during trials, especially in districts, villages, and rural areas, because the Department of Legal Aid, which operates under the Ministry of Justice, has the very little capacity and human resources to actually implement the provisions of Article 31 of Afghanistan Constitution equally throughout the country. In districts and villages where Mr. Noori lived, it's unpracticable for the Ministry of Justice to provide legal aid attorneys for indigent people. Another factor that prevents this was war, and insecurity. In some instances, the insecurity led the private defense attorneys to move to rural and unsafe areas, in exchange for a fee. I remember when I was a judge in one of the districts, I was escorted by the police to the court, while the defense lawyers did not have these facilities and would feel threatened by the populace.

14. Justice requires that the interrogation of the suspect or accused must be conducted in an environment away from any feeling of fear and pressure. Their fundamental rights should be explained to them in the best possible way, and they must be given enough time and tools to exercise those rights. Upon watching the video of Mr. Noori's interrogation, he looks scared and under extreme pressure. He had been in a cold cell for 40 hours, between arrest and interrogation, without anyone talking to him or explaining anything. When he was interviewed, no one had spoken with him or answered any of his questions about why he was there. In his town there are no jails and the whole experience of being in jail and being interrogated would be unfamiliar to him.

15. Mr. Noori spent his entire life in insecurity and a war-turn country, suddenly left his country, family, friends, and relatives in an extremely bad situation, and finally made it to the United States with beautiful dreams in his mind. Unexpectedly, he found himself in a situation that he had never experienced in his life and being charged and interrogated for an act of crime that he was not aware of. He looks under extreme stress during the

interview. He was scared and didn't understand his right to remain silent and not to answer questions. He didn't know his right to have an attorney. That is why when he asked whether he knows any lawyer? He assumed that the reason for the investigation was about his asylum case, then he started talking about his journey to coming to the United States. He seems to not know that the interrogation was about the charges against him.

16. Every human being seeks refuge in God in times of trouble and seeks help from him in times of trouble. Muslims normally pray five times a day and, like the followers of other religions, turn to God in times of trouble and recite the prayer and the Qur'an, and this is the only way to help them get rid of stress and better manage their problems. ..Fortunately, we now live in a country where freedom of religion is a constitutional right, and followers of all religions can practice their religion freely. When the law gives these rights to individuals, the police who enforce the law must abide by the law and provide the necessary facilities, and allows detainees to perform their religious rites on time. Upon reviewing the discovery, I notice that during the 40 hours that Mr. Noori was detained prior to his interview, he was not given a watch, so he could know when to pray. He was not given a prayer rug or a Quran. And to a faithful Muslim these deprivations cause extreme personal anguish and anxiety.

17. In the United States, there are numerous resettlement and reintegration programs for immigrants and newcomers at the national and state levels. Through such programs, the relevant agencies provide various orientations and training that cover all aspects of immigrant lives in America. They provide training about American culture, society, history, and laws, living in America, school enrollment, and even shopping in the stores, using public transportation…etc. Without the above training, it would be unlikely for newcomers to easily adjust to the new society. Unfortunately, Mr. Noori did not receive any of the above-mentioned training and cultural orientation during his stay on the military base. Mr. Noori did not have prior knowledge about American laws and culture.

By considering the above facts and upon reviewing the discovery and the interrogations, I believe that Mr. Noori was not fully aware of his rights during interrogation. He grew up and lived in the rural area of Laghman province of Afghanistan. It's unlikely that he had ever interacted with any professional police or formal court system in his community.

This opinion is limited to matters of the Afghanistan laws and culture stated herein and may not be read as extending by implication to any matters not specifically referred to. Unless otherwise stated, I make this affidavit from my own knowledge. Except to the extent otherwise stated, my opinions set out in this affidavit are wholly or substantially based on my specialized knowledge and experience gained from the training, study and experience set out below and in my curriculum vitae a copy of which is annexed to this report and marked as ***Exhibit A.***

I have made all the inquiries that I believe are desirable and appropriate and no matters of significance that I regard as relevant have, to my knowledge, been withheld from the Court.

I hereby opine and advise.

Respectfully submitted,
Afghan American Legal Advisor

By:_____
EHSANULLAH SAFI (Former Afghan Judge)
KHALID. F HAMIDI (VA Bar No. 94447)
Afghan American Legal Advisors
11632 Nellings PL
Woodbridge, VA 22192
602-491-5295 (Direct)
703-388-8594 (Office)
Ehsansafi78@gmail.com
khalid.hamidi@afghanlegalus.com

# Exhibit A

Ehsanullah Safi

Address: 4701 Kenmore Ave, Alexandria, VA, 22304, #209

Ehasansafi78@gmail.com

001 602 491 5295

KEY QUALIFICATIONS

Ehsanullah Safi is an Afghan judge with extensive experience in the judicial and criminal justice sector of Afghanistan. His background as a judge in the Afghanistan's judiciary and working in several judicial and criminal reform project has effectively improved justice in courts and communities where he served as a judge. His judicial and criminal justice background, coupled with ten years of working with courts and public effectively developed his communication skills. He has deep knowledge of criminal justice and legal system of Afghanistan. Through his work he has established relationships with high- level of Afghan government officials. His native fluency of Dari and Pashto give him an intimate knowledge of the complex social and religious fabric of Afghan culture and traditions.

EDUCATION

1998 -2001: Bachelor of Law, Kabul Sharia law, Kabul, Afghanistan

2002 -2003: Professional Judicial Education Training

EXPERIENCE

June 2003 - June 2004: Criminal and Court judge, District 9, Kabul provincial Appeals court, Afghanistan

June 2004 – May 2005: Civil and Criminal Court Judge, Distract 5, Kabul provincial Appeals court, Afghanistan

May 2005- February 2006: Civil and Criminal court Judge, Deh-Sabz Distract, Kabul provincial Appeals court, Afghanistan

- Adjudicated criminal cases in the primary stage.
- Manage a caseload of several hundred cases from filing out disposition
- Set hearings and trials to overcome extreme backlog in the system
- Conduct legal research and investigations in order to resolve cases
- Draft legal documents, letters, and memoranda to parties

September 2006 – February 2008 Judge, Legal Deeds and document registration court, 1st Distract, Kabul Provincial Appeals Court, Afghanistan.

- Over sighting processing legal deeds and documents and finalizing with judicial confirmation.
- conduct legal research and investigation in order to resolve cases
- Draft legal documents, letters, and memoranda to parties
- Working in working group to reform legal deeds registration system.

March 2008 – January: 2010 Civil and Criminal Court Chief Judge, Tagab Distract, Kapisa Provincial Appeals court, Afghanistan

- Adjudicated criminal cases in the primary stage.
- Manage a caseload of several hundred cases from filing out disposition
- Set hearings and trials to overcome extreme backlog in the system
- Conduct legal research and investigations in order to resolve cases
- Draft legal documents, letters, and memoranda to parties
- Leading initiatives to make justices access to more people in community.

November 2010 – August 2011: Criminal Court Chief Judge, Balk Urban Primary, Balk Provincial Appeals Court, Afghanistan (this court was special tribunal for Anti-corruption.)

- Adjudicated criminal cases in the primary stage, for criminals who committed corruption crimes.

October 2011 – January 2013: Civil and Criminal Court Chief Judge, Hesa-Doo District, Kapisa Provincial Appeals Court, Afghanistan

- Adjudicated criminal cases in the primary stage.
- Manage a caseload of several hundred cases from filing out disposition
- Set hearings and trials to overcome extreme backlog in the system
- Conduct legal research and investigations in order to resolve cases
- Draft legal documents, letters, and memoranda to parties
- Leading initiatives to make justices access to more people in community.

March 2013 – January 2017: Criminal Court Chief Judge, Bagram District, Parwan Provincial Appeals Court, Afghanistan (this court was special tribunal for terrorist cases, which they were held in Bagram Detention Center.)

- Adjudicated criminal cases in the primary stage, for criminals who committed crime against internal and external security

# PROFESSIONAL CERTIFICATES & CONFERENCES

- Approval of the Supreme Court High Council for judicial appointment
- Approval of President of Islamic Republic of Afghanistan for judicial appointment
- Civil and Criminal Law, Fair Trial, and Court Deeds processing training certificate
- Attended Criminal Justice Training in Roma Italy 2014

# LANGUAGES

- Fluent in English, Dari, Pashtu.

# PUBLICATIONS

- Several Articles has been published in Mezan Magazine of Judiciary

# REFERENCES

Ahmad Shakir Murid

Department of Health and Human Services

Community Services Agency

Stanislaus County, CA, USA

Former Judge of Kabul Appeal Court

Cell: 209 596 3197

Email: shmorid@gmail.com