UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

UNITED STATES OF AMERICA,

       Plaintiff,

-vs-                   Case No. 21-CR-92

BAHRULLAH NOORI,        Madison, Wisconsin
                        October 24, 2022
       Defendant.      9:06 a.m.

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF EVIDENTIARY HEARING
HELD BEFORE THE HONORABLE STEPHEN L. CROCKER
**(TRANSCRIPT OF DIGITAL RECORDING)**

APPEARANCES:

For the Plaintiff:
          Office of the United States Attorney
          BY:  TAYLOR KRAUS
          Assistant United States Attorney
          222 West Washington Avenue, Ste. 700
          Madison, Wisconsin  53703

Also appearing:  Mark Meyers, Special Agent

For the Defendant:
          Federal Defender of Wisconsin, Inc.
          BY:  JOSEPH BUGNI
             ELIZABETH BLAIR
          22 East Mifflin Street, Ste. 1000
          Madison, Wisconsin  53703

Also appearing:  Bahrullah Noori, defendant
                Ron Cagel - paralegal
                Interpreter Samadey
                Interpreter Saidi

Lynette Swenson   RMR, CRR, CRC
Court Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin  53703

1    **I-N-D-E-X**

2    GOVERNMENT'S WITNESSES          EXAMINATION          PAGES

3    ANDREW SCHWARTZ          Direct by Ms. Kraus     13-34
                              Cross by Ms. Blair      34-49
4                             Redirect by Ms. Kraus   49-52
                              Recross by Ms. Blair    52-53
5    EDGAR BOLIVAR            Direct by Ms. Kraus     54-63
                              Cross by Ms. Blair      63-70
6                             Redirect by Ms. Kraus   70-71
     CHRISTOPHER HENKE        Direct by Ms. Kraus     73-93
7                             Cross by Ms. Blair      94-96
     MATTHEW O'NEIL-LEVINE    Direct by Ms. Kraus     100-117
8                             Cross by Ms. Blair      117-120
     MARK MEYERS              Direct by Ms. Kraus     120-142
9                             Cross by Ms. Blair      142-149

10

11   **E-X-H-I-B-I-T-S**

12   GOVERNMENT'S EXHIBITS                    IDENTIFIED/RECEIVED

13   Ex. 1    CAD call log                  76          ---
14       2    Photo - D cellblock           32          ---
         3    Photo - cellblock             58          ---
14       4    Photo - cellblock             58          ---
15       5    Photo - blanket               82          ---
         5A   Blanket                       85          85
16       6    Photo - blanket               83          ---
         6A   Blanket                       85          85
17       7    Photo - cell widow            91          ---
         8    Photo - interior cell         91          ---
18       13   Complaint                     141         ---

19   DEFENDANT'S EXHIBITS

20   Ex. 131  Log page  (admitted by Govt.)  50         51

21   Docket 56 exhibits                       9          9

22

23

24

25

(Proceedings called to order.)

THE CLERK:  Case No. 21-CR-92.  *The United States of America v. Bahrullah Noori* is called for an evidentiary hearing.  May we have the appearances, please.

MS. KRAUS:  Good morning, Your Honor.  Taylor Kraus for the United States.  With me at counsel table is Special Agent Mark Meyers with the FBI.

THE COURT:  Good morning to both of you.

MR. BUGNI:  Good morning, Your Honor.  Joe Bugni and Beth Blair from our office, as well as Ron Cagel, our paralegal, and Bahrullah Noori, who is present here with an interpreter.

THE COURT:  All right.  Good morning to all of you as well.  Please be seated.  Mr. Noori, good morning.

All right.  Let's begin by swearing our current interpreter.  Let's do both, both interpreters, please. Please raise your right hands.

(Interpreters sworn.)

THE COURT:  All right.  Thank you.  Please be seated.  Gentlemen, thank you for assisting today.  I understand that you will be switching out on a regular basis.  We will accommodate you however you need to be accommodated, so either give me a signal or do what you need to do and we will oblige what needs to happen.  Any

questions right now?

THE INTERPRETER:  Your Honor, every half hour if we can take turn.

THE COURT:  Okay.  And if I forget, I'm sure the attorneys will give me the hi sign.  But about every half hour.

THE INTERPRETER:  (Unintelligible), please.

THE COURT:  We can do that.  Okay.

Next, for the benefit of counsel and the witnesses, we are recording this electronically.  We do not have a court reporter.  So it is important that when you're speaking, you're near a microphone.

Also with regard to COVID protocols, you may wear your masks if you choose to.  When you're sitting at your own table, you do not have to.  But when you are actually speaking, we do need you at least to drop your mask if you choose to wear it so that the microphone accurately can pick up what you're saying, okay?

In terms of other housekeeping matters, we will switch every half hour for the benefit of the interpreters.  We will take a morning break for everybody at some convenient and logical point.  I'll let the attorneys perhaps suggest when that ought to be.  When it comes time for a lunch break, we will talk about how long and so forth.  But I want to make this work for all of

you.  The point today and tomorrow is to make as complete
and accurate an evidentiary record for both sides as we
can so that everybody has the information in the record,
the evidence in the record that you want the Court to
consider when it reviews your legal arguments on the
motions.  So do not be shy about asking the Court to
accommodate you in some fashion.

There's no jury here.  We can add much more to the
record than might be the case in front of a jury because
we can always sort that out later.  I would rather be
overly complete than to miss something.  Okay?

With that then, I'll also note something that may be
the subject of a motion.  Under Federal Rule of Evidence
615, I will sequester witnesses.  So, of course, the case
agent gets to stay throughout the case.  Government
witnesses would then have to appear one at a time and
otherwise stay out in the hallway or elsewhere.  I know
the defense is planning on calling witnesses tomorrow.
The same Rule 615 ruling would apply to defense witnesses
tomorrow.

That said, let's see if -- oh, one more part before
I check in.  I have received and read the joint factual
stipulation of the parties.  That's Docket 61.  So those
facts are of record.  Nobody has to refer to those.  I
have accepted those.

I'm going to check in with each side, and as part of that, I'd like each side to let me know is there any objection to your opponent's evidentiary submissions or exhibits?  If everybody is willing to let all of the exhibits in, then I will just grant those motions at the outset so nobody has to worry during witness testimony about laying a foundation or authenticating exhibits and then putting them into the record.

With that, Ms. Kraus, the floor is yours.

MS. KRAUS:  Thank you, Your Honor.  I wanted to first note that the government's first witness, Sergeant Andrew Schwartz, is in the courtroom right now.  He can step out in the hallway if you'd like, but because we're not taking testimony, he is in here, just so everybody --

THE COURT:  That's fine, because the rule is not aimed at that.

MS. KRAUS:  So with respect to the exhibits, I do not have an objection to the admittance of the exhibits attached to the original motion to suppress.  I believe those were lettered exhibits.  No objection there.

Attorney Bugni and -- as well as Attorney Blair and I agreed that the government's exhibits that are listed, I believe in Docket 59 -- excuse me, 56, can be admitted. I would just note that Exhibits 5A and 6A I intend to use

for demonstrative purposes rather than physically enter those into the evidence because they are physical items. Exhibit 5 and 6 are photographs of the same objects, so there will be photographic evidence in the record as well pertaining to those.

Other than that, I don't have any other matters to address.

THE COURT: Understood. So I want to make sure I'm tracking, Ms. Kraus. On October 21, which would have been Friday -- I'm sorry, October 20, Thursday, the Court received as Docket 59 the defense exhibit list.

MS. KRAUS: I do object to the admittance of those exhibits; however, it's my understanding that defense prepared those for impeachment purposes and may not be actually admitting them at the hearing. But I would admit or would object to admitting those exhibits en masse.

THE COURT: Okay. I'm not going to look for trouble at this point so I'm not going to quiz you down as to which ones or why. Mr. Bugni, that segues rather naturally to you. You have an open mic as well.

MR. BUGNI: Thank you, Your Honor. We have no problem with the government's going en masse as a correct agreement. And I believe the agreement is that the ones we attached in July to our motion, those all come in.

What we have -- we didn't know all the government's

witnesses, so we prepared as if we had everybody that

could possibly be called. We'll lay the foundation and

bring those in that we need to throughout the trial or

throughout the hearing. Sorry. So we have no problem

going old school when it comes to that.

THE COURT: Okay.

MR. BUGNI: If I may, I've been sick for, like,

the last four days, so Ms. Blair is going to be doing

actually most of the hearing. Five COVID tests;

negative. But so the only thing that I had, Your Honor,

was it would be helpful for the defense, especially in

how much we cross, to know what the government's legal

theory is as to why -- you know, to support this, given

the fact that we're all agreeing that Mr. Noori is in

federal custody pretty early on, whether it's within 30

minutes or two hours, I believe that could be the

difference of it. And we want to cut down our

cross-examinations as well. To the extent that things

aren't really going to be disputed, then we're not going

to ask questions about it. But to the extent we have to

make all the possible factual arguments that we could

for -- to rebut legal arguments, so if we could have a

short proffer from the government just to know what is

really in dispute here, that would be helpful.

1          THE COURT:  Did you front this request with

2    Ms. Kraus before the hearing?

3          MR. BUGNI:  Yes, Your Honor.

4          THE COURT:  Okay.  Well, we'll get there

5    momentarily.  So the record is clear, I am admitting all

6    of the government's exhibits as listed in Docket 56, and

7    I am admitting into evidence all of the exhibits that

8    were attached to the original motion to suppress.  I

9    don't have that docket number in front of me, but I think

10   it's clear from the record what those are.  And as

11   Mr. Bugni put it, we'll go old school with the rest of

12   them.

13         MS. BLAIR:  Your Honor, I apologize for

14   interrupting.  We have a small update to our exhibit

15   list, just including two additional exhibits that were

16   attached to the motion to suppress.  If I may pass this

17   up?

18         THE COURT:  If you wish, yeah.  Has Ms. Kraus

19   seen those as well?

20         MS. BLAIR:  I provided her a copy as well.

21         MS. KRAUS:  Yes, Your Honor.

22         THE COURT:  Received.  Thank you.  Ms. Kraus,

23   back to you then.  A, do you object to providing a legal

24   proffer?  B, if not, what is it?

25         MS. KRAUS:  I'd like to start with the fact that

Attorney Bugni called me at 8:15 to discuss whether I'd provide a legal proffer this morning with respect to my argument.  So approximately one hour ago is when he fronted this issue.  Although he filed this motion in July and we were set for a hearing in August, at that point he didn't ask me for a legal proffer either.  So, Your Honor, frankly I think I'm unprepared to provide a legal offer that I'm going to be bound to in subsequent briefing.

But I will note I don't dispute that Mr. Noori was in federal custody soon after his arrest.  But I do dispute several of the other allegations that are contained in the motion.  And while I can appreciate that Mr. Bugni wants a proffer so that he can cut down on cross-examination, I don't feel comfortable making an exact legal argument without knowing how the facts are going to come in.

But I do dispute that, one, that any delay was unreasonable with respect to presentment.  I also dispute that 5A is the procedure under which this Court should analyze the facts in this case.  I think there's a different procedure we need to look at contained in 5B, which requires that upon a warrantless arrest, any criminal complaint be filed promptly.  So that's all I feel comfortable saying at this point.  I would have been

happy to have discussed this further with Attorney Bugni
and believe I made it clear I was available all weekend.
I spoke with Attorney Blair last week and I was not
contacted until 8:15 this morning.

THE COURT: Understood. As I made clear a
moment ago, I do not intend to exceed anybody's comfort
levels this morning, so I'm not going to require you to
say anything else at this point. But thank you for what
you've offered.

Ms. Blair, Mr. Bugni, does that help at all?

MR. BUGNI: Yeah.

THE COURT: Okay.

MR. BUGNI: I mean we're okay with either one.
We have, in fairness, been asking since July, but not
asking for a proffer. But, you know, we're okay to do it
whatever way you want, Your Honor. And, you know, we'll
try not to be exhaustive in the cross-examinations. If
it's really 5A or 5B, if it's, you know, unreasonable,
that's sort of where we thought it was headed. You know,
we'll be good to go.

THE COURT: Sure. And again, I wanted to get to
the witnesses as quickly as possible. But 5A is more
concrete, and either you've met the deadlines or you
haven't, and then the question is would there be some
exception. 5B is more ethereal, so I don't think it's a

1  surprise to anyone that that is the direction in which

2  the government intends to head.  But as I indicated to

3  Ms. Kraus, I'm not going to hold her to anything at this

4  point.  Let's make the evidentiary record.

5      I think we're ready to start.  Any other preliminary

6  matters from either side before the government calls its

7  first witness?

8          MR. BUGNI:  Not from the defense, Your Honor.

9          THE COURT:  Are we ready to go?

10         MS. KRAUS:  Yes, Your Honor.

11         THE COURT:  Please call your first witness.

12         MS. KRAUS:  The government calls Lieutenant

13 Andrew Schwartz -- excuse me, Sergeant Schwartz.

14         THE COURT:  A field promotion, I suppose.

15         THE WITNESS:  I'll take it, Your Honor.

16         THE COURT:  Up here.

17 **ANDREW SCHWARTZ, GOVERNMENT'S WITNESS, SWORN,**

18         THE COURT:  Please be seated, Sergeant.  There's

19 water to your left, if you'd like it.  And if you're

20 comfortable, please take your mask off.  Thank you.

21         THE WITNESS:  Thank you, Your Honor.

22         MS. KRAUS:  Is the witness sworn, Your Honor?

23         THE COURT:  I'm sorry?

24         MS. KRAUS:  Was the witness sworn?

25         THE COURT:  He was.

ANDREW SCHWARTZ - DIRECT

MS. KRAUS:  Okay.  Thank you.

**DIRECT EXAMINATION**

BY MS. KRAUS:

Q    Can you please state your name for the record, please.

A    Andrew Richard Schwartz.

Q    And Mr. Schwartz, what do you do for a living?

A    I'm a police officer currently at Fort McCoy.

Q    What title do you hold?

A    Patrol sergeant.

Q    How long have you worked for the Fort McCoy Police Department?

A    Since 2017.

Q    Prior to that were you employed as a law enforcement officer?

A    I was a police officer in Alaska.

Q    How long in total would you say that you've been a law enforcement officer?

A    Since January of 2011.

Q    Within that time, have you received any specialized training or been responsible for specialized investigations?

A    Yes.  I specialize in child forensic interviews.  I was the child forensic interviewer for my agency in Alaska.  The basic course that I went to was CornerHouse

ANDREW SCHWARTZ – DIRECT

in Minnesota, and then I've had some advanced child
forensic interviewing since then.

As far as other advanced stuff for investigations,
that's it in relation to the child forensic portion of
it. There's other things in different criterias for
interviewing techniques and armor schools and firearms
training, that type of stuff.

Q    Now, going to your role as patrol sergeant at Fort
McCoy, generally can you describe what you do on a
day-to-day basis?

A    The bread and butter at Fort McCoy is traffic stops,
as some people are aware in this room. So the majority
of things that we deal with are going to be the traffic
infractions, you know, OWIs, things of that nature,
speeding violations. When the units are there, training.
We get a lot of 911 calls, ambulatory calls, traffic
accidents, and, you know, suicidal ideation, that type of
thing. Every once in awhile there might be some assaults
or some domestic violence crimes that come about.

Q    Under normal operations at Fort McCoy, what kind of
hours do you work?

A    So I work 12 hours normal shift, and then a half
hour overtime before that 12 hours and half hour after.

Q    Under normal operations, what kind of call volume
would you respond to or would the Fort McCoy Police

Department respond to?

A    It depends on what time of the year.  Usually
it's -- like, for instance, this time of year it would be
pretty slow; not a lot of call volume with the exception
of maybe some car/deer accidents or vehicle versus
vehicle, some 911 calls for, you know, some ambulatory
patients, fire department calls, and every once in awhile
some larceny or an assault or something like that.  But a
very -- a very low vol column -- call volume at this time
of year historically since I've been there.

Q    Generally is this a relatively quiet police
department?

A    Yes.  Actually I've -- in comparison to the Alaska
police department, I consider this a retirement job.  So,
yes, I would say that this is a very calm police
department.

Q    I want to turn your attention to September of 2021.
Was there anything that happened at Fort McCoy that
changed essentially how Fort McCoy Police Department
operated?

A    The Operation Allies Welcome, with them coming to
Fort McCoy, there was a significant amount of individuals
that had come that we weren't necessarily prepared for,
and it was a huge influx in call volume, both for -- you
know, for a variety of reasons.  And it was a significant

1  amount of -- I mean a lot of the officers that, you know,

2  wouldn't normally have experience are getting experience

3  during their tenure there; got a lot of good experience

4  in regards to, you know, different things that would have

5  happened.

6  Q    Sergeant Schwartz, you referenced "them coming to

7  Fort McCoy."  Can you please clarify or explain what you

8  mean.

9  A    So Operation Allies Welcome, the Afghan mission

10 overseas ended and so we received -- I want to say Fort

11 McCoy received around 13,000 or more at a time that were

12 stationed there at Fort McCoy living in the barracks in

13 varying blocks and they had different D cell -- not D

14 cells, excuse me, barracks rooms and then mayor cells and

15 chow halls and then interpreter stations, things of that

16 nature that were set up around the post.

17 Q    When you refer to 13,000 people, are you referring

18 to Afghan civilians?

19 A    Yes.

20 Q    And does Fort McCoy typically house 13,000 foreign

21 nationals at the barracks?

22 A    Foreign nationals, no.  But there is the ability to

23 house more than that in troop capacity.

24 Q    In your experience on Fort McCoy, has there been a

25 time where 13,000 people were living on base?

ANDREW SCHWARTZ - DIRECT

A    During the summertime there is usually, depending on
the missions for that year, there's usually a significant
amount of soldiers that come there to train.  And so they
will fill up the barracks on post and then they will
oftentimes fill up the different FOB locations throughout
Fort McCoy as well.

Q    Now, with respect to Operation Allies Welcome and
the Afghani civilians that were at Fort McCoy, did this
change how Fort McCoy Police Department was able to
handle call volume?

A    It was significantly different and challenging, not
just because of the call volumes that were coming in, but
also because of the language barrier and different social
dynamics that we weren't prepared for.

Q    Did you end up working more or less time than your
usual shift during this period?

A    There was a lot of times where there was mandated
overtime and overtime that was, you know, given out with
basically whoever wanted it.  We were short staffed
anyways and so to have this influx of people with a short
staff anyways created -- I mean it was call to call to
call and, you know, you'd have ten calls holding after
you cleared that first one, which is not normal for Fort
McCoy operations.

Q    I want to turn to a specific call you might have

ANDREW SCHWARTZ - DIRECT

responded to on September 11 of 2021. Did you respond to
a allegation of a sexual assault?

A    I did, yes.

Q    And how were you alerted to this?

A    Via radio.

Q    And at the time you were made aware of this
allegation, what did you know?

A    There wasn an allegation of a possible child abuse
at -- I don't remember the building number at the
location. Officer Herzog was going to respond. Due to
my background, I responded as well to give him some
assistance.

Q    And at this time, were you under the impression this
involved some of the Afghan civilians that were housed at
Fort McCoy?

A    Yes.

Q    Now, you said you responded to the barracks?

A    It was like a mayor cell location. So each block
had, like -- there was one mayor cell. And the main
mayor cell had, like, you know, all the higher ups and
everything else, and they kind of coordinated with all
the smaller individual mayor cells around the post. And
those smaller individual mayor cells were broken down
into where they kind of took control over blocks, as we
called them. And so the building number -- again, I

ANDREW SCHWARTZ - DIRECT

1 don't remember it off the top of my head, but that mayor

2 cell for that block is where we responded to.

3 Q    Now, I'm listening to your description of a mayor

4 cell.  Is it fair to say this is some sort of

5 administrative headquarters for each block of barracks?

6 A    Yes, ma'am.  That's where the interpreters would be,

7 that's where the people for the -- those who are living

8 in the barracks in those blocks would come to for

9 assistance or if they had a problem or if they needed

10 meal cards or, you know, things of that nature, for the

11 administrative purposes, yes.

12 Q    So you arrived to a mayor cell corresponding to a

13 specific barracks.  And what did you do?

14 A    We made contact with a father, two children, and two

15 interpreters and, you know, he gave us a breakdown of

16 what was going on as far as the allegations.  And we were

17 -- he didn't speak very good English and so we were using

18 the interpreters to converse with him to see what had

19 happened.  And then they came out with the allegations

20 of, you know, his nephew and his son had been sexually

21 assaulted and/or molested by an individual.

22 Q    You've referenced two interpreters were there.  Did

23 you arrange for these interpreters?

24 A    No.  So one of them was already on scene, and we had

25 called for an interpreter to meet us there because at

ANDREW SCHWARTZ - DIRECT

1   this point in the mission, it was fairly new and there

2   wasn't a lot of interpreters to go around, and so calling

3   ahead of time was key because they usually came from

4   different portions of the base because not every block

5   had an interpreter.  And so one of them specifically was

6   an interpreter that we had called for and the big mayor

7   cell sent them down.  One of the people that was there

8   was somebody who the mayor cell was using as an

9   interpreter and he was actually one of the guests as

10  well, but he had, like, a vest on that they were using

11  for him and he was helping them for the block operations.

12  Q    So just to clarify, one of these interpreters was

13  more of an official interpreter and one sounds like it

14  may have been a volunteer that was being utilized within

15  the block for ease of convenience.

16  A    Hundred percent, yes, ma'am.

17  Q    Okay.  Now, you referenced that you spoke via

18  interpreter with the complaining witness.  Did he provide

19  any details about who had allegedly committed these

20  assaults?

21  A    They had said that Mr. Noori was in the building

22  that they resided in.  And in the second floor, I can't

23  remember -- I can't remember if it was the day before or

24  that day, there was -- he had gone into the restroom and

25  had observed him taking off his nephew's clothes.  And he

ANDREW SCHWARTZ - DIRECT

1   had gotten very upset and started yelling and got really

2   mad at his nephew for letting Mr. Noori take his clothes

3   off.  And I don't remember the father -- the father made

4   mention that he was taking his clothes off to have sex

5   with him.  Whether that was his actual interpretation or

6   what, I don't know.  That's what he said.  And then he

7   said that he --

8   Q    I want to stop you there.

9   A    Yes, ma'am.

10  Q    I don't want to go into the details of what was

11  said.

12  A    Oh.

13  Q    I'd like to track back to whether or not the father

14  identified who had committed the alleged assaults.

15  A    Yes.

16  Q    And he did that on scene at the barracks?

17  A    Yes, ma'am.  And then we confirmed as we brought

18  Mr. Noori to the patrol car and had him visually identify

19  him as well.

20  Q    Okay.  At this point when you are speaking with the

21  father, could you describe his demeanor or his behavior?

22  A    He was very upset, emotional, and very angry,

23  making words that, you know, if we weren't going to do

24  anything about it, then he would; that he was going to,

25  you know, go find him and take matters into his own

ANDREW SCHWARTZ - DIRECT

1    hands.

2    Q    Did you take that to mean the father was expressing

3    a desire to physically confront the alleged assaulter?

4    A    The father had made words that if we didn't do

5    something about the allegations, that he was going to

6    find Mr. Noori and beat him up.

7    Q    Okay.

8    A    So...

9    Q    At any point while you were speaking with the

10   complaining witness, were any other witnesses or nonlaw

11   enforcement officers present?

12   A    At the time that we originally started talking to

13   him and made contact, it was just us us in a small group.

14   But then as the call volume went on, there was a larger

15   group that started to gather, both around the mayor cell

16   area and then later around the barracks where we had gone

17   to find Mr. Noori.

18   Q    So just so I'm understanding your answer, a crowd

19   started to form as you were speaking with the witness on

20   scene.

21   A    Yes.

22   Q    Okay.  And did that give you any concern?

23   A    It did.  At the time, there was a group of

24   military-aged males that were walking around and they

25   would -- it was found out later they would kind of act as

ANDREW SCHWARTZ - DIRECT

like a vigilante-type group, so they would kind of be
like the different blocks' enforcement, so to speak.  A
lot of guests would give them money and then they would
do favors and stuff for them.  These people had also, you
know, caused some fights and everything else.  Basically
we were concerned about the crowd gathering and there
being concern for his safety at that location, so we were
trying to get everybody -- you know, control the crowd
and then get everybody -- get all the information we
could and then take care of it.

Q    I want to clarify your answer about concerns with
the crowds.  You referenced guests.  Could you tell me
who you're referring to when you use the phrase or the
word "guests."

A    So the Afghanistans that came to Fort McCoy, we
referred to them as guests.

Q    Okay.  And you also referenced a group of
military-aged males that you were concerned about from
other experiences.  Are you referring to other guests or
military members?

A    Other guests.

Q    Okay.  Now going back to your interview on scene
outside the barracks, at any point did you make a
decision to locate Mr. Noori?  And I'm going to pause
here.

ANDREW SCHWARTZ - DIRECT

1          THE COURT:  Right.  We're switching

2    interpreters.  (Pause at 9:35 a.m.)

3          Let's continue.

4    Q    Okay.  I'll repeat the question for the interpreter.

5    At any point, did you make the decision to locate and

6    speak with Noori, who'd been identified by the father?

7    A    Yes.

8    Q    Okay.  And where did you find him?

9    A    Mr. Noori was located in the barracks building that

10   the father and his nephew and son resided at, on the

11   second floor.

12   Q    And did you go into the barracks itself to find him?

13   A    We did not originally.  We had soldiers that worked

14   the block and the soldier -- one of the soldiers for that

15   area had located him for us, and we asked him to bring

16   him down to the front entrance of the building.  But I

17   didn't want to keep him around there because there was a

18   massive crowd that was gathering around that front

19   barracks area right there, so I was trying to get him

20   away from that.

21   Q    Did you speak with him outside when he was brought

22   down by those soldiers?

23   A    Yes.

24   Q    What, if anything, did you tell him?

25   A    I told him that he needed to come with us to answer

ANDREW SCHWARTZ - DIRECT

some questions about some allegations.  I didn't go into

details about it because there was a crowd there that

hardly spoke English.  I didn't feel like it was their

business knowing his business.  I asked him to gather his

personal belongings, or anything that he didn't want left

in the barracks, with him.  I told him I didn't know how

long he'd be with us, and he asked to go back upstairs to

go gather his belongings.

Q    Did you let him go back upstairs?

A    Yes.  He went back up to the second floor, grabbed

his ID, some cash -- I don't remember all exactly that he

grabbed, but we captured it on a DA Form 4137, the items

that he had, and then I went upstairs with him while he

gathered them.

Q    So you were present with him when he collected his

belongings.

A    Yes.

Q    At any point during this interaction did you have

your gun drawn?

A    No.

Q    At any point during this interaction was he

handcuffed?

A    Not during the initial contact, no.

Q    And after he gathered his belongings, did you take

him anywhere else?

ANDREW SCHWARTZ - DIRECT

A     Yes.  I took him down to my patrol car and we took

him over to the patrol car by the mayor cell, and then I

handcuffed him before I put him in the back of my vehicle

per department policy.

Q     And at any point when you took him from the barracks

to your squad car, did you draw your gun?

A     No, I never drew my firearm.

Q     Okay.  And did you physically touch him at all while

he was being placed in the squad car?

A     I had physical control of him as I escorted him over

to my patrol car, yes.

Q     And did you, beyond escorting him to the squad car,

did you use any physical force against him?

A     No.

Q     While you -- what was your plan once you had him in

the squad car?

A     The plan was to take him back to the police

department and have the FBI continue an investigation

with him.

Q     Did -- I know you referenced another officer had

come out to respond with you.  Did that officer come with

you back to the police station?

A     So Officer Herzog had arrived on scene with me.  I

informed him to collect 850s, an investigative data

sheet, on the father, the nephew, and the son.  And then

the interpreters that were helping us, I told them -- and

I told him to gather information in the mayor cell

because, again, there was a large cell going on.  I

didn't want him to do it outside.  And I told him not to

ask so many questions or get any statements from them

unless it was something that the father initially wanted

to give a statement.  But I said to not get anything

other than the investigative or the information data

sheet and then meet me back at the police department.

Q    Once you are at the police station with -- first,

let me back up.  Did you positively identify this person

as Bahrullah Noori?

A    So after I had put Mr. Noori in my patrol car, I

walked over to the father and I asked if this was the man

who he was talking about and he said yes, that is the

person.

Q    Okay.  And at this point did you know his last name

or one of his names was Noori?

A    Yes.

Q    Okay.  So once you are at the police station with

Mr. Noori, what did you do?

A    I took Mr. Noori into one of the investigative rooms

that we have and I got a information data sheet on him,

an 850, which is an administrative form.  I told him the

purpose for being there, and we conversed a little bit.

ANDREW SCHWARTZ - DIRECT

And I told him that I wouldn't be interviewing him and
that the FBI would be talking to him and I wasn't going
to ask him any questions.

Q    At this point, were you using an interpreter to
speak with Mr. Noori?

A    At that immediate point, no, I don't believe so.
Mr. Noori spoke or speaks broken English and -- he had
made mention about being, like, an English speaker at one
of the locations in Afghanistan and so we were able to
converse just fine with each other.

Q    And you just testified that you essentially told him
why he was at the police station.  What exactly did you
tell him about that?

A    I told him that there were allegations about him,
you know, being sexual with some little boys and that
whether -- you know, that was not something that was
allowed here in America.  And he made mention that was
not illegal in, you know, Afghanistan.  And I said well,
you're not in Afghanistan.  You're in America.  And I
understand it may be okay over there, but in America,
it's not okay for that.  So, you know, that's why he's
there.  And then we -- he kept wanting to know
information about it, and I said, you know, sir, I don't
-- I can't talk to you about this.  An FBI agent is going
to come here and converse with you.

ANDREW SCHWARTZ - DIRECT

1  Q    Based on your conversation with him, did it appear

2  he understood what you were telling him with respect to

3  why he was there?

4  A    Yes, because he kept asking questions about it.  But

5  then after -- after some time would pass by, he would

6  reask the questions again and we would go through the

7  same process of explaining it to him.

8  Q    Now at this point while you're going through this

9  paperwork and answering some preliminary questions, was

10 he handcuffed?

11 A    No, I took the handcuffs off as soon as we got back

12 to the station.

13 Q    Okay.  And what kind of room did this interaction

14 occur in?

15 A    I'm not sure exactly about the size, but it's an

16 enclosed office space with a giant window that you could

17 see through one way.

18 Q    This was not a jail cell.

19 A    No, this was an interview room.  So there's a table,

20 some chairs, and then it does require a key access to get

21 out.

22 Q    About how long did you stay in this room with

23 Mr. Noori?

24 A    I don't know about the exact time.  Over a half

25 hour.

1  Q    And during this time, how did Mr. Noori appear to

2  you?

3  A    Nervous, which is understandable for somebody who's,

4  you know, in that position and at a police station being

5  questioned for something.  That's the only thing out of

6  the norm I would say that I observed.

7  Q    Was he crying?

8  A    He did get emotional a couple of times, yes.

9  Q    Would you say that he was emotional to the point of

10  hysteria?

11  A    No.

12  Q    Was he hyperventilating at all?

13  A    No.

14  Q    Did he appear to you extremely confused and

15  completely unaware of what was going on?

16  A    No.  But like I did say, he did keep repeating the

17  same questions and then they would get answered and then

18  he would wait some time and ask them again.

19  Q    While you were speaking with him in this room, did

20  he ask you for any creature comforts?

21  A    I think he asked to use the restroom.

22  Q    Did you let him?

23  A    Yes.

24  Q    Did you provide him with any food or water?

25  A    I think somebody had brought him a bag of chips or

1   something.

2   Q    And did he appear --

3   A    But he didn't ask for it, we just brought it to him.

4   Q    Did he -- did he eat it?

5   A    Yes.

6   Q    Do you know if he drank any water?

7   A    Not while I was there with him, but I believe that

8   he was -- either drank out of the water fountain when he

9   went to use the restroom and then later on he had been

10  brought some liquids, yes.

11  Q    At any point during this conversation with him in

12  this room did you draw your gun?

13  A    No, I never drew my firearm during the entire time I

14  was with Mr. Noori.

15  Q    At any point did you use any kind of physical force

16  on him during this conversation?

17  A    The only force I utilized was I had my hand on his

18  arm as I walked him to my patrol car when I first

19  encountered him.

20  Q    But with respect to your interaction with him at the

21  police station, did you use any physical force?

22  A    No.

23  Q    At any point did you threaten him?

24  A    No.

25  Q    At any point did you observe anyone use physical

1  force or threaten him?

2  A    No.

3  Q    Now, after you completed this paperwork with him,

4  what, if anything, was done?

5  A    We were trying to find out when an FBI agent would

6  be able to come and meet with him.  The agent had to

7  coordinate a forensic interview for the children and so

8  it was determined that he would be staying in one of the

9  D cells.  And I wasn't there during that portion of it --

10  I mean I was, but I didn't escort him to the D cell.  We

11  were trying to find somebody to watch him, like an MP or

12  somebody from the mayor cell to come there and relieve

13  me, because again, we were very short staffed and I was

14  needed to go take additional calls.

15  Q    But you just used the phrase MP.  What do you mean?

16  A    Military police.

17  Q    Okay.  And do you know where Mr. Noori was

18  ultimately housed?

19  A    At one of the D cells at the police department.

20  Q    I'm going to show you what's been marked as Exhibit

21  -- government Exhibit No. 2.  Do you see that?

22  A    Yes, ma'am.

23  Q    Okay.  And what are we looking at here?

24  A    That's the entrance to the D cellblock.

25  Q    And I see -- is there a sign on this door or this

ANDREW SCHWARTZ - DIRECT

1  hallway here?

2  A    Yes, there is.

3  Q    And what is that number?

4  A    119.

5  Q    And is this the area and the station where Mr. Noori

6  would have been housed?

7  A    Yes.

8  Q    Okay.  And to clarify, is this at the Fort McCoy

9  police station?

10  A    It is, yes.

11  Q    And is this within the actual station itself?

12  A    Yes.  So right down -- so let's go ahead and say

13  that this hallway is facing north.  Just to the east of

14  it, if you were to turn east, your immediate right is

15  where the interview room is.

16  Q    And so does this cellblock or this hallway contain

17  more than one cell?

18  A    Yes.

19  Q    And do you know how many cells?

20  A    I believe there's three or four.

21  Q    Do you recall what cell Mr. Noori was ultimately

22  placed in?

23  A    I do not.

24  Q    Okay.  After you finished this paperwork with

25  Mr. Noori, did you do anything else in connection to this

1  investigation?

2  A     No.  Again, I informed Mr. Noori that somebody would

3  be there to talk to him.  I informed him that he would

4  have to stay the night here and somebody would be here

5  tomorrow to talk to him.

6         MS. KRAUS:  I don't have any further questions

7  for this witness.

8         THE COURT:  Very well.  Cross-exam.

9         MS. BLAIR:  Yes, Your Honor.  Thank you.

10                    **CROSS-EXAMINATION**

11 BY MS. BLAIR:

12 Q     Good morning, Officer.

13 A     Morning, ma'am.  How are you?

14 Q     I'm good.  How about you?

15 A     Good.  Thank you.

16 Q     I want to ask you just a couple of questions about

17 your investigation and also what the government went

18 through with you, okay?  I first would like to talk about

19 the timing of how everything happened.  So initially a

20 report is made of some sort of abuse; right?

21 A     Correct.

22 Q     And that report is made at 8:15 p.m.  Does that

23 sound correct?

24 A     It was during the evening.  I don't remember the

25 exact time.

                    ANDREW SCHWARTZ - CROSS

1    Q    Okay.  So there's a binder in front of you.

2    A    Okay.

3    Q    And that binder has all the reports in the case.

4    Would it refresh your recollection to look at a case

5    report to let you know what time?

6    A    It would.

7    Q    Okay.  So I'd like you to look -- there's an initial

8    timeline, then I'd like you to look at Bates 170, which

9    is Exhibit -- tell you right here -- Exhibit 130.  Could

10   you turn to that, please?

11   A    1-3-0.

12   Q    And I believe it's an incident log.

13   A    So 1-3-0, I have an 8:50, an 8:50 and an 8:50,

14   unless it's on the next page.  Okay.  The CAD, yes.

15   Q    Yes.  Perfect.  And you're familiar with the CAD?

16   A    Yes, ma'am.

17   Q    And what time does it look like the initial report

18   came in?

19   A    21:04.

20   Q    Okay.  21:04 is?

21   A    9:04 p.m.

22   Q    All right.  Great.  And then you were able to

23   respond very quickly to this incident; correct?

24   A    Yes, ma'am.  My call sign at the time was 2-1.

25   Q    I'm sorry?

ANDREW SCHWARTZ - CROSS

1   A    My call number at the time was 2-1.  Looks like I

2   arrived at 21:06.

3   Q    Okay.  So immediately after the incident was called

4   in.

5   A    Yes.

6   Q    And you also were able to have interpreters with

7   you.  It seems like one was a formal interpreter and one

8   was an Afghanistan civilian or a guest?

9   A    Yes, ma'am.  There was one on scene, and prior to us

10  arriving, we had called and asked for one to meet us

11  there, who then showed up as we were there.

12  Q    And when you were interviewing the complaining

13  witness, the father, you did that outside of the presence

14  of Mr. Noori?

15  A    Yes.

16  Q    Okay.  And so Mr. Noori presumably was not aware

17  that you were interviewing this complaining witness?

18  A    At the time; correct.

19  Q    And you stated during direct that you made the

20  decision that no one else should be interviewed.  Can you

21  explain that?  Perhaps I misunderstood you, that no one

22  should talk to the complaining witness or that no one

23  should be interviewed in the barracks.

24  A    So during forensic interviews with children, you're

25  not -- the more you interview a child, the more the story

ANDREW SCHWARTZ - CROSS

-- the more the stories change just because of their maturity levels and things of that nature.  So you don't want to talk to children more than you have to.  It wasn't my case, the FBI was doing it.  We weren't going to talk to the children.

As far as talking to the father and getting his statement, again, this isn't my case.  I don't know how -- we didn't want to get involved more than we had to as far as getting people's information.

Q    So is it fair to say that you didn't interview anyone else on scene except for speaking to the father, the complaining witness?

A    Correct.

Q    You didn't interview anyone else in the barracks.

A    No.

Q    Okay.  And you're familiar with these barracks?

A    Yes.

Q    About how many guests were housed in the barracks that Mr. Noori and the complaining witness were in?  Approximately.

A    So they changed a lot with the amount of people that they were putting in barracks just so they could fit them.  I mean they had beds with curtains to give them some privacy in between.  So I don't -- a rough guess, maybe 50 people per floor or more.

ANDREW SCHWARTZ - CROSS

Q    Okay.  So 50 people all sleeping in one area?

A    Yeah.  So it would be -- the barracks was an open barracks area, so the curtains were the only form of privacy that they would be allowed.

Q    Okay.  Then there's just one bathroom right there; correct?

A    So there's a men -- a men's bathroom and a women's bathroom.

Q    Thank you, yes.  I understand that you're trained in forensic interviewing of children and those types of cases.  Was this case always going to be an FBI case even though you're familiar with these types of issues?

A    So the way that normally -- prior to this incident if there was a sexual allegation, say a soldier sexually assaults another soldier or somebody sexually assaulted a child at their home at housing, it would go to CID.

Q    And CID is what?

A    Criminal Investigation Division for the Army.  It's basically -- so because of the Afghan guests being there, it changed the whole dynamics of how everything operated. It was kind of chaotic as far as who would take control over certain dynamics.  The FBI had lead.  They were the top of the chain.  So they had priority if they wanted a case or not.  If they didn't want the case, then it would go to CID.  If CID didn't want the case, then it would go

ANDREW SCHWARTZ - CROSS

to MPI.  And then if MPI didn't want the case, then it would go to the patrol officer.

Q    And this case was always going to be an FBI case.

A    So again, FBI has the primary first choice if they wanted it or not, and so the FBI was called to see if they were interested or wanted the case.  They had stated that they were interested and they were going to take it. If they didn't take it, then the next step, according to Army regulation, would go to CID.  They have to investigate it.

Q    Okay.  And like you said, in this case the FBI took the case and that happened fairly quickly.

A    Yes.

Q    Okay.  Now, I want to talk a little bit about when you bring Mr. Noori to your patrol car.  Is this a marked patrol car?

A    Yes.

Q    You mentioned that you take his handcuffs off at some point.  When did you put them on?

A    It was before he got into my patrol car.

Q    And you seated him in the back of the car.

A    Correct.

Q    And there's a cage in between; right?

A    Yes.

Q    What was his demeanor at this point?

ANDREW SCHWARTZ - CROSS

A    Concerned.  Confused.

Q    And you mentioned that he speaks some English, but you would agree he's not fluent in English.

A    He speaks broken English, yes.

Q    You wouldn't be able to have a complicated conversation with him.

A    I was able to talk to him just fine.

Q    You mentioned that he kept asking you the same question even though you answered his questions?

A    Yes.

Q    Okay.  I want to talk about your specific role here. So like I mentioned before, you're obviously trained to handle these types of cases.  You have a specific role here and you brought Mr. Noori into custody; correct?

A    Correct.

Q    And so your job was just to bring him over to the cell and to interview to get -- that paperwork form was what you called it?

A    So my job was to bring him back to the police station to the interview room.  The D cell came later. But the form is called 850.

Q    Thank you.  And it's not your job to inform him of what charges may be filed against him.

A    So I informed him of what he was being brought in for.  What I did not do is read him his rights because I

ANDREW SCHWARTZ - CROSS

1    was not going to ask him any questions, which I informed

2    him of that during the interview room area.

3    Q    And when you informed him, you said, of what the

4    allegations were, I believe your words were you didn't

5    have an interpreter there; right?

6    A    Not immediately, no.

7    Q    Did you ever have an interpreter there when you

8    talked about what allegations would be against him?

9    A    I'll be honest with you, ma'am, this happened a long

10   time ago.  I know I asked for an interpreter to come

11   there.  I don't remember 100 percent if one actually

12   showed up and we had a conversation about it or if, you

13   know, because he was able to speak broken English and

14   understand what we were saying to him, if -- you know,

15   because there weren't that many interpreters at the time,

16   so I don't remember how that whole process went.

17   Q    So like you said, this was over a year ago.

18   A    Correct.

19   Q    And something that you did in this case was you

20   wrote a sworn statement.

21   A    Yes, ma'am.

22   Q    And the purpose of that sworn statement is to make

23   sure you put in enough information so you can recall it

24   later.

25   A    Correct.

1  Q    And enough information where if someone else is

2  reading it, they would understand what you did in this

3  case.

4  A    Yes.

5  Q    And there's no limit on what you can put in your

6  sworn statement; right?

7  A    There is not, no.

8  Q    Okay.  I would like, in the same exhibit book in

9  front of you, I would like you to go to Exhibit 132,

10  which I believe is your sworn statement.

11  A    Yep, I see it.

12  Q    Perfect.  Nice and quick.  In this sworn statement,

13  you wrote about the investigation and a full synopsis of

14  what you did here; right?

15  A    Yes, ma'am.

16  Q    And on direct examination, you testified that --

17  I'll get the exact language here -- that Mr. Noori would

18  need to answer about some allegations; correct?

19  A    I believe that's what I said, yes, ma'am.

20  Q    And that conversation or anything about allegations

21  is nowhere in your report; correct?

22  A    I don't recall.  May I look?

23  Q    Of course.  Yes, take your time.

24  A    The last paragraph of my investigative report is

25  where I talk about him needing to come with me for

ANDREW SCHWARTZ - CROSS

1  questioning.

2  Q    The paragraph starting with "I made contact with

3  Noori..."?

4  A    That is correct.

5  Q    Yes.  And what sentence are you speaking to?

6  A    It would be the very first sentence of that

7  paragraph.

8  Q    "I made contact with Noori outside of Building 2529

9  and informed him that he needed to come with me to Fort

10  McCoy PD for questioning and that he should gather any

11  identification he has."

12  A    Correct.

13  Q    You agree that doesn't talk about allegations

14  against him?

15  A    No, that's something that I would talk to him in

16  person and not necessarily write down the exact details

17  of what I would tell somebody.

18  Q    And another item that you testified about on direct

19  was that there were allegations about him being sexual

20  with little boys and that's illegal in America, and

21  that's also nowhere in your report.

22  A    That's correct.

23  Q    And Mr. Noori responds "Well, that's not illegal in

24  Afghanistan"; correct?

25  A    Correct.

ANDREW SCHWARTZ - CROSS

1  Q    And you would agree that a statement about the crime

2  that an allegation has been made about is incredibly

3  important in a criminal case.

4  A    I could agree with, yes.

5  Q    And that is nowhere in your report.

6  A    It appears that I had failed to mention that in my

7  report, yes.

8  Q    And you did not mention that in any report that you

9  made in this case at all; correct?

10  A    That would be correct.  Well, hold on a second.

11  Q    All of the --

12  A    Are you talking about the allegations that were

13  made?  Is that what you're saying?

14  Q    Any -- any conversation between you and Mr. Noori

15  where you spoke to him that he was alleged to have

16  touched small boys and he made comments about

17  allegations.

18  A    No, I did not ask him any questions, therefore I

19  didn't write about it.

20  Q    Are you aware if anyone from your department or any

21  other department went back to the barracks to interview

22  the small children before they were interviewed by the

23  FBI?

24  A    They should not have been and I'm not aware of it,

25  no.  I gave directions for that not to happen.

                    ANDREW SCHWARTZ - CROSS

1   Q    Yes.  And I believe you testified that the FBI would

2   talk to Mr. Noori, you told us that?

3   A    Yes, ma'am.

4   Q    Okay.  And what you wrote in your synopsis on the

5   same exhibit, Exhibit 132, is Noori was apprehended and

6   transported to the Fort McCoy police station until able

7   to be interviewed by the FBI.  It's right under

8   "Synopsis"; is that correct?

9   A    Yes, that is correct in the synopsis.

10  Q    I'm sorry?

11  A    In the synopsis, yes, that is correct.

12  Q    I want to talk more about the statement that we

13  addressed just a couple questions before.  Where were you

14  when you say that this conversation between you and

15  Mr. Noori happened where you said there are allegations

16  of a sexual nature, that you touch small boys, he says

17  that's not illegal in Afghanistan, and you say well, it's

18  illegal here.  Is that -- does that capture the full

19  statement?

20  A    He asked me why I was there.  I told him that he was

21  there because of some allegations about some sexual

22  contact with some children, and then he made a comment it

23  not being illegal in Afghanistan.  And I said "Well, it's

24  illegal here in America and I understand that it may be

25  legal in Afghanistan, but it's not legal in America."

ANDREW SCHWARTZ - CROSS

Q    And where are you during this statement?

A    We were in the interview room, that I

aforementioned, to the east of the cellblocks.

Q    Before he was taken to his cell.

A    Correct.

Q    And it's just you and Mr. Noori in that interview

room?

A    Yes.

Q    And again, you said he didn't have an interpreter;

correct?

A    Correct.

Q    At this point is he still handcuffed or is he

unhandcuffed?

A    I unhandcuffed him when we got back to the police

kept.

Q    Okay.  And you had not advised him of his Miranda

warnings because, as you said, that wasn't your role in

this investigation.

A    I didn't ask him any questions or questions related

to the crime, so no, I didn't read him his Miranda

rights, no.

Q    Okay.  How long were you two together in this room?

A    Again, I don't -- I don't recall the exact time.

Over a half hour.

Q    And what took a half hour?  I understand you were

ANDREW SCHWARTZ - CROSS

1    filling out that form with his name.  What else takes

2    time?

3    A    So I took over -- I went over the 850 form with him.

4    Then we also went over the 4137 form with him.  So it's

5    the evidentiary -- or excuse me.  If you were to collect

6    evidence or something in a safekeeping from somebody, you

7    would capture that data on, like what was taken from that

8    person, on a 4137.  And then that form would then be used

9    to either keep it for safekeeping, if the person was in

10   custody, so they could be handed those items later after

11   they got out of custody.  It's a custody -- it's --

12   what's the word I'm looking for.  It's a chain-of-custody

13   sheet.

14   Q    Is it --

15             THE COURT:  Stop.

16             MS. BLAIR:  Oh, I apologize.

17   BY MS. BLAIR:

18   Q    If you flip in that exhibit book to Exhibit 131, so

19   immediately prior to where you are, is that the form that

20   you're speaking of?

21   A    Yes, ma'am.

22   Q    Okay.  And so you did take custody of his

23   wristwatch; right?

24   A    It looks like I did, yes.

25   Q    And if he had anything else on him, you would have

                    ANDREW SCHWARTZ - CROSS

1  marked that down.

2  A    Everything that he had on him was marked down on

3  this form.  It looks like it's not -- it doesn't have his

4  clothing on here, but I didn't take his clothes.

5  Q    He still wore the same clothes he came in with?

6  A    Correct.

7  Q    And so during the 30 minutes you fill out this form,

8  you write down his information.  What else did you do?

9  A    We waited.

10  Q    And you waited for what?

11  A    We were waiting to see what the FBI was going to do

12  as far as if they were going to have somebody come in

13  that evening or if they were going to wait for the

14  forensic interview to get done, if that was going to

15  happen that day or the next day.  It ended up happening

16  the next day that they were going to schedule it for, and

17  so I had to wait there until somebody either from the

18  mayor cell or an MP or somebody was able to relieve me so

19  that I could get back out and start taking calls again.

20  Q    Back up just a little bit.  I understand that you

21  didn't get Mr. Noori out of the barracks, it was someone

22  from the Army; is that right?

23  A    Originally somebody from the military had found him

24  in the barracks for us and had -- I had met him and the

25  soldier at the front entrance to the barracks originally

ANDREW SCHWARTZ - CROSS

1  when I made contact with them, yes.

2  Q    Was Mr. Noori dressed as if he was about to go to

3  sleep?

4  A    No.

5  Q    Okay.  Were you aware if he had eaten anything or

6  eaten dinner?

7  A    So there was a -- the guests were on a -- there was,

8  like, a timeframe that they could go to and from the chow

9  halls.  Each section or block section had different times

10  and chow halls that they had to go to.  So if he had

11  personally gone there and eaten, I don't know.  That was

12  his choice if he wanted to go there and eat or not.

13  Q    You were unaware of that.

14  A    Correct.

15  Q    Thank you.  I have no further questions for you.

16        THE COURT:  Do you wish to redirect?

17        MS. KRAUS:  I do.

18                **REDIRECT EXAMINATION**

19  BY MS. KRAUS:

20  Q    I want to start with defense Exhibit 131, which I

21  believe you still have in front of.

22  A    Yes, ma'am.

23  Q    Now, you've testified that this is a form that's --

24  is this a form maintained by the Fort McCoy Police

25  Department?

ANDREW SCHWARTZ - REDIRECT

1   A    Yes, ma'am.

2   Q    And just page through it.  Is it a fair and accurate

3   copy?

4   A    The 4137 is; correct.  The 2708 is missing some

5   information.

6   Q    Okay.  Well, let's -- specifically let's just look

7   at the first page.  It has the blue exhibit sticker on

8   it.  And I believe at the bottom right hand it says

9   "Noori" and there's a series of numbers; is that right?

10  A    Say that again, ma'am.

11  Q    On the bottom right-hand corner there's --

12  A    Oh, yes.

13  Q    -- a series of numbers.

14  A    That's correct.

15  Q    So this page, just talking about this page, is this

16  page fair and accurate?

17  A    The 172?

18  Q    Just that single page, yes.

19  A    Yes, ma'am.

20  Q    Okay.

21  A    And that is my signature in the chain-of-custody

22  block.

23  Q    And this is something that the Fort McCoy Police

24  Department regularly fills out in investigations.

25  A    Yes.

ANDREW SCHWARTZ - REDIRECT

1    MS. KRAUS:  I'm going to move for admittance of

2    that first page, Exhibit 131.

3         THE COURT:  In your case?

4         MS. KRAUS:  Yes.  This is a defense exhibit.

5         MS. BLAIR:  No objection.

6         THE COURT:  Okay, it's in.

7    BY MS. KRAUS:

8    Q    Okay.  So you testified that everything Mr. Noori

9    had on him would have been on this paperwork you filled

10   out.

11   A    With the exception of the clothes he had on his

12   person, yes.

13   Q    Okay.  And it's your testimony that you didn't

14   remove any of his clothing.

15   A    I did not.  That's why I didn't put it on here.

16   Q    Okay.  So if the fact -- if you would have taken his

17   shoes, for example, you would have put that on this form?

18   A    Yes, ma'am.

19   Q    Okay.  And now, this lists any of the belongings

20   that were on his person at the time that you took him

21   from the barracks; is that a fair assessment?

22   A    So I gave him the option to take whatever he needed,

23   because he had said that he needed to get stuff because

24   he didn't want anything stolen because there was people

25   that could steal his stuff.  So I told him to grab

ANDREW SCHWARTZ - REDIRECT

1  whatever he needed that he didn't want stolen, and these

2  are the items that he grabbed.

3  Q    And turning to this list of items, a crayon isn't

4  listed on here.

5  A    No.

6  Q    Okay.  Now, you did testify that after you filled

7  out this paperwork with Mr. Noori, you were waiting.  You

8  were not a part of any of the decisions that were being

9  made while you were in that interview with him.

10 A    No, ma'am.

11 Q    Okay.  So beyond filling out this paperwork with him

12 and waiting to see what was going to happen, those are

13 things that weren't your concern.

14 A    That is correct, ma'am.

15 Q    Okay.

16       MS. KRAUS:  I don't have any further questions.

17       THE COURT:  Very well.

18       MS. BLAIR:  May I ask one brief clarifying

19 question, Your Honor?

20       THE COURT:  You may ask one brief clarifying

21 question.

22                  **RECROSS-EXAMINATION**

23 BY MS. BLAIR:

24 Q    Officer, can you please flip back to defense Exhibit

25 132, onto the back side where you talk about your

ANDREW SCHWARTZ - RECROSS

1  conversation with Mr. Noori as he's about to leave and

2  you write that -- at the -- under "Investigation

3  continued," the second paragraph, informed him they need

4  to come to Fort McCoy PD for questioning and he should

5  gather any identification that he has; is that correct?

6  A    Correct, that's what I wrote down.

7          MS. BLAIR:  That's the only question I have,

8  Your Honor.

9          THE COURT:  That's the only one I was going to

10 give you.  Thank you, Sergeant.  You're free to go about

11 your business.

12         THE WITNESS:  Thank you, Your Honor.

13         MS. KRAUS:  Your Honor, I just want to confirm

14 with defense that this officer is released from his

15 subpoena or if they would like him to stay.

16         MS. BLAIR:  Yes, he may be released, Your Honor.

17         THE COURT:  All right.  You are free to go about

18 your business.

19         THE WITNESS:  Thank you, Your Honor.

20     (Witness excused.)

21         THE COURT:  All right.  Do we need a break or

22 can we keep going with the next witness?  We're good?

23 Okay.  Let's keep going.

24     Mr. Bugni, while we're between witnesses, why don't

25 you put the pitcher close to our interpreter.  I think

ANDREW SCHWARTZ - RECROSS

1  he's doing more talking than anyone.

2         MS. KRAUS:  The government calls Edgar Bolivar.

3         THE COURT:  Mr. Bolivar, please come up and

4  stand next to our clerk, who will administer the oath.

5  **EDGAR BOLIVAR, GOVERNMENT'S WITNESS, SWORN,**

6         THE COURT:  Mr. Bolivar, please have a seat.

7  Let me just explain a couple of points.  Under our COVID

8  protocols, you may keep your mask on if you wish, but you

9  do not have to as long as you are sitting there.

10 However, when you are actually speaking, if you choose to

11 keep your mask on, please lower it and speak into the

12 microphone so we make a good record.

13        Second, there is water to your left.  Please feel

14 free to help yourself while you're testifying.  Okay?

15        THE WITNESS:  Yes, sir.

16        THE COURT:  Let's begin.

17                    **DIRECT EXAMINATION**

18 BY MS. KRAUS:

19 Q    Good morning.

20 A    Good morning.

21 Q    Could you please tell us your name.

22 A    Edgar Bolivar.

23 Q    Mr. Bolivar, would you mind scooting your chair a

24 bit forward.

25 A    Sure.

1  Q    Thank you.  How are you currently informed or

2  employed?  Excuse me.

3  A    I'm employed by the DoD, ma'am.

4  Q    What is the DoD?

5  A    The Department of Defense.

6  Q    What do you do for the Department of Defense?

7  A    I'm in the U.S. Army.

8  Q    And what kinds of things do you usually do in your

9  role with the military?

10 A    I'm a mechanic.

11 Q    And where do you usually work?

12 A    Fort Bliss, Texas, ma'am.

13 Q    Did you travel to Wisconsin from Texas just for the

14 hearing today?

15 A    Yes, ma'am.

16 Q    Thank you.  I want to turn your attention to

17 September of 2021.  At any point, did your work with the

18 military take you to Wisconsin?

19 A    Yes, ma'am.

20 Q    Where?

21 A    Fort McCoy.

22 Q    And what was the point of you going to Fort McCoy

23 with the military?

24 A    We were involved in helping the guests, basically

25 just tend to their needs, anything they needed, we were

EDGAR BOLIVAR – DIRECT

1  there for them.

2  Q    Now you just used the word "guests."  Who are you

3  talking about?

4  A    The Afghani refugees that came from Afghanistan when

5  -- back in 2021 when they were all coming back.

6  Q    How long or do you remember when you got to Fort

7  McCoy yourself?

8  A    I got there back in -- I want to say August of 2021.

9  Q    What kinds of things did you usually do at Fort

10  McCoy in order to support the Afghan refugees?

11  A    We patrolled the blocks, and basically whenever the

12  guests came up to ask us for anything they needed,

13  accommodations or whatever, we would just tend to their

14  every need.

15  Q    At any point when you were at Fort McCoy as part of

16  this, I'm going to say support mission, were you asked to

17  watch someone at a police station?

18  A    Yes, ma'am.

19  Q    Can you tell me a little bit about where you were

20  asked to do this.

21  A    So it was on the actual Fort McCoy base.  It was at

22  the MP station.  I was watching the guest for two

23  individuals for two separate days.

24  Q    Now you said MP.  What do you mean?

25  A    Military police station.

EDGAR BOLIVAR – DIRECT

1    Q    Where were you asked to watch these guests?

2    A    At the cellblock.

3    Q    So just so I'm understanding, you were asked to

4    watch over people who were in cells or something else?

5    A    In the cells.

6    Q    Okay.  How many people were you asked --

7              THE INTERPRETER:  I didn't get the word.  Did

8    you say sales?

9    Q    My recollection is cells.  C-e-l-l-s.

10             THE COURT:  As in jail cells.

11             MS. KRAUS:  Jail cells.

12             THE INTERPRETER:  All right.  Thank you.

13   BY MS. KRAUS:

14   Q    Now you said you were asked to watch over two

15   guests.  Can you describe for me a little bit more what

16   exactly you were asked to do?

17   A    So basically we would just sit in front of the

18   cellblock where the actual cells were and just every,

19   like, 30 minutes to an hour, just look over, look into

20   the window and make sure they were still okay.

21   Q    Besides checking in on these people who were in the

22   cells, were you asked to do anything else?

23   A    No, ma'am.

24   Q    Okay.  I want to start by showing you a couple of

25   pictures and I just want you to let me know if you

                    EDGAR BOLIVAR - DIRECT

1   recognize them.

2   A    Yes, ma'am.

3   Q    I have government Exhibit No. 3 on the screen in

4   front of you.  Can you tell me if you know what this

5   shows.

6   A    Yes, ma'am.  That's the cellblock that I was

7   watching.

8   Q    Okay.  Now, do you see anywhere in this photo where

9   you would have been watching or -- well, let me ask a

10  question first.  When you were watching these people,

11  were you standing or sitting or something else?

12  A    That chair right there, that's where I was sitting.

13  Q    Okay.  I'm going to turn to government Exhibit No. 4

14  here.  Okay.  What does this picture show?

15  A    The cellblock where the individual was staying.

16  Q    Is this a closeup picture of where you were asked to

17  sit?

18  A    Yes, ma'am.

19  Q    Okay.  How long did you sit in that chair we see?

20  A    For nine hours.

21  Q    And did you do that for nine hours straight?

22  A    Yes, ma'am.

23  Q    Did you take a break after nine hours?

24  A    Yes.  After my shift, I got released for the rest of

25  the day.  Because we had different dayshifts, so for my

EDGAR BOLIVAR - DIRECT

1 shift, it was just those nine hours.

2 Q    Did you come back at a different time?

3 A    No, ma'am.

4 Q    Okay.  Now, I believe earlier you might have said

5 you were there for two days.  Did I get that wrong?

6 A    No, ma'am.

7 Q    Okay.  Can you explain a little bit more about what

8 you did or how much time you spent in this -- in this

9 cell area.

10 A    So it was a two-day time period.  It was nine hours

11 each day.  And then -- yeah, that's basically it.

12 Q    So if nine plus nine is 18, is it fair to say that

13 you spent 18 hours in this area watching?

14 A    Yes, ma'am.

15 Q    Okay.  Did you spend all 18 hours in this chair or

16 did you move?

17 A    I did move.

18 Q    Where else did you go?

19 A    Whenever I had to -- like if one of the police that

20 were there would come in, I would ask them for a break so

21 I could use the latrine or get water, stuff like that.

22 Q    Okay.  Is it fair to say that for both of your

23 shifts, though, that you were in this general area

24 keeping post?

25 A    Yes, ma'am.

EDGAR BOLIVAR - DIRECT

1  Q     Now, do you remember how many people you were asked

2  to watch?

3  A     Only two.

4  Q     Okay.  And were they both housed in cells?

5  A     Yes, ma'am.

6  Q     Were those cells next to each other?

7  A     Yes, ma'am.

8  Q     Okay.  Do you remember being able to look into the

9  cell through the door?

10 A     Yes, ma'am.

11 Q     So turning to this picture again that's on the

12 screen, do you see a window where you might have looked

13 in?

14 A     Yes, ma'am.

15 Q     Okay.  And so I see that there's a window on the

16 door.

17 A     Yes, ma'am.

18 Q     Is that where you were kind of checking in inside

19 the cells?

20 A     Yes, ma'am.

21 Q     Okay.  Do you remember anything about the two people

22 you were asked to watch?

23 A     So on the first day, it was an older individual, and

24 then the second day, it was a younger male.

25 Q     I want to talk about the younger male.  Do you

EDGAR BOLIVAR – DIRECT

1  recall checking in on him during your shift?

2  A    Yes, ma'am.

3  Q    Okay.  And how often did you check in on him?

4  A    Every 30 minutes to an hour.

5  Q    Do you remember seeing what he was doing inside the

6  cell when you checked in on him?

7  A    He was just sleeping, ma'am.

8  Q    Okay.  You said that he was sleeping.  Did he seem

9  to sleep most of the time you watched him?

10  A    Yes, ma'am.

11  Q    At any point did you see him sleeping -- or where

12  did you see him sleeping in the cell?

13  A    Just on the cell bed.

14  Q    Okay.  Did you ever see him sleeping on the floor?

15  A    No.

16  Q    Did you ever observe him crying?

17  A    No, ma'am.

18  Q    Did you ever observe him hurting himself?

19  A    No, ma'am.

20  Q    Did you ever observe him looking really upset?

21  A    No, ma'am.

22  Q    Did you ever have an interaction with him in that

23  you actually spoke with him?

24  A    No, ma'am.

25  Q    At any point did he get your attention to speak with

EDGAR BOLIVAR – DIRECT

1  you or someone else?

2  A    No, ma'am.

3  Q    If someone -- were you under instructions that if

4  someone did knock on the cell door from inside the cell

5  to go get a guard?

6  A    Yes, ma'am.

7  Q    Okay.  So is it fair to say that if someone inside

8  the cell needed something, you would have alerted the

9  Fort McCoy Police Department.

10  A    Yes, ma'am.

11  Q    Did you see anyone interact with this younger man

12  while you were watching?

13  A    No, ma'am.

14  Q    Did you hear anyone make any threats to him?

15  A    No, ma'am.

16  Q    Did you see anyone use physical force while he was

17  inside the cell?

18  A    No, ma'am.

19  Q    At any point did you see anyone attempt to make this

20  man uncomfortable in any way?

21  A    No, ma'am.

22  Q    At any point did you see whether he was given food?

23  A    Yes, ma'am.

24  Q    Can you explain that for me.

25  A    So every day around six in the morning they would

1  bring our breakfast chow, so whenever they would bring my

2  chow with his -- yeah.

3  Q    Did you see the man eat?

4  A    No, ma'am.

5  Q    Okay.  Did you see food being given to the man?

6  A    When they brought the food for the specific day, I

7  had asked to go to the bathroom so I didn't see how they

8  give him the food or when they give him the food.  I know

9  that the food was brought to him.

10 Q    Was there anything that you observed of this man

11 during your shift that struck you as odd or concerning?

12 A    No, Ma'am.

13      MS. KRAUS:  I don't have any further questions.

14      THE COURT:  Cross-exam.

15      MS. BLAIR:  Yes, Your Honor.  (10:24 a.m.)

16                **CROSS-EXAMINATION**

17 BY MS. BLAIR:

18 Q    Good morning.

19 A    Good morning.

20 Q    So it's fair to say your involvement in this case

21 was watching Mr. Noori for approximately nine hours?

22 A    Yes, ma'am.

23 Q    It was nine hours on one day.

24 A    Yes, ma'am.

25 Q    And you had only watched someone in a cell during

EDGAR BOLIVAR - CROSS

1  these two days; is that fair?

2  A    Yes, ma'am.

3  Q    You've never done this before.

4  A    Negative.

5  Q    You're not specially trained to observe a prisoner

6  in a cell.

7  A    Negative.

8  Q    You're not trained in psychology.

9  A    Negative.

10  Q    Your job was to sit in the chair that we -- that we

11  looked at in the government's Exhibit 4 and check on this

12  individual every 30 minutes to a half hour.

13  A    Yes, ma'am.

14  Q    Now, you didn't author any reports in this case.

15  A    Negative.

16  Q    You didn't write anything; correct?

17  A    Negative.

18  Q    And do you speak any other languages beside English?

19  A    Spanish.

20  Q    Do you speak Pashto?

21  A    Negative.

22  Q    Do you speak Dari?

23  A    Negative.

24  Q    Now, you testified that almost the entire time you

25  were there you saw Mr. Noori sleeping.

EDGAR BOLIVAR - CROSS

1   A    Yes, ma'am.

2   Q    You're looking through the window in the door;

3   correct?

4   A    Yes, ma'am.

5   Q    You don't open the door.

6   A    Negative.

7   Q    The door is shut the entire time.

8   A    Yes, ma'am.

9   Q    So Mr. Noori is laying down, but you have no

10  personal interaction with him; correct?

11  A    Negative.

12  Q    Is that correct?

13  A    Yes, ma'am.

14  Q    Now your involvement, however, is recorded on an

15  incident detail report.  I believe it could be called a

16  CAD?

17  A    Yes, ma'am.

18  Q    I would like you to look at that exhibit binder in

19  front of you --

20  A    Yes.

21  Q    -- and flip to Exhibit 152.  And let me know when

22  you're there.

23  A    Yes, ma'am, I'm here.

24  Q    And do you call this a CAD or an incident report?

25  How would you classify it?

EDGAR BOLIVAR - CROSS

1          MS. KRAUS:  I'm going to object to a lack of

2     foundation here.  I don't believe that there's been any

3     foundation laid that this witness can identify this

4     document at all.

5          THE WITNESS:  Yeah, I've never seen --

6          THE COURT:  Hold that thought.  But you can ask

7     him if he's ever seen it or had any input on it.  If not,

8     then you have to explain to me why you are showing it to

9     him.

10         MS. BLAIR:  Yes, Your Honor.

11    BY MS. BLAIR:

12    Q    Have you seen anything like this before?

13    A    Negative.

14    Q    Okay.  When you are watching a subject, do you log

15    in and make notes anywhere?

16    A    Negative.

17    Q    When someone else is watching a subject, do you know

18    if they log in and write notes anywhere?

19    A    Negative.

20    Q    You're unaware if someone would take notes on

21    whether a prisoner has touched his chow.

22    A    Yes, ma'am.

23    Q    And you're unaware if anyone said that you were

24    relieving a current prisoner.

25         MS. KRAUS:  Objection.  Asked and answered.

EDGAR BOLIVAR - CROSS

1      THE COURT:  I'll let her ask.  Do you want her

2  to repeat the question?

3      THE WITNESS:  Yes, please.

4      THE COURT:  Please.

5  BY MS. BLAIR:

6  Q    You're not familiar with this at all.

7  A    Negative.

8  Q    So you started watching Mr. Noori right around

9  midnight; is that fair?

10  A    Yes, ma'am.

11  Q    And so then you were done around 9 a.m.

12  A    Yes, ma'am.

13  Q    And you said he was laying down that entire time.

14  A    Yes, ma'am.

15  Q    I want to talk about the specific observations that

16  you made of this cell.  And I understand you were only

17  there for a total of eight hours, but this is a rather

18  small room.

19  A    Yes, ma'am.

20  Q    And there's a small cot with a plastic blue piece of

21  material?

22  A    Yes, ma'am.

23  Q    And as you stated, Mr. Noori had to stay in this

24  cell; right?  He couldn't leave if he wanted to?

25  A    Yes, ma'am.

1   Q    And he wouldn't make a decision about when he would

2 eat?

3   A    Yes, ma'am.

4   Q    And you didn't see him with a prayer book or a

5 Quran?

6   A    Negative.

7   Q    Or a prayer rug?

8   A    Negative.

9   Q    He didn't have a watch on?

10   A    Negative.

11   Q    There's no TV or books inside the cell?

12   A    Negative.

13   Q    It was just Mr. Noori who, for your knowledge, was

14 there for nine hours entirely alone.

15   A    Yes, ma'am.

16   Q    And he could not communicate with anyone; correct?

17   A    Yes, ma'am.

18   Q    Now, it's rather chilly in this part of the -- in

19 this area; is that fair?

20   A    Yes, ma'am.

21   Q    What were you wearing?

22   A    I was just wearing my uniform.

23   Q    Is that long sleeved?

24   A    Yes, ma'am. Well, not long sleeve, but it's an over

25 jacket, like a regular U.S. Army uniform.

```
1   Q    You had the over jacket on?

2   A    Negative.

3   Q    I'm sorry, can you explain to me?

4   A    So it's just basically a basic uniform: regular

5   t-shirt, my uniform, pants, boots.

6   Q    And the uniform, is it a button-up shirt?

7   A    Zip up.

8   Q    Zip up and it's long sleeved.

9   A    Yes.

10  Q    Okay.  And it was a little chilly in there; right?

11  A    I wouldn't remember.

12  Q    You kept on the overshirt?

13  A    Well, I mean I have to.  It's the uniform.

14  Q    Okay.

15            THE INTERPRETER:  What was the answer?  I'm

16  sorry, I couldn't hear it.

17            MS. BLAIR:  He has to.

18            THE COURT:  Because it's his uniform.

19  BY MS. BLAIR:

20  Q    I want to go back to what your particular

21  responsibilities are here, okay?

22  A    Yes, ma'am.

23  Q    All right.  Your job is to ensure his general

24  well-being; right?

25  A    Yes, ma'am.
```

1  Q    Your job isn't to inform him of any charges.

2  A    Negative.

3  Q    Your job isn't to make sure he gets to court on

4  time.

5  A    Negative.

6  Q    Your job isn't to make sure the FBI interviews him

7  within a reasonable period of time.

8  A    Negative.

9           MS. KRAUS:  Objection.

10          THE COURT:  Move on.

11          MS. BLAIR:  Yes, Your Honor.  I have no further

12 questions.  Thank you very much.

13          THE WITNESS:  Yes, ma'am.  Thank you.

14          THE COURT:  Any redirect?

15          MS. KRAUS:  Briefly.

16                    **REDIRECT EXAMINATION**

17 BY MS. KRAUS:

18 Q    I want to clarify something that the other attorney

19 just asked you.

20 A    Yes, ma'am.

21 Q    She asked you whether Mr. Noori, the person you were

22 watching, whether he could not communicate with anyone.

23 Is it fair to say that he could have knocked on the

24 window if he needed someone?

25 A    Yes, ma'am.

1  Q    Did he or any other of the people you watched knock

2  on the window and ask for anything?

3  A    Negative.

4  Q    Okay.

5       MS. KRAUS:  I don't have any further questions.

6       THE COURT:  All right.  Thank you.  Now you are

7  done.  You are free to go about your business.

8       MS. KRAUS:  And Your Honor, just to confirm

9  whether defense would like Mr. Bolivar to stay or if he

10 can be released.

11      MS. BLAIR:  He does not need to stay.

12      THE COURT:  Let's make this the book of the

13 month club negative option.  Unless the defense actually

14 says I want the witness to stay, we will assume that when

15 the person -- the witness is excused from testifying, he

16 or she is free to go about his or her business, okay?

17 That's our rule going forward.  You are free to go.

18      THE WITNESS:  Thank you, Your Honor.  Have a

19 good day.

20      THE COURT:  Thank you.  Safe travels home.

21   (Witness excused.)

22      THE COURT:  Do we need a break or can we keep

23 going?

24      THE INTERPRETER:  I think we're fine.

25      THE COURT:  We will keep going.  Please call

EDGAR BOLIVAR - REDIRECT

1  your next witness.

2          MS. KRAUS:  The government calls Lieutenant

3  Christopher Henke.

4          THE COURT:  And just for planning purposes,

5  about how long do you think your direct will be?

6          MS. KRAUS:  Of Lieutenant Henke, I'm going to

7  approximate a half an hour.  I have no concept of what

8  time we've been going, so...

9          THE COURT:  We will definitely take a break

10  after this witness's testimony.

11          MS. KRAUS:  Okay.  Thank you.

12          THE COURT:  Lieutenant, I'm going to need you to

13  stand and raise your right hand as you take the oath,

14  please.

15      **CHRISTOPHER HENKE, GOVERNMENT'S WITNESS, SWORN,**

16          THE COURT:  All right.  Lieutenant, please have

17  a seat.  Let's talk about COVID protocols.  You are free

18  to keep your mask on if you choose to.  While you're

19  testifying, however, you may take your mask off.  It's

20  your choice.  If you're taking it off, I don't have to

21  tell you part B.

22          THE WITNESS:  All right, Your Honor.

23          THE COURT:  There is water to your left if you

24  would like it.  Help yourself.  With that, let's begin

25  the questioning.

CHRISTOPHER HENKE – DIRECT

MS. KRAUS: Thank you.

## DIRECT EXAMINATION

BY MS. KRAUS:

Q    Could you please state your name.

A    Christopher Henke.

Q    How are you employed, Mr. Henke?

A    I'm employed with the Fort McCoy Police Department.

I'm a lieutenant and one of the shift watch commanders.

Q    How long have you been working for the Fort McCoy

Police Department?

A    Since approximately 2003.

Q    What do you typically do for the police department?

A    I'm a shift supervisor, so I'm responsible for the

supervision of the officers assigned to dayshift,

administrative tasks, case review, and then protocols

around the station.

Q    Generally how would you describe the call volume

that the Fort McCoy Police Department receives?

A    It's seasonal. It depends on the flux of soldiers

there for training and so forth. Generally our April to

October training season is the peak. Typically outside

of that training season, our call volume is not real

high.

Q    Under normal operations, what kind of shift do you

work?

CHRISTOPHER HENKE – DIRECT

1  A    Generally I'm on a 12-hour shift, 05 in the morning

2  until 1700 in the afternoon.

3  Q    I want to talk about late August, early September of

4  2021.  Is it fair to say that during that time the Fort

5  McCoy Police Department was operating kind of outside of

6  maybe its normal volume or kind of normal course of

7  business?

8  A    That would be a fair assessment, yes.

9  Q    Could you expand on that for me.

10 A    To do the mission that we picked up, the OEW

11 [verbatim] mission, we had a large influx of personnel in

12 a very short span of time, in addition to some of the

13 normal things that were going on there.  Obviously due to

14 the nature of the mission, there was a lot of additional

15 challenges, I guess, with language and the development of

16 the policies, procedures, and so forth that we were going

17 to do moving forward with that influx of population.

18 Q    How did your day-to-day work change, if any?

19 A    It changed quite immensely because we worked through

20 a much more convoluted chain of command, I guess.  We

21 still had the same obligations, duties, but we had

22 additional calls for service.  We had additional

23 responsibilities to interact with various points of

24 contact and liaison with these mayor cells and the

25 footprint over there, in addition to our normal

CHRISTOPHER HENKE - DIRECT

workforce.

Q    I want to turn your attention to September 12 of
2022.  Do you recall if you were working on that day?

A    I do not off the top of my head.  I'm sure it would
be in the CAD.

Q    Sure.  For context during this time, do you recall
what hours your normal shift was or the shift you were
expected to work?

A    Yes.  I would work Sunday through Tuesday every
week, I had every other Wednesday off, and as I say
before, 05 to 1700 was my daily shift.  There's a little
bit of overlap before or after those hours for shift
change with the oncoming and offgoing shift supervisors.

Q    You said your shift generally was 05 to 1700 hours?

A    Correct.

Q    Would that mean 5 a.m. to about 5 p.m.?

A    Yes.

Q    Okay.  Now, before I jump, I guess, to whether you
were working September 12, at this point in time -- at
any point in time were you made aware of a possible
sexual assault allegation that Fort McCoy was assisting
with?

A    Yes.

Q    Do you recall about the time of day that you were
made aware of this investigation?

A    It would have been when I came in to work prior to
that 5 a.m.  Usually anywhere between 15 and 30 minutes
prior to shift is where the oncoming supervisor will come
in, link up with the current supervisor on duty, and we
do a changeover briefing.

Q    Okay.  Now I'm going to show you what's been marked
-- excuse me.  One moment, please.  I'm going to show you
what's been marked as government Exhibit No. 1.  Do you
recognize what this is?

A    Yes.  It's just one of our standard CAD call logs.

Q    Okay.  So you just used the word CAD.  Can you
explain to me what that is?

A    It's just an acronym for computer-aided dispatch,
and it's just what our dispatchers at our call center,
what some people may refer to as a 911 call center or
whatever.  It also sends out to patrols.  Every time we
have a call for service or an incident that occurs, they
start a CAD sheet and log all pertinent activity.

Q    Taking a look at this specific CAD, that same
government Exhibit No. 1, is this the CAD related to that
sexual assault I asked about earlier?

A    Yes, I believe so.

Q    And so if you would have been involved in this
investigation or at least in any kind of assistance, at
some point your involvement would have been logged in

CHRISTOPHER HENKE - DIRECT

1  this CAD?

2  A    Yes.

3  Q    Okay.  And when someone logs maybe something that

4  they did or their activity, is there a name listed or

5  something else?

6  A    Something -- it may vary.  Sometimes there may be

7  both, sometimes it may be one.  Generally it's going to

8  be a call sign.  So you'll see 106.  I know 100 series is

9  a supervisor.  I don't off the top of my head know which

10 one it would be.  I know I'm 101.

11 Q    Okay.  So, for instance, then turning to page two of

12 this CAD, and I'm going down to about halfway down the --

13 a third -- about a third down this page, turn your

14 attention to a line that says 9-12-2021, 7, I believe

15 72825 and then I see there is 101 appears.  What's that

16 in reference to?

17 A    That is my call sign, 101 being the dayshift watch

18 commander supervisor, and that is a check of our guest in

19 the detention cell, all in order.  So it was just

20 basically a welfare check that I conducted at that time

21 based on the shift change briefing and the information

22 that we were -- had somebody in one of our detention

23 cells.

24 Q    So kind of going back to the question I asked

25 earlier which was whether you were working on September

1  12, is it fair to say that you were?

2  A    Yes.

3  Q    And so at what point in time do you recall that you

4  were made aware of this investigation and asked to

5  assist?

6  A    It would have been at the shift briefing, probably

7  between 0445 and 0500 that morning.  So 4:45 to 5 a.m.

8  Q    So prior to that time that you started on the

9  morning of September 12, did you have any involvement at

10 all in this investigation or -- at all?

11 A    No.

12 Q    Okay.  When you arrived to work on September 12,

13 what were you assigned to do in connection to this

14 investigation?

15 A    I wasn't made any assignment specific to the

16 investigation whatsoever.  As a dayshift supervisor, me

17 taking control, I'm responsible for anybody that we're

18 holding in a detention cell.  So my duties related to

19 that would be simply taking care of welfare, food, and

20 all those other things for the individual we had in the

21 detention cell and making sure that those got logged.

22 You know, my welfare checks.  So that was my -- the

23 extent of my duty.

24 Q    Now, you referenced again, you know, you're

25 responsible for checking in on someone inside of a cell.

1  What cell is involved as it relates to this particular

2  CAD or your assignment?

3  A    You're asking a specific cell number?

4  Q    Do you recall.

5  A    I know that it was -- we walk into our detention

6  cell from the police-enter hallway, you have a processing

7  room, a first cell and a second cell.  It would have been

8  the second cell.

9  Q    Okay.  And so if it's helpful, let's take a look at

10  the top of this screen here.  Turning your attention to

11  about the third line down.

12  A    Yep.

13  Q    9-11-2021, there's a call cell and it says in cell

14  119B.

15  A    Yep.  And Bravo would be second cell.  First one

16  would be Alpha cell.

17  Q    So based on what you remember from this, you were

18  checking in on someone who was detained in cell 119B.

19  A    Correct.

20  Q    Okay.  Now, what was the point -- I see that here

21  your call sign pops up a few times.

22  A    Yes.

23  Q    Really what is the point of continuing to log

24  activity on this CAD?

25  A    The logging of the activity is ensuring that the

CHRISTOPHER HENKE - DIRECT

1 individual that's being held is in good health. They're

2 not in distress. It's just a health-and-welfare check

3 that we're required to do. Even though we have live

4 camera and audio feed that goes to dispatch, they

5 obviously have other duties as kind of an ancillary duty.

6 So it's just a series of safeguards and checks that we do

7 to ensure that everybody that we put in a detention cell

8 is fine.

9 Q    Okay. Now, if something happened and you didn't log

10 it, I mean is that typical that you are not logging every

11 single interaction verbatim from this CAD?

12 A    That's probably a fair assessment. Due to --

13 particularly due to the call volume, I'm sure the

14 dispatchers at times may not get an entry in right away

15 if they're dealing with another emergent call for

16 service. At that time the call volume was pretty high,

17 so we had a lot of ambulance runs and various 911 calls

18 that we were responding to.

19 Q    For clarification, are you entering in your activity

20 or does someone else?

21 A    It would be one of our dispatchers. All I do is

22 make a call on the radio to let them know that I did a

23 check or patrolman calls in and out to a call. They do

24 the actual data entry.

25 Q    Okay. So you're not responsible for the exact words

CHRISTOPHER HENKE - DIRECT

1  that are put into this CAD.

2  A    No.

3  Q    Okay.  I want to turn to what interactions you might

4  have had on September 12 with one of the individuals you

5  were watching specifically in cell 119B.  Turning to your

6  CAD here, it looks like your first check was about 7:30

7  in the morning; is that fair?

8  A    Yes.

9  Q    And at that time, do you recall anything about your

10  interaction or observation of this person?

11  A    I don't specifically recall if I had any interaction

12  or conversation at that time.  That's not the purpose of

13  me checking in.  It's popping my head in the window,

14  making sure that the individual is either up, moving

15  around.  You see that they're still there and in good

16  health.

17  Q    And do you recall making any specific observations

18  of this person in the morning when you got there?  What

19  did they look like?  What were they doing?

20  A    I don't know specifically if it was that very first

21  check, but the individual most of the time was sleeping.

22  At some point, he would be wrapped up in the blanket on

23  the cot, other times he'd be wrapped up in a blanket on

24  the floor of the cell.

25  Q    Now, I want to talk a bit about -- you said

CHRISTOPHER HENKE - DIRECT

1  blankets.

2  A    Correct.

3  Q    Is it standard issue -- is it standard issue to have

4  blankets in these cells?

5  A    Yes.  Each cell is equipped with a blanket as part

6  of the equipment that's in there and it's essentially a

7  hard structured bed that's attached to the floor so they

8  can't move it and so forth with a -- kind of a vinyl

9  colored mattress and a blanket.

10  Q    Now I want to turn to Exhibit 5 that's on the screen

11  here.

12  A    Yes.

13  Q    What is that?

14  A    That is a blanket that we would issue in the D cell.

15  Q    So that's the kind of blanket that comes with every

16  cell.

17  A    Either that or the lighter green-colored blanket.

18  Q    Okay.  And do you recall whether the person in 119B

19  had this green blanket?

20  A    I believe they had the light green one.  I believe

21  the wool blanket would have been the second blanket that

22  was given to the individual in that detention cell.

23  Q    So turning to Exhibit 6, what's this?

24  A    That is the more common blanket that we keep in the

25  D cells.

CHRISTOPHER HENKE - DIRECT

1   Q    Okay.  Do you recall whether the person in 119B had

2   this blanket?

3   A    Yes, that's the blanket they would have had.

4   Q    I see you've got a bag next to you.

5   A    Yes.

6   Q    Do you have that blanket with you?

7   A    Maybe not that specific blanket, but -- they get

8   laundered when we rotate people through, but it is the

9   exact same issued blanket.

10  Q    Would you mind pulling it out for me?

11  A    Okay.

12  Q    And can you describe it for us.

13  A    I would describe it as a typical, if you stay at any

14  lower-priced motel or hotel.  Other than color, it's a

15  typical blanket that you'd have on one of those

16  motel/hotel beds.

17  Q    Okay.  Is it soft?

18  A    It is soft.

19  Q    Okay.  And about what weight is it?

20  A    I don't know.  I mean they're, like I said, standard

21  hotel blanket, I guess is the best way.

22  Q    Okay.  And you recall seeing the person in 119B with

23  this blanket.

24  A    Correct.

25  Q    And at any point, did the person ask for a second

CHRISTOPHER HENKE - DIRECT

1  blanket?

2  A    Yes.

3  Q    And do you recall at about what time this happened?

4  A    I do not.  I'm sure it may have been in the CAD when

5  we provided.  If it's not, I just know that at one point

6  in one of my welfare checks, the individual indicated

7  they were cold and we got them an additional blanket.

8  Q    I want to turn to -- oops, let me find it.  Exhibit

9  No. 1 here again.  Okay.  Turning back to Exhibit No. 1,

10 I'm going to scroll down here and I'm going to zoom this

11 up a little bit.  Do you see where it's marked, this

12 reference to the second blanket?

13 A    Correct, I do see.  Yep.

14 Q    And about what time do you indicate that you're

15 trying to get some additional blankets?

16 A    It says there 15:39, which would be 3:39 p.m.

17 Q    What exactly does that line say?

18 A    It says "meal passed on to detainee along with an

19 extra blanket."

20 Q    Okay.  So then going to Exhibit 5, is that that

21 extra blanket?

22 A    Correct.

23 Q    And do you have that blanket with you?

24 A    Yep, it is also in the bag here.

25 Q    Do you mind pulling that one out.  How would you

CHRISTOPHER HENKE - DIRECT

1  describe that blanket?

2  A    That is an Army-issued wool blanket.

3  Q    So in response to this person asking or expressing

4  that they're cold, you arranged for a second blanket to

5  be brought to this person.

6  A    Correct.

7  Q    Now, I want to turn to some of your other

8  observations of this person in 119B.  Do you recall --

9          THE COURT:  Can I interrupt?  Are the blankets

10  going to be offered as exhibits?

11          MS. KRAUS:  I'm offering as demonstratives, 5A

12  and 6A.  The photos were admitted into evidence and I

13  just am offering those for a visual aid.  I don't want to

14  enter them in evidence in that I don't want the court

15  clerk to be responsible for physical blankets.

16          THE COURT:  We've handled bigger stranger things

17  than that.

18          MS. KRAUS:  Well, then at this point I'll move

19  them into evidence.

20          THE COURT:  All right.  Any objections?

21          MS. BLAIR:  No, Your Honor.

22          THE COURT:  We will keep the blankets.

23  BY MS. KRAUS:

24  Q    All right.  So I want to then move on to some other

25  observations of this person.  About what length of time

CHRISTOPHER HENKE - DIRECT

1  were you responsible for checking in on them?

2  A    Well, it would have been from the time that I came

3  in for duty that morning at about 5 a.m., and I would

4  have handed those duties off to the next supervisor, my

5  relieving supervisor, at about 5 p.m. that same day.

6  Q    Okay.  So that's about 12 hours.

7  A    Correct.

8  Q    Do you recall if you were assigned to watch or check

9  in on that person the following day, September 13th?

10 A    I believe so.  The next day, up until the time that

11 he was pulled to speak with people, I would have had the

12 same duties.

13 Q    Now during this time, about how often did you check

14 in on him?

15 A    I tried to do an hourly check.  Obviously that

16 didn't always happen.  I think it's important to note

17 that that room is under video surveillance, and we also

18 had a posted monitor in the hallway to the D cells.  It's

19 just kind of an extra precaution because it was the first

20 time we were dealing with the mission that we were

21 dealing with and we didn't want anything bad to happen.

22 Q    At any point when you checked in on this person, did

23 they communicate with you?

24 A    Occasionally, yes.

25 Q    Can you describe some of those interactions?

CHRISTOPHER HENKE - DIRECT

A    The interactions, it was difficult because of a
little bit of a language barrier.  But generally wanted
to know why they were there; that he wanted to be
released, and I kept explaining to the individual that I
wasn't in control of that timeline.  We would continue to
get him food, meal time -- meals at mealtime, and that we
would get to him as soon as able.

Q    Did you provide this person food?

A    Yes.

Q    And do you know if the person ate?

A    From my observation, very little, if any, of the
food was touched that we dropped off.

Q    Where did you get this food from?

A    The food came from the same dining facilities that
were contracted to provide food for the rest of the OEW
[verbatim] mission.

Q    So essentially you were giving this person the same
food that had been offered for any amount of time that
they were staying on base.

A    Correct.

Q    Okay.  Now, you have the ability to control the
temperature of individual cells?

A    No.

Q    And can you explain that?

A    Our complete building, not only not the cells but I

CHRISTOPHER HENKE - DIRECT

1  have an office, for instance, I have no control --

2  there's no separate thermostats in that building.  It's

3  all controlled by the installation.  And they have

4  prescribed times that they turn air conditioning off,

5  turn heat on, and what temperature it's at we have no

6  control over that.

7  Q    Do you have any recollection of what the person in

8  119B was wearing when you observed them?

9  A    Some sort of long pants, possibly sweat pants, but

10  something similar, sandals, and I believe a t-shirt.

11  Q    Did this person have shoes?

12  A    Yes.

13  Q    Okay.  At any point did -- now you described the

14  person appeared to be sleeping for most of the time; is

15  that fair?

16  A    Yes.

17  Q    And how -- what led you to believe this person was

18  sleeping?

19  A    They were just lying down, like I said, either on

20  the cot or on the floor.

21  Q    At any point did you observe this person to be

22  crying?

23  A    Not in my observation, no.

24  Q    At any point did the person appear hysterical?

25  A    No.

CHRISTOPHER HENKE - DIRECT

1  Q    At any point did you have any concerns that this
2  person was inordinately upset or in distress?
3  A    No.
4  Q    At any point did this person ask you directions as
5  in north, south, east, west?
6  A    No.
7  Q    At any point did this person ask for religious
8  accommodations?
9  A    No.
10 Q    At any point did you use physical force on this
11 individual?
12 A    No.  As a matter of fact, I never entered the cell.
13 Q    Did you ever deprive him intentionally of sleep?
14 A    No.
15 Q    Did you ever intentionally deprive him of food or
16 water?
17 A    No.
18 Q    Did you intentionally make the cell colder?
19 A    No.
20 Q    At any point did you observe anything that caused
21 you alarm in your observations of this individual?
22 A    No.
23 Q    I want to turn to -- just a few last questions here,
24 Lieutenant Henke.  I want to turn to government Exhibit
25 4.  What am I looking at here?

CHRISTOPHER HENKE - DIRECT

1  A    That is the hallway where the detention cells are

2  located.  They're all on the right-hand side from that

3  view and that is the inside the cell door in the propped

4  open position.

5  Q    And is this cell 119B?

6  A    Correct.

7  Q    The specific cell you were asked to essentially keep

8  watch over.

9  A    Yes.

10 Q    And is there a window in this door?

11 A    Yes, that is a see-through -- I mean it's not one

12 way or anything.  I can see in and the individual can see

13 out that window.

14 Q    And when you communicated with this individual, did

15 you communicate with them at that window?

16 A    Yes.

17 Q    I see there's a chair in this hallway.

18 A    Yes.

19 Q    Was anyone seated there when you did your checks?

20 A    That was where we had what we would refer to as

21 borrowed military manpower.  So we had units that were

22 assisting with the care of everyone during mission and we

23 had somebody stationed in that chair.  Short of restroom

24 breaks, they were there 24-7.

25 Q    And this person, to be clear, is not a police

CHRISTOPHER HENKE - DIRECT

1  officer or law enforcement member.

2  A    No.

3  Q    Turning to Exhibit No. 7, can you tell me what that

4  is?

5  A    That's the outside view of the window, from the

6  looks of it.

7  Q    And so was this photo, does it look like it was

8  taken inside the cell?

9  A    Oh, I see -- yeah, I see the chair from inside the

10 cell; correct.

11 Q    So if someone were standing in the cell, they could

12 -- this is what they would see upon looking out.

13 A    Correct.

14 Q    Okay.  The final picture I wanted to show you was

15 government Exhibit 8.  And for clarity, the last exhibit

16 I showed you was Exhibit No. 7.  What is Exhibit 8?

17 A    That's just a view of the cell.

18 Q    This is an interior shot of 119B.

19 A    Correct.

20 Q    Okay.  And I want to show you -- I want to show you

21 a photo from Docket 43, which is the defense motion.  I

22 want to show you a photo here.  Is this the -- is this

23 cell 119B?

24 A    No.  The cell he would have been in, the cot would

25 have been on the right side.

CHRISTOPHER HENKE - DIRECT

1    Q    So going back to Exhibit No. 8, that is 119B.

2    A    Correct.

3    Q    Okay.  This photo that's included in Docket 43, that

4    is not the cell where the individual was being held.

5    A    No, no.  The cot was on the right.  Yeah, that's it.

6    Q    Okay.  My last line of questioning here, Lieutenant

7    Henke, has to do with whether you observed the FBI

8    interact with the person who is being held in 119B.  Did

9    you?

10   A    My only observance of that is once Mr. Noori had

11   been removed from the detention cell and taken to one of

12   our interview rooms, I did periodically check in --

13   there's an observation room that has the one-way glass.

14   It's located in between the two interview rooms.  I went

15   into that several times to make sure everything was going

16   all right with the interview.  That's also common

17   protocol any time we're doing an interview, to make sure

18   that whoever is being interviewed is in good health and

19   that they haven't also done anything to law enforcement

20   personnel in there.

21   Q    And did you observe any instances of physical force

22   being used against Mr. Noori?

23   A    No.

24   Q    Did you observe any threats between Mr. Noori and

25   any of the FBI investigators?

1  A    Absolutely not.

2  Q    And did you interact with either Mr. Noori or the

3  FBI following the interview?

4  A    Very briefly.  My interaction was solely to assist

5  the FBI in taking him back to the detention cell so that

6  he could utilize the latrine facilities there before the

7  departure and subsequent ride back to Madison.

8  Q    And during that interaction did you use any force on

9  him?

10 A    No force was used.  Obviously we had to put our

11 hands on him to take the hand irons off, so he was placed

12 against the wall, they were removed so he could use the

13 restroom facilities, and he was placed back in the

14 handcuffs.

15 Q    In sum, did you observe anything either of this

16 person, Mr. Noori, or done to this person that -- during

17 your entire observation of him over the course of these

18 two days that gave you any concern or pause?

19 A    No.

20        MS. KRAUS:  I have no further questions.

21        THE COURT:  Cross-exam.  (10:59 a.m.)

22        MS. BLAIR:  Yes, Your Honor.

23                  **CROSS-EXAMINATION**

24 BY MS. BLAIR:

25 Q    Good morning, Lieutenant.

1    A    Good morning.

2    Q    I want to begin by clarifying your role in this

3    investigation.  Your role is to ensure the general well

4    being of Mr. Noori while he's in the facility; is that

5    fair?

6    A    Yes.

7    Q    You don't investigate the case at all, you're just

8    there to make sure he's okay generally.

9    A    Me in a general sense or me specifically?

10   Q    You specifically in this case did not investigate

11   this case.

12   A    Correct.

13   Q    Now, you're familiar obviously with the standard

14   operating procedures for the detention cells and holding

15   area operations.

16   A    Correct.

17   Q    And one of those procedures is that a civilian may

18   not be held more than 12 hours in your custody; is that

19   fair?

20   A    In normal circumstances; correct.

21   Q    Until the FBI had taken over, they were just using

22   your facility to hold him; correct?

23   A    Correct.

24   Q    Okay.  Now, you had mentioned that there's a live

25   feed going on inside this cell.  Is that what you

1 testified to?

2 A    There is surveillance of that detention cell;

3 correct.

4 Q    From the inside of the cell?

5 A    Yes.

6 Q    Is it just a live feed or does it record in any way?

7 A    It's recorded, I believe, but I think there is a

8 very short window that it stores any of that.

9 Q    How short is that window?

10 A    I do not know.  You'd have to talk to dispatch and

11 find out.  That's all their technology and they're the

12 ones that run those recording systems.  There's very few

13 people that have access to that.

14 Q    As far as you're aware, has anyone asked you or

15 anyone else that you've heard of to preserve the

16 recording of Mr. Noori in his cell?

17 A    Not that I'm aware of.  That wouldn't be something

18 anyone would ask me, because like I said, that's not one

19 of my duties.  I'm not privy to access to that.

20 Q    Do you know exactly how cold it is in the holding

21 cell area?

22 A    It would be the same temperature as the rest of the

23 building.

24 Q    Do you know what that is?

25 A    I have no idea.  I suspect --

CHRISTOPHER HENKE - CROSS

1  Q    Just one moment.  I apologize.

2           THE COURT:  I'm sorry, I'm not keeping track

3  either.     (pause at 11:01 a.m.)

4  A    Whatever the government sets it on is the mandated

5  --  I mean, I'm sure it's like this building.  It's a set

6  parameter and I don't ever look at the temperature in

7  there so I wouldn't know.  But same as the rest of the

8  building.

9  Q    At some point a clock is set outside Mr. Noori's

10 cell?

11 A    Yes, I believe we did put something out there for

12 him.

13 Q    Okay.  And something to tell time.

14 A    Correct.

15          MS. BLAIR:  I have no further questions.  Thank

16 you, Lieutenant.

17          THE COURT:  Redirect?

18          MS. KRAUS:  No.  Thank you.

19          THE COURT:  All right.  Thank you, Lieutenant.

20 You're done.  You're free to go about your business.

21          THE WITNESS:  And do I just leave these here?

22          THE COURT:  Yes.

23          THE WITNESS:  All right.

24     (Witness excused at 11:02 a.m.)

25          THE COURT:  All right.  Before you call for your

next witness, let's talk about how we want to handle

this.  Do you want to take a 5- to 10-minute break and

come back and do more witnesses?  Do you want to take an

early lunch hour of 30 to 45 minutes and then finish the

last two witnesses?  I will do whatever you want to do.

MS. KRAUS:  Your Honor, my preference would be

to perhaps take the early lunch now so I can get the

second -- the last two witnesses ready to go, and then

after the lunch break, we'll be able to just move

seamlessly through.

THE COURT:  How long a lunch break would you be

requesting?

MS. KRAUS:  Half hour is fine.

THE COURT:  That's enough time?

MS. KRAUS:  That's fine.

THE COURT:  Okay.  Ms. Blair, Mr. Bugni, how

does that sound to you?

MR. BUGNI:  All right.

MS. BLAIR:  That sounds good.

THE COURT:  Okay.  So it's a little after 11.

Let's break for an early lunch.  Let's reconvene at 11:40

to finish the government's witnesses, and then pursuant

to our previous understanding, Ms. Blair, the defense

witnesses will be called tomorrow.

MS. BLAIR:  Your Honor, if -- so absolutely as

to Dr. White and then to the judge from Afghanistan.
However, if Your Honor would prefer to use all of our
time today, we would be prepared to call Mr. Noori today.
Whatever is the best use of the court's time.

THE COURT:  I am free all day.  I am available
if it works for the interpreters and for the attorneys.
If Ms. Kraus is ready to cross-examine today, we will do
that.  If she was planning on tomorrow, I will not make
her go today.  Ms. Kraus.

MS. KRAUS:  Your Honor, my impression was that
we were going to be calling defense witnesses tomorrow.
I certainly could prepare a cross, but also I should add
that Ms. Blair did represent to me that it was unlikely
they were going to call Mr. Noori, so I'm unprepared --

THE COURT:  No, I've heard enough.  Then we'll
stick with the previous arrangement.  I won't make the
government cross-examine Mr. Noori today if he were to
choose to take the stand.  If you add any other witnesses
today, we could probably do those, otherwise then we'll
finish the hearing today when the government calls its
last witness.  We'll continue tomorrow with all the
defense witnesses at that time.

I just used three of your minutes of lunch hour.
Let's reconvene at 11:45.

(Lunch recess      11:04-11:51 a.m.)

1    THE CLERK:  All rise.  This Honorable Court is

2  again in session.  Please be seated and come to order.

3    THE COURT:  All right.  Welcome back everybody.

4  Just for the record, let me remind both our interpreters

5  that you remain under oath.

6    Any preliminary matters before the government calls

7  its next witness?  Are we good?  Please call your next

8  witness.

9    MS. KRAUS:  The government calls Matthew

10  O'Neill-Levine.

11    **MATTHEW O'NEILL-LEVINE, GOVERNMENT'S WITNESS, SWORN**

12    THE COURT:  Please be seated.  Let me just give

13  you two frontal advisals.  One about our COVID protocols.

14  If you wish to keep your mask on, you may.  You don't

15  have to.  Because you're taking it off, part B is

16  irrelevant.

17    THE WITNESS:  Okay.

18    THE COURT:  Also there is water to your left, if

19  you wish.

20    THE WITNESS:  Thank you, sir.

21    THE COURT:  With that, let's begin.

22    MS. KRAUS:  Thank you.

23    <u>**DIRECT EXAMINATION**</u>

24  BY MS. KRAUS:

25  Q    Can you please state your name.

1  A    Matthew D. O'Neill-Levine.

2  Q    What do you do for a living, Mr. O'Neill Lavigne?

3  A    I am a supervisory federal agent with the TSA Law

4  Enforcement/Federal Air Marshal Service.  My official

5  title is Assistant Federal Security Director for law

6  enforcement.

7  Q    Generally how long have you been with the TSA?

8  A    Almost 21 years.

9  Q    And as part of your employment with the TSA, at any

10  point were you asked to assist at Fort McCoy?

11  A    Yes.

12  Q    In what capacity?

13  A    Initially I was deployed to Fort McCoy as the Law

14  Enforcement Group Supervisor for the Department of

15  Homeland Security, and then later I was Acting Deputy

16  Federal Coordinator.

17  Q    At what time were you assigned in this role with

18  respect to Fort McCoy?

19  A    It began in September, early September 2021.  My

20  first tour went through until Thanksgiving, around that

21  time, and then my second tour began in January and ended

22  towards the end of February 2022.

23  Q    What led you to essentially this assignment at Fort

24  McCoy?

25  A    So I had previously deployed, for instance, for a

refugee crisis out of Lebanon previously and disaster

recovery to hurricane-affected disaster zones in the past

in a leadership role in law enforcement.  When they were

looking for volunteers to assist with Afghanistan

evacuees, I volunteered.  I initially thought I was going

to be deployed internationally, but they said that DHS

wanted me domestically at Fort McCoy.

Q     You referenced DHS.  Can you tell me what that is?

A     Department of Homeland Security.

Q     So essentially you were asked to assist at Fort

McCoy on behalf of the Department of Homeland Security?

A     Correct.

Q     Now before we get into what your exact role was at

Fort McCoy, I wanted to just ask you some general

questions about this mission --

A     Okay.

Q     -- that you were asked to support.  Is it fair to

call it a mission?

A     Yes.

Q     And can you tell me what that mission was called?

A     Operation Allies Welcome.

Q     And can you provide me a brief overview of what

Operations Allies Welcome was.

A     So Operation Allies Welcome was basically the mass

whole of government effort, also with the assistance of

MATTHEW O'NEILL-LEVINE – DIRECT

nongovernmental organizations, state and local, and

volunteer organizations to bring Afghanistan refugees and

U.S. citizens and their loved ones to the United States

for their protection from the situation in Afghanistan at

the time.

Q    And what's your understanding of how Fort McCoy was

used or involved in support of this mission?

A    So Fort McCoy was utilized as what we call a safe

haven, a housing facility until all immigration and other

issues were rectified to allow for full entrance into the

United States.

Q    Is it fair to say then that people from Afghanistan

were being housed at Fort McCoy pending what you've just

explained?

A    Correct.

Q    Okay.  And do you recall when, for lack of a better

word I'm going to use Afghani civilian or phrase, when

they arrived to Fort McCoy?

A    I believe it was around the last week of August of

2021.

Q    Now, do you have any reason -- do you have any

explanation for why Fort McCoy specifically was chosen to

house this population?

A    Fort McCoy is used for a training facility and had

at the very least housing available in the form of

MATTHEW O'NEILL-LEVINE - DIRECT

1  barracks and had previously a significant time in the

2  past served the same purpose for Cuban refugees.

3  Q    Do you recall about how many Afghani civilians were

4  essentially housed at Fort McCoy during the beginning

5  part of this mission?

6  A    Approximately 13,000.

7  Q    And was this one influx?  Was it in stages?  How did

8  they arrive?

9  A    In stages over, I would say, a week to two weeks,

10 that initial first week of August and first week of

11 September.  But for a full influx, approximately 13,000

12 by the beginning of September.

13 Q    From your understanding, did Fort McCoy, beyond

14 having barracks, did it already have infrastructure

15 needed for 15,000 foreign nationals?

16 A    No.

17 Q    About how long do you think or are you aware Fort

18 McCoy had to prepare for this massive influx of people?

19 A    It was a very short turnaround.  I would say, as

20 everything -- I mean everything that was unfolding in

21 Afghanistan, Fort McCoy had to be stood up within a week,

22 two weeks of the instant happening.  So it was a very

23 short time.

24 Q    I want to talk next about -- well, before I jump to

25 that, you did reference that part of the reason why these

Afghani civilians were housed at Fort McCoy was
essentially for the process of immigration.

A    Yes.

Q    What legal status, if any, did they have at Fort
McCoy while they were there?

A    So they were granted admission into the United
States.  So -- and while they were in Fort McCoy, they
were being processed for different additional visa
statuses that would give them more benefits.  However,
they were admitted to the U.S. with a special immigration
status that allowed them to be present in the United
States.

Q    So if someone wanted to leave Fort McCoy, an Afghani
civilian, were they able to?

A    Yes.

Q    Without any ramifications.

A    Correct.  They could freely leave.  They were
allowed into the United States.  They had immigration
status in the United States.  It could have impacted
their special visa benefits or timeline for those
benefits if they did leave the base, but they could
freely leave the base.

Q    So from a law enforcement perspective, if someone
wanted to leave, there was no, for example, a law
requiring their presence on the base.

MATTHEW O'NEILL-LEVINE – DIRECT

1    A    No.

2    Q    Okay.  I want to turn to your exact role.  You

3    mentioned you were there in a law enforcement capacity.

4    A    Correct.

5    Q    Okay.  And what exactly was your role?

6    A    So my role was very similar to my day job.  I'm

7    essentially, for my day job, I am my agency's law

8    enforcement liaison and coordinator to the State of

9    Wisconsin.  So my job is to be liaison to federal, state,

10   local law enforcement throughout the state for whatever

11   reason.  So if it's an incident, criminal investigation

12   response, if it touches my agency or the transportation

13   sector, my job is to be our agency's liaison and

14   interface with, for instance, FBI or HSI or state police.

15   I am the liaison.

16         So with that, I was sent on behalf of DHS, our

17   parent agency, to serve the same role, to essentially be

18   the one that interacts with the different law enforcement

19   entities that are on base and to make sure we are

20   coordinated and meeting the mission goals.

21   Q    Why -- why would DHS or other agencies even be

22   involved at this point if this is a military base?

23   A    So Operation Allies Welcome initially started under

24   the purview of DoD and Department of State while it was

25   in Afghanistan; however, domestically Department of

                    MATTHEW O'NEILL-LEVINE - DIRECT

Homeland Security became the lead agency. So it became a

interagency, what's called a Unified Command Group, UCG,

where representatives from different parts of the federal

government led the mission, with DHS being the primary

leader because it was a domestic operation. So it fell

onto DHS to be the overall conductor; make sure that all

the different agencies provided the resources that were

needed and everyone was communicating and, you know,

following regulations and protocol.

Q    So this kind of coordination and infrastructure you

referenced, was this something unique to this mission as

opposed to whether it already existed at Fort McCoy?

A    No, this was a very unique mission. This was

unprecedented. Nothing like this had ever really

happened in modern times for DHS and the federal

government to deal with in this capacity. There is a

overarching incident command system, ICS, that basically

helps us coordinate and used standardized forms. But

beyond that, there's nothing. Nothing that was existing

before this.

Q    So at least when it pertains to law enforcement at

the base for this mission, DHS was trying to build

essentially law enforcement infrastructure in support of

this mission.

A    Correct.

MATTHEW O'NEILL-LEVINE - DIRECT

1  Q    And your role was to coordinate with all of these

2  different agencies.

3  A    Correct.

4  Q    Now turning to law enforcement, what's your

5  understanding of what law enforcement agencies would have

6  been responsible should there be a criminal investigation

7  at Fort McCoy?

8  A    So the primary criminal investigative agency is FBI

9  because of federal -- exclusive federal jurisdiction,

10 it's federal land.  The base has a static assigned law

11 enforcement agency, the Fort McCoy Police Department, and

12 Army Criminal Investigation Division, ACID, on the base.

13 However, they are geared more towards military members

14 and their normal small presence of military members that

15 are there.  But FBI would be the primary criminal

16 investigative agency.

17 Q    Now, are you aware whether FBI would have typically

18 staffed a number of agents on this military base outside

19 of Operation Allies Welcome?

20 A    No, not normally.  I mean my understanding is prior

21 to this, it's kind of an on call.  There's federal

22 jurisdiction, it's handled by the FBI, but it's a

23 response capacity, not a static deployment.

24 Q    So can you explain why the presence of, say, 15,000

25 civilians can change the law enforcement landscape at

1    Fort McCoy during Operation Allies Welcome?

2    A    So the influx of 13,000 Afghan refugees basically

3    made a small city.  It became the largest city in the

4    region and the local infrastructure base was completely

5    overwhelmed.  So resources were called in, as I said,

6    from all of government to be able to deal with

7    everything.  It's a humanitarian crisis.  So it's similar

8    to a refugee camp overseas, but it was here in Wisconsin.

9    So we needed everything from not just FBI food personnel,

10   sanitary personnel, medical personnel, whole of

11   government lists responded to help deal with this

12   unprecedented influx.

13   Q    I want to talk now about maybe some law enforcement

14   specific concerns during this mission.  Were there any

15   perhaps unique features in criminal investigations during

16   this mission that perhaps might not be present if we're

17   dealing with just a military presence at the base?

18   A    Yeah, definitely.  I mean, first and foremost is a

19   language interpretation.  The population did not speak

20   the same language among themselves.  There are multiple

21   different languages.  Some -- some of our guests, the

22   Afghan refugees, may have spoke one or two languages, and

23   others spoke completely different, and they were all in

24   the same location.  So before every incident, the

25   responding law enforcement personnel had to ensure that

MATTHEW O'NEILL-LEVINE - DIRECT

they had interpreters that spoke the correct language for

the victims and the subjects involved.

Q    Now -- and kind of turning to the timeframe of

mid-September, say September 11, 12, 13.  I mean, at this

point is it fair to say are there enough interpreters at

the base or is this meaningfully addressed?  What's your

impression of that?

A    At this point, no.  It was -- that was very early on

in the mission.  The personnel were still coming in.

Housing was still being established where everyone was

located, structure, resources.  We were dealing with just

trying to get food and water and adequate resources for

basic living.  And interpreters were also influx at the

time.

Q    Now, were there any -- as the law enforcement

coordinator, was it essentially your responsibility to

kind of keep a beat on potential crime or safety issues

that might be cropping up during this mission?

A    Yes.

Q    Okay.

A    Yes.

Q    Are there any specific kind of safety forward or

safety-minded issues that were a concern with law

enforcement?

A    Yeah, definitely.  Just like any large city or large

MATTHEW O'NEILL-LEVINE - DIRECT

even sporting event, you have a mass of humans, and with
that comes the matter of security concerns, personal
grudges.  In this case, we had an influx of 13,000 Afghan
refugees that came from a war zone and were unpacking a
lot of trauma and a lot of experiences, so that was just
one aspect.

     We had behavior health issues.  There was -- we had
incidents where we had, you know, intertribal grudges
from Afghanistan that came with them to Fort McCoy.  So
we had to keep a robust law enforcement security
presence, just like any large mass of humans.

Q    Were there any specific concerns about perhaps
vigilante justice or maybe nonformal criminal justice
resolution within this population?

A    Yes.

Q    And can you explain that a little.

A    So we had certain intertribal grudges, people that
were upset about wrongs that may have happened in
Afghanistan and now they're in the same location in a
refugee -- for lack of a better word -- refugee camp in
Wisconsin.  So we had to be cognizant of those.  And same
thing where, for instance, a family may have had a
marriage contract in Afghanistan and then they find
themselves in Wisconsin and the participants of that
contract did not want to follow through with it now that

MATTHEW O'NEILL-LEVINE - DIRECT

they're in the United States. We would have family
members actually stalk or follow members of that contract
and try to force them to go through with it, which is an
issue. It's -- it was an example of the issues in
Afghanistan coming over to here that we had to be
cognizant of and watch. So there was a personal security
issue for them.

Q My last point or question on that point is whether
there were concerns that perhaps the Afghan -- Afghani
civilian population would respond to crime outside of
calling law enforcement or asking the military for
support.

A Yes. So there were concerns that personnel would
want to keep crimes internal so they could deal with them
internally rather than bring in outsiders, for lack of a
better term.

Q Now, with respect to a formal response protocol, as
the law enforcement coordinator, was there kind of a
chain of response that was expected to be followed if
there was a report of possible crime?

A Yes. So basically in an operation of this
magnitude, we wanted to keep it as simple as possible.
So all response protocol for each agency involved stayed
the same. They went over their internal response
protocol and we treated the base as essentially Any Town

MATTHEW O'NEILL-LEVINE - DIRECT

1    USA.  So say this was New York or Chicago, Chicago PD or

2    NYPD, encounter a subject suspected of a crime, they make

3    an initial detainment while the crime is being

4    investigated.  And in this case, if it had a federal

5    nexus or FBI nexus, they would be called in to take over.

6    So we maintained that same structure.  It's exclusive

7    federal territory, so local PD, Fort McCoy PD, responded

8    to this and then it gets referred to FBI.

9    Q    And so that was the response for really any crime.

10   A    Correct.

11   Q    Okay.  And to clarify, FBI was expected in most

12   cases to assume the investigation because this was under

13   a special or exclusive federal jurisdiction.

14   A    Correct.

15   Q    And that was your understanding as the law

16   enforcement coordinator.

17   A    Yes.

18   Q    And is this a plan that was communicated essentially

19   to the higher ups within this mission as well?

20   A    Yes.

21   Q    Okay.  And that being the Department of Homeland

22   Security.

23   A    Correct.

24   Q    Okay.  Now my last kind of questions,

25   Mr. O'Neill-Levine, have to do with the ability to either

MATTHEW O'NEILL-LEVINE - DIRECT

1  keep guests safe or on the base.  And you testified

2  earlier that someone could leave any time they chose.

3  A    Yes.

4  Q    Okay.  So absent some sort of formal detention

5  either by law enforcement or military for some reason,

6  law enforcement was unable to make someone stay.

7  A    Correct.

8  Q    Okay.  Was there any kind of ability for law

9  enforcement or other agencies within this mission to kind

10 of separate out people in order to maybe diffuse a

11 conflict?

12 A    No.  I mean there was no other special housing or

13 anything like that.  If it was a criminal-related

14 incident, it was something where they're detained by law

15 enforcement while it's investigated.

16 Q    So it's safe then to say there's not some ability

17 for Fort McCoy personnel, other agency government

18 personnel to essentially separate someone in a different

19 barracks or in some sort of quarantine?

20 A    Not -- not for a criminal-related incident; correct.

21 Q    Okay.  Were you involved in the investigation of a

22 sexual assault involving a man named Bahrullah Noori?

23 A    No.

24 Q    Okay.  Were you briefed on that investigation?

25 A    Yes.

MATTHEW O'NEILL-LEVINE - DIRECT

1    Q    Okay.  And based on what you know about that

2    investigation, was the law enforcement response what was

3    contemplated by the multiple agencies involved in this

4    mission?

5    A    Yes.

6            MS. BLAIR:  I would object to lack of

7    foundation.

8            THE COURT:  Keep going.

9            MS. BLAIR:  I don't believe that they've laid

10   out exactly what the protocol was and what information he

11   actually has.  He said he wasn't involved, so I'd like to

12   know exactly what happened and then if that complied with

13   it.  But his simply saying it complied with it without

14   exactly knowing what channels were notified, I don't

15   think it informs us of anything.

16           THE COURT:  Understood.  It's a fair question,

17   Ms. Kraus, but let's set it up like a hypothetical in a

18   tort case.  Set forth all of your assumptions and then

19   ask Mr. O'Neill-Levine to respond with his opinion on the

20   hypothetical that you've given him, okay?

21   BY MS. KRAUS:

22   Q    Mr. O'Neill-Levine, you referenced that Fort McCoy

23   was -- the police department was being used, kind of, as

24   a first response.

25   A    Yes.

                 MATTHEW O'NEILL-LEVINE - DIRECT

1  Q    Okay.  And then following that kind of initial

2  response, it was expected that the FBI would assume the

3  investigation.

4  A    Yes.

5  Q    Okay.  Is that -- and then was there potential for

6  other law enforcement agencies, military or otherwise,

7  were they somehow involved?

8  A    I mean every situation is different.  In any initial

9  law enforcement response, for instance, on this base it

10 could have been security personnel or Army, uniformed

11 Army that is initial response and then calls the police

12 and then they call FBI.  But the -- what was set up was

13 essentially, like I said, Any Town U.S.A.  Fort McCoy PD

14 was the first response, and then FBI was essentially the

15 detective bureau, if this was Any Town U.S.A.

16 Q    So if there was a report of a crime amongst Afghan

17 civilians, it could initially be reported by, as you

18 said, military personnel who are in charge of watching

19 the barracks.

20 A    Correct.  I'm sorry, could you repeat that?

21 Q    So if there was -- in some instances, reports of

22 crime were actually reported by perhaps military

23 personnel that might be tasked with observing the

24 barracks.

25 A    Correct, yes.

MATTHEW O'NEILL-LEVINE - DIRECT

1   Q   Okay.  And it's your understanding that they would,

2   in turn, call Fort McCoy Police Department.

3   A   Correct.

4   Q   Because, as you said, that department was set up as

5   a first response.

6   A   Exactly.

7   Q   All right.  And then following that chain you set

8   forth, FBI at some point would assume the investigation

9   because of the jurisdiction.

10  A   Correct.

11  Q   Okay.  And so were you made aware of the order of

12  offense that occurred with respect to the investigation

13  of Bahrullah Noori?

14  A   Yes.

15  Q   Okay.  And are you aware that that was a child

16  sexual assault investigation?

17  A   Yes.

18  Q   Okay.  And do you know who was the first response to

19  that report?

20  A   I don't recall specifically who was the direct.  I

21  do know that Fort McCoy PD referred it to the FBI.

22  Q   Would it surprise you, given the chain of command

23  and the response protocol you've set forth, if Fort McCoy

24  did actually provide some sort of first response duties?

25  A   Yes, it would be completely normal for them to do

MATTHEW O'NEILL-LEVINE - DIRECT

1  first response duties.

2  Q    And would have been under this kind of protocol

3  that's set forth for Operation Allies Welcome, would it

4  be formal for Fort McCoy to make some of those first

5  investigative decisions and then turn it over to the FBI?

6  A    Yes, completely normal, just like NYDP or Chicago

7  PD, same process.

8  Q    Okay.  I guess my final question,

9  Mr. O'Neill-Levine, is understanding that great efforts

10  were taken to organize law enforcement and other

11  infrastructure for Operation Allies Welcome in early

12  September, mid-September, is it fair to say that it was

13  still a very new process?

14  A    Yes.  Yes.  Very, very new, yes.

15          MS. KRAUS:  I don't have any further questions.

16          THE COURT:  Understood.  Cross-exam.

17          MR. BUGNI:  Judge, could we have a minute?

18          THE COURT:  You may.  We need to switch

19  interpreters anyway.  (12:16 p.m.)

20                    **CROSS-EXAMINATION**

21  BY MS. BLAIR:

22  Q    Good morning -- afternoon.  Good afternoon.

23  A    Good afternoon.

24  Q    Sounds like based on your role here, you had some

25  familiarity with what was going on in Afghanistan?

                MATTHEW O'NEILL-LEVINE - CROSS

1  A    Yes.

2  Q    And a lot of the refugees that were brought here

3  were brought here because they were facing violence in

4  Afghanistan.

5  A    Correct.

6  Q    And you're aware that police and law enforcement is

7  very different in Afghanistan than how it is here in the

8  United States.

9  A    Yes.

10 Q    And how it would be at Fort McCoy.

11 A    Yes.

12 Q    Out of the time that you were supervising OAW or

13 supervising your specific role, how many federal charges

14 do you believe were brought or how many Afghanis were

15 brought to federal court to be prosecuted?

16 A    I believe we've -- during that timeframe, we had

17 three, two criminal and one immigration.

18 Q    When you said "during that timeframe," what

19 timeframe are you referring to?

20 A    OAW at Fort McCoy.

21 Q    And what is that -- what are the months?

22 A    I would say end of August 2021 through end of

23 February or early March 2022.

24 Q    And when an official interpreter couldn't be used,

25 would law enforcement occasionally use someone from

1   Afghanistan who spoke English as well or someone who was

2   in the Army who also spoke Pashto or Dari?

3   A    There were interpreters of both, contractors and

4   military members, and the military had set up a

5   availability or duty roster spread across all avenues of

6   the operation.  So at least in my experience of just

7   pulling someone aside and saying hey, do you speak this

8   language didn't necessarily happen during the response.

9   There was a designated response for the law enforcement

10  that was there.

11  Q    On this duty roster, approximately how many

12  interpreters were available to --

13  A    It varied per timeframe.  This was early on in the

14  operation, so -- I mean it would be a guess, but I would

15  say during this timeframe maybe a hundred would be a

16  ballpark, but spread across, you know, all avenues of

17  business.  So you'd have behavior health, you'd have food

18  lines, you'd have medical appointments, complex -- I mean

19  you're essentially running a city with a population that

20  didn't speak the language.  So...

21  Q    That number of approximately a hundred is excluding

22  any refugees who were bilingual or close to bilingual.

23  A    Yeah, I'm saying just official interpreters.

24        MS. BLAIR:  I have no further questions.  Thank

25  you.

MATTHEW O'NEILL-LEVINE - CROSS

1      THE WITNESS:  Thank you.

2      THE COURT:  Any redirect?

3      MS. KRAUS:  No.  Thank you.

4      THE COURT:  All right.  Well, thank you,

5  Mr. O'Neill-Levine.  You're done.  You're free to go

6  about your business.

7      THE WITNESS:  Thank you, sir.

8      (Witness excused at 12:20 p.m.)

9      THE COURT:  One more witness for the government?

10     MS. KRAUS:  Yes.  The government's last witness

11 is Special Agent Mark Meyers.

12     **MARK MEYERS, GOVERNMENT'S WITNESS, SWORN**

13     THE COURT:  Agent, you've been present when I've

14 given the advisals to other witnesses so I will eschew

15 giving them to you.

16     THE WITNESS:  Thank you, Your Honor.

17                   **DIRECT EXAMINATION**

18 BY MS. KRAUS:

19 Q    Can you please state your name.

20 A    Mark B. Meyers.

21 Q    How are you employed?

22 A    By the Federal Bureau of Investigation.

23 Q    What is your role within the Bureau?

24 A    I'm a special agent.

25 Q    How long have you been with the FBI?

MARK MEYERS - DIRECT

1  A     About eight years.

2  Q     And during that time, what kinds of investigations

3  have you been assigned to?

4  A     Criminal investigations.

5  Q     And has that always been in Wisconsin?

6  A     No.  I was first assigned to the Bemidji resident

7  agency, part of the Minneapolis field office.  I worked

8  five-and-a-half years in Indian country doing violent

9  crime investigations.

10 Q     During that time, did you have any experience

11 responding to sexual assaults?

12 A     Yes.

13 Q     And was there anything unique about your assignment

14 to that particular -- I believe you said reservation?

15 A     Correct.  It was a special -- federal special

16 jurisdictional land.

17 Q     And what does that mean?

18 A     Primarily major felonies or anything criminal was

19 investigated by the FBI.

20 Q     Where are you currently assigned?

21 A     I'm assigned to La Crosse resident agency.

22 Q     And when were you assigned to that agency?

23 A     June of 2020.

24 Q     How many agents are assigned to that particular

25 division?

MARK MEYERS - DIRECT

1  A    It's a two-agent resident agency.

2  Q    And what kinds of investigations or territory are

3  you assigned to investigate or cover as part of that

4  agency?

5  A    Multiple counties across kind of southwest

6  Wisconsin.

7  Q    And so would those two agents within that office be

8  responsible for investigation on behalf of the FBI for

9  that entire area?

10  A    Correct, yes.

11  Q    And how many state counties does that cover?

12  A    I can't recall off the top of my head, it's nine or

13  eleven because we're changing.  They're talking about

14  changing the counties.  But there's lots; several.

15  Q    And so it's fair then that you're responsible for

16  investigating any potential federal crime that falls

17  within FBI purview for that whole area.

18  A    Yes.

19  Q    I want to turn to September of 2021 or late August

20  2021.  At any point were you assigned to a special,

21  either area within your general region or a special --

22  kind of like a special mission?

23  A    So Monroe County is one of our counties, and the

24  Fort McCoy military installation resides completely in

25  Monroe County.  And so we were notified that -- of

MARK MEYERS - DIRECT

1  Operation Allies Welcome, and then I began attending

2  information briefings.

3  Q    And what was the expectation at that point with

4  respect to you and your ability to investigate crime?

5  A    It would remain the same, to do any kind of violent

6  crime or violent criminal investigation, anything that

7  met a federal nexus on special jurisdictional land.  We

8  were to operate as normal, per se.

9  Q    Now, outside of Operation Allies Welcome, does the

10 FBI maintain an office or presence at Fort McCoy?

11 A    Just in a liaison.  Unless there's an allegation of

12 a federal crime, it's just a response.

13 Q    So typically it's fair to say that your

14 investigative involvement as it relates to Fort McCoy is

15 minimal.

16 A    Correct.

17 Q    Okay.  And did your role in Operation Allies

18 Welcome, was there something different about the FBI

19 response in the context of Operation Allies Welcome?

20 A    Yes.  We're putting a large civilian population on a

21 military installation that is a special jurisdictional

22 land.

23 Q    And that's just not a typical -- a typical

24 population when you're kind of going about the course of

25 your regular work, the FBI.

MARK MEYERS - DIRECT

1   A    Correct.  When it kicked off, I held two roles.  I

2   was to lead the criminal investigations, and then also in

3   a liaison, I guess liaison job with all the other federal

4   and local agencies that were there because it was a large

5   overtaking, something that doesn't happen very often.

6   Q    So kind of talking about when you were first, I

7   guess, assigned to assist with this mission at Fort

8   McCoy, what was your understanding of how many federal

9   agents from the FBI would be present at Fort McCoy?

10  A    That was in constant flux.

11  Q    So let's talk about maybe early September.  Do you

12  know how many agents were actually physically present at

13  Fort McCoy?

14  A    It was either six or eight.

15  Q    And were all of them responsible to respond to

16  criminal investigations?

17  A    No.  We had a large national security job there as

18  well.

19  Q    So not all of the agents present at -- on the base

20  were involved in responding to reports of crime.

21  A    Initially we started with two agents --

22  Q    Okay.

23  A    -- for responding to crime.

24  Q    And around September 11, do you recall how many

25  agents you had up there at any given time to respond to

MARK MEYERS - DIRECT

1  crime?

2  A     Two.

3  Q     And so can you explain for me what kind of hours you

4  were working at this time?

5  A     I was working a lot of hours between all the liaison

6  meetings and stuff that needed to be done and then also

7  investigating and coordinating investigations.  My

8  average day would range between 12 and 18 hours.

9  Q     If the FBI determined there was a need for

10  additional agents, was there a system put in place for

11  you to request that help?

12  A     Yes.

13  Q     And can you explain that for me.

14  A     We would have morning and evening briefings where

15  we'd talk over challenges, events, things that happened.

16  At that time, if we see an event happened and we needed

17  to coordinate to get extra bodies there or investigators

18  there, special agents to do interviews or canvases or

19  whatever may be, whether it was on the national security

20  side or on the criminal side, those morning briefs, we

21  would sit down and we would talk logistics of how can we

22  make this work and what other challenges are going on at

23  the time so we can try to facilitate accomplishing

24  everything.

25  Q     If there was a need for additional FBI agents to

MARK MEYERS - DIRECT

1   assist with criminal investigations, where were they

2   coming from?

3   A    So this was a Midwest agent response and basically

4   we were pulling agents from Chicago field office,

5   Milwaukee field office, and Minneapolis field office.

6   Q    And were they kind of on call or how did -- how did

7   you determine where these FBI agents were going to come

8   from?

9   A    So that -- I didn't make that determination of where

10  they would come from.  That was higher up the food chain.

11  I'm on the bottom level.  When I see a need, I request it

12  and it gets filled as able.  So I put in the request to

13  an on-site supervisor who was there and then they further

14  it up the change or up the chain to an assistant special

15  agent in charge from one of the field offices, who then

16  assigns personnel to respond.

17  Q    So this was not a matter of you personally calling

18  other agents for additional help.

19  A    That is correct.

20  Q    Okay.  I want to turn to September 11 of 2021.  Now,

21  at this point in time, is it still these two FBI agents

22  assigned for criminal matters?

23  A    Yes.

24  Q    Okay.  And do you recall if you were working on

25  September 11?

MARK MEYERS - DIRECT

1    A    Yes.

2    Q    And do you recall what you were doing that day?

3    A    The 11th, I was conducting a different criminal

4    investigation at the time.

5    Q    And was this involving Afghanistan civilians?

6    A    Yes.

7    Q    Okay.  At any point on September 11 were you made

8    aware of a sexual assault allegation?

9    A    Yes.

10   Q    Okay.  About at what time?

11   A    It was the early morning, and I believe I had -- it

12   was at the morning briefing when I was made aware of it.

13   Q    I want to turn to Saturday, September 11, 2021,

14   specifically.

15   A    Okay.

16   Q    If there had been an arrest -- actually Agent

17   Meyers, I'm going to put on the screen some stipulations

18   here that might help you.  I just want to make sure we're

19   talking about the same time here.  May I approach?

20          THE COURT:  You may.

21   BY MS. KRAUS:

22   Q    Agent Meyers, I'm handing you what's been filed as

23   Docket No. 61.  It's listed or it's titled "Joint

24   Stipulation of the Parties."  Do you recognize this

25   document?

MARK MEYERS - DIRECT

1  A    Yes, I do.

2  Q    Is this something that you reviewed prior to your

3  testimony today?

4  A    Yes.

5  Q    Okay.  So I want to turn to that document where it

6  indicates a timeline for September 11 of 2021.  What time

7  was there a report of a sexual assault?

8  A    8:15 p.m.

9  Q    Okay.  So understanding that the sexual assault

10  report was made at about 8:15 on September 11, were you

11  made aware of it that evening?

12  A    I was not.

13  Q    Okay.  What were you doing that evening?

14  A    I was conducting a separate investigation at that

15  time.

16  Q    Okay.  When were you made aware of this sexual

17  assault allegation?

18  A    That would have been the following morning.  So my

19  previous statement that I was made aware on the morning

20  of September 11 was not correct.

21  Q    Okay.

22  A    It would have been the following morning at the

23  morning brief that this incident had happened.

24  Q    So when you testified earlier, again, you were made

25  aware earlier in the morning, you're referring to the

MARK MEYERS - DIRECT

1  morning of Sunday, September 12th.

2  A    That is correct.

3  Q    Okay.  Were you on base the evening of September 11?

4  A    The evening, yes.  The night, I don't believe so.  I

5  believe I was at the hospital with a different case.

6  Q    At any point did you -- did you leave the base or

7  kind of clock out and go home?

8  A    Yes, I went home to sleep.

9  Q    Okay.  At that point, had you been working a normal

10 shift?  Extended hours?  Like what kind of timeline are

11 you working here?

12 A    I don't recall the exact hours I worked that day,

13 but I was averaging about three to four hours of sleep

14 and then turning around and coming back.

15 Q    Okay.  So turning to the morning of Sunday,

16 September 12th, what were you told when you got in to

17 work that morning about this sexual assault

18 investigation?

19 A    I was informed that there was allegations of a

20 sexual assault by an Afghan guest on two minors; that

21 Fort McCoy had taken him back to the police department,

22 and basically the criminal investigation was getting

23 referred to me.

24 Q    Okay.  And when you say it was referred to you, what

25 do you mean?

MARK MEYERS - DIRECT

1    A    It was getting turned over for me to organize to

2    make sure that the criminal investigation was completed.

3    Q    As in were you assigned as the lead agent for that

4    investigation?

5    A    The case agent; correct.

6    Q    Okay.  So it could be true that FBI might have been

7    made aware of this investigation or the case prior to

8    that morning, but that morning is when you personally

9    were assigned.

10   A    That is correct.

11   Q    Okay.  And did you have any decision-making power

12   with respect to whether the FBI was even going to start

13   investigating this case or not?

14   A    No.

15   Q    Okay.

16   A    No.  That decision was already made the prior

17   evening.

18   Q    So the prior evening, the FBI is already assuming

19   this investigation.

20   A    Yes.

21   Q    Okay.  But it's not until Sunday, September 12th,

22   that you're assigned as the case agent.

23   A    Correct.

24   Q    And what does that mean?

25   A    That means that I conduct the investigation,

MARK MEYERS - DIRECT

facilitate making sure forensic interviews are organized,

requesting extra agents for interviews, to conduct

interviews making sure that the investigation is moving

forward.

Q    Now, on Sunday, September 12th, was this the only

criminal investigation that you were working?

A    No.

Q    How many others were you working?

A    There were a total of three open criminal

investigations at the time.

Q    Now, when you were briefed of the fact that this was

a sexual assault of a child, what investigative steps did

you take first knowing that?

A    The first thing I did was reach out to our child and

adolescent forensic interviewer because I knew they would

have to travel from Minneapolis.  That's just -- that's

the one that's assigned for our area, so I reached out to

try to organize that.  And then also I had to have

medical completed for the children.

Q    Now, you mentioned you had to have a forensic

interviewer assigned through Minneapolis.  Can you

explain that decision-making process for me?

A    There's only a handful of child and adolescent

forensic interviewers that are assigned, and per policy

we have to call them to give them the opportunity to come

MARK MEYERS - DIRECT

and conduct the child and forensic -- the child and
adolescent forensic interview.  They can decline if they
just have a scheduling conflict and they just can't make
it, then we can reach out to a local family and children
center interviewer to conduct the interviews with the
children.

Q    So just so I'm understanding, it's FBI policy that
you need to go through a specific, either office or
agency to arrange for forensic interviews.

A    That is correct.

Q    In this case, you contacted the Minneapolis office?

A    I did contact the Minneapolis office.  I contacted
the CAFI directly and she didn't return my phone call for
a few hours.  She was still sleeping.  And then when she
got up and received the call, she had a scheduling
conflict and couldn't make it.  At that point, I reached
out to the Family & Children Center in La Crosse.  They
were unable to help facilitate an interviewer.  And then
I started reaching farther out and ended up finding a
forensic child interviewer out of Dane County, which just
so happens to be a task force officer for the FBI.

Q    But you first needed to get that declination from
the official kind of --

A    Correct.

Q    -- child and forensic interviewer.  Now, in addition

MARK MEYERS - DIRECT

to finding a forensic interviewer, were there any other
considerations or steps you had to take with respect to
forensic interviews in this sexual assault investigation?

A     Finding an interpreter.

Q     Can you explain that.

A     We have to call -- we were given a number to call.
Basically we'd call in to the operations center and say
we have a need for a forensic -- or an interviewer, an
interpreter to help assist for a forensic interview.
That call wasn't initially returned right away.  However,
we had to work in schedule because the interpreters were
stretched out on pretty much everything as well.  So we
had to wait for an interpreter to be available and
coordinate that with when our forensic interviewer could
do the interview.

Q     Did you participate either directly or observe the
forensic interviews?

A     Initially I think I was in and out.  There was a lot
going on at the time.  I had observed maybe a minute or
two of it and then I was in and out of the observation
room doing other coordination for other investigations.

Q     And at this point -- you can refer to the
stipulations in front of you if it's helpful -- do you
recall about what time you were actually able to get the
forensic interviews arranged?

MARK MEYERS - DIRECT

1  A     It was on that Sunday.  It was about 1:50 p.m.

2  Q     Now, beyond the forensic interviews which you were

3  able to arrange for that time, was there other either

4  investigative steps or administrative steps you were

5  taking in connection to this investigation on that day?

6  A     For the forensic interview we needed a soft room,

7  and there was no video audio recorded soft room for it.

8  And so we had to coordinate with CID -- or I mean

9  Criminal Investigative Division to set up a new soft room

10 essentially.

11 Q     Can you very briefly, what is a soft room?

12 A     Soft room is more child friendly, in the least

13 amount of words.  I guess instead of a table and chairs,

14 you have a couch.  And it's just more of a living room

15 setting instead of an interview room.

16 Q     And from your perspective as the lead agent, why did

17 you focus your initial efforts on arranging for -- I'm

18 just going to restart the question.  As the lead agent,

19 why did you focus your kind of initial investigative

20 steps in this case on the forensic interviews?

21 A     Without the information from the victims, the

22 alleged victims, there's not a lot to talk about with the

23 suspect or the alleged suspect.

24 Q     And from your perspective, were the initial

25 interviews conducted by the Fort McCoy Police Department

MARK MEYERS - DIRECT

sufficient for that?

A    Just an overview.  There's no details to find out whether something actually happened or not, it was all alleged at the time and you want to dig down and get as much information as you can.

Q    Following the forensic interviews, did you do anything else related to this investigation on that Sunday, the 12th?

A    Yes.  I was trying to coordinate getting child SANE exams completed as well.

Q    You said SANE exams.  Can you tell me just what that means?

A    Sexual Assault Nurse Examiner kits completed on the children.

Q    Was that something that could have been done at Fort McCoy?

A    No.

Q    And did you need to bring the children essentially off base?

A    Yes.

Q    And was that as simple as putting them in a car and taking them?

A    No.

Q    Can you explain that for me.

A    There's procedures we had to go through for that,

1  because essentially we were taking them out of an

2  immigration process to take them basically off post and

3  we needed interpreters to interpret for the SANE

4  examiner.  And then also we had to take them to Gundersen

5  Lutheran, where it was either Gundersen Lutheran in

6  LaCrosse or we'd have to travel down to Children's in

7  Madison.  Those were the only two locations where child

8  SANE nurse examiners were available.

9  Q    While you're focusing on first the forensic

10 interviews and then these SANE exams, you mentioned there

11 was a second criminal agent on base.  What was he doing

12 in connection with this?

13 A    He was conducting the other investigation, and there

14 were multiple -- just because we had three open criminal

15 investigations at the time doesn't mean we weren't

16 getting more referrals and calls and other cases to

17 review to see if they were something we needed to take.

18 Q    At this point, realizing that you're inundated, did

19 you make a request for additional FBI agents to respond?

20 A    Yes.  At the Sunday morning brief, I requested right

21 away because I knew we needed to interview the children

22 and I also knew we needed to interview the subject.  And

23 so I requested agents for that.

24 Q    You were aware the subject was in custody at this

25 time.

MARK MEYERS - DIRECT

1   A    Yes.  At the Fort McCoy Police Department, yes.

2   Q    And you also determined that he needed to be

3   interviewed.

4   A    Yes.

5   Q    Okay.  Were you able to interview him that day?

6   A    No.

7   Q    And was this other agent -- that other agent decided

8   not to interview him either?

9   A    No.  He was -- he was responding -- the other agent

10  was responding to other calls and weeding out whether we

11  needed to investigate those, and then also trying to

12  follow up on the other case that had just been opened, I

13  believe the day before or two days before.

14  Q    And was the subject of that other investigation also

15  in custody?

16  A    Yes.

17  Q    Okay.  And you were involved in that investigation.

18  A    Yes.

19  Q    Okay.  Were there other kind of special conditions

20  in that case, like a forensic interview that needed to be

21  done?

22  A    There was medical examinations and a forensic

23  interview on both of those cases, yes.

24  Q    Were you coordinating those steps in that

25  investigation in addition at the same time as this

MARK MEYERS - DIRECT

1  investigation?

2  A    Yes.

3  Q    Okay.  Do you know if the FBI approved for

4  additional agents to come up to assist you?

5  A    They did.

6  Q    When did those agents arrive?

7  A    Late Sunday night.

8  Q    And was it your understanding that one of those

9  agents would interview the subject of this investigation,

10  Mr. Noori?

11  A    Yes, yes.  It would probably be more likely it would

12  be two agents that would conduct the interview, but yes.

13  Q    Do you recall what time you completed your

14  assistance with the SANE exams at the hospital with the

15  kids?

16  A    It was just before midnight.  I don't believe we got

17  to the hospital and began the first one until ten

18  o'clock, I believe.

19  Q    Okay.  And then following that, did you go home and

20  sleep?

21  A    Yes.

22  Q    The following morning, Monday, September 13th, I

23  believe, that Monday, when did you respond to Fort McCoy?

24  A    For the morning brief.

25  Q    And at that time did you see the other agents that

MARK MEYERS - DIRECT

1  were sent to assist you?

2  A    Some of them, yes.

3  Q    And at that time, were they essentially briefed on

4  the need to interview Mr. Noori?

5  A    Yes.

6  Q    Okay.  Were you a part of that interview at all?

7  A    I was not.

8  Q    Did you have any decision-making -- decision-making

9  with respect to that portion of the investigation?

10 A    No.

11 Q    Okay.  At what point did you begin working with the

12 U.S. Attorney's Office on drafting a criminal complaint

13 in connection to this investigation?

14 A    Sunday, the 12th, in the afternoon.

15 Q    And this was before the interview of Mr. Noori?

16 A    That is correct.

17 Q    Okay.  When did this process finish?  As in when did

18 you actually obtain a signed criminal complaint and

19 warrant from a judge.

20 A    It was Monday.  Give me a second, please.  It was

21 2:16 p.m. on Monday, September 13th.

22 Q    And so up until -- so between the time that you

23 began working on this complaint with the U.S. Attorney's

24 Office, you said that started at some point on Sunday.

25 A    Correct.

MARK MEYERS - DIRECT

1   Q    Okay.  And was this process as simple as sending a

2   complaint or an affidavit to the U.S. Attorney's Office

3   or were there multiple revisions and discussions about

4   it?

5   A    There were multiple, but it wasn't just as simple as

6   providing the reports.  The incident had happened the

7   night prior, on Sunday, so the police officers that were

8   working that shift, some of them didn't have their

9   reports completed and/or approved and so we had to wait

10  until we had the physical reports so that I could forward

11  them on to the U.S. Attorney's Office.

12  Q    Did you feel it was important to complete the

13  forensic interviews before complaints and affidavit was

14  finalized?

15  A    Yes.

16  Q    Why?

17  A    As I said before, that's where the information is.

18  You get it from the victims.  You see what they have to

19  say.

20  Q    So you said that you obtained the complaint at about

21  2:16 p.m.  When did you receive the arrest warrant?

22  A    3 p.m.

23  Q    And what did you do with it?

24  A    I immediately forwarded the email to Special Agent

25  Peter Reist, who was conducting the interview of

MARK MEYERS – DIRECT

Mr. Noori.

Q    So it's fair to say that charges against Mr. Noori were not filed until 2:16 p.m.

A    That is correct.

Q    And you did not receive an executable warrant until 3 p.m.

A    That is correct.

Q    Were you on base at that time when you received that warrant?

A    Excuse me.  I don't believe I was on base.  I believe I was in my office in La Crosse.  I had to process the evidence and make sure it got out in FedEx that I picked up that morning.

Q    So you yourself could not execute this warrant.

A    No.

Q    I want to turn to the criminal Complaint.  I'll put that on the screen for you.  This is marked as Exhibit -- government Exhibit 13.  Scroll down so that you can see the sticker here from Exhibit No. 13.

       You had a chance to review this complaint?

A    Yes.

Q    Okay.  And this is the same complaint that you actually drafted.  Sorry, one second.  Okay.  And is there any reference to statements made by Bahrullah Noori in this criminal Complaint?

MARK MEYERS - DIRECT

1  A    No.

2          MS. KRAUS:  I don't have any further questions.

3          THE COURT:  Cross-exam.

4          MS. BLAIR:  Yes, Your Honor (12:51 p.m.)

5                    **CROSS-EXAMINATION**

6  BY MS. BLAIR:

7  Q    Good afternoon, Agent.

8  A    Good afternoon.

9  Q    I want to go back through the timeline a little bit.

10 Do you still have the joint factual stipulation of the

11 parties in front of you?

12 A    Yes, I do.

13 Q    All right.  Great.  You stated that you were made

14 aware of this investigation into Mr. Noori at your

15 morning briefing?

16 A    That is correct.

17 Q    What time does your morning briefing take place?

18 A    It was either -- that time kept changing too.  It

19 was either 7 or 7:30 or 8 o'clock.  I believe at that

20 time we were meeting at 7 or 7:30 a.m.

21 Q    Okay.  So you were made aware sometime between 7 and

22 8 a.m.

23 A    Yes.

24 Q    However, the FBI generally was contacted before that

25 about the investigation.

                    MARK MEYERS - CROSS

A    We had an on-call phone that Fort McCoy dispatch would call, yes.

Q    And dispatch is actually called at 9:23 p.m. on Saturday.

A    That is correct.

Q    Okay.  So they're alerted much before you.

A    Yes.

Q    We spoke a lot about the different steps you needed to take to be able to interview the children.  Do you remember that?

A    Yes.

Q    You had to get a room together, get an interpreter together, all those things.

A    That is correct.

Q    And the interview of the children starts on Sunday at 1:50 p.m.; correct?

A    Yes.

Q    And that interview is finished by the early afternoon.

A    I don't believe I was there when it was finished.

Q    It didn't take five hours or six hours.

A    It was completed on that afternoon, yes.

Q    Okay.  Now, as an FBI agent, you're trained in different aspects of federal law?

A    Yes.

1  Q    And federal law that applies specifically to

2  criminal defendants.

3  A    Yes.

4  Q    And one of the rights that a criminal defendant has

5  is the right to prompt presentment.

6  A    Yes.

7  Q    Or that he be brought before a magistrate judge

8  promptly; correct?

9  A    Yes.

10 Q    And part of that law is that someone may be held six

11 hours and then the FBI cannot interview them absent

12 special circumstances.

13 A    There is a law, yes.

14 Q    And you were trained on that --

15 A    Yes.  The six-hour rule, yes.

16 Q    -- during your FBI training.  Just to finish the

17 question.  Okay.

18      And Mr. Noori is interviewed over 40 hours since his

19 initial arrest; correct?  Approximately 40 hours since

20 his initial arrest.

21 A    I guess I didn't run the hours, but yes.  It was --

22 he was interviewed on Monday afternoon.

23 Q    Yes.  And the FBI has actually a waiver that someone

24 can sign saying I waive my right to prompt presentment.

25 A    I believe that would be a Department of Justice

1  waiver.

2  Q    You're aware that a defendant may waive their right

3  to prompt presentment.

4  A    Yes.

5  Q    And that was not done in this case, a waiver was not

6  presented to Mr. Noori.

7  A    No.

8  Q    One wasn't written up and translated for him or even

9  spoken to him; right?

10  A    Correct, not to my knowledge.  I was not there

11  during the interview, but that was not brought up.

12  Q    The interview was audio and video recorded and you

13  reviewed that video recording.

14  A    Yes.

15  Q    And it's not present in that recording.

16  A    That is correct.

17  Q    Now, we spoke about the importance of interviewing

18  the children.  Did you interview the father or uncle of

19  the children?

20  A    I don't believe in that case I interviewed either

21  one.  It was a while ago, so I don't know if I -- I -- I

22  don't believe I conducted any interviews in this case on

23  my own.  I believe those were all assigned out.

24  Q    Are you aware of anyone interviewing the father or

25  uncle of the two complaining -- alleged victims?

1  A    Yes, I believe Fort McCoy PD did.

2  Q    Who at Fort McCoy PD?

3  A    I can't recall the officer.

4  Q    If you had been present for this interview, you

5  would have created a report?

6  A    If I was conducting the interview, I would have

7  created a report, yes.

8  Q    I have a clarifying question about something that

9  you mentioned on direct where you were talking about the

10  importance of having a forensic interviewer interview the

11  children based on the nature of the case.  You stated

12  that someone from Fort McCoy wouldn't be enough per

13  protocol.  Are you aware if someone from Fort McCoy did

14  interview the children about what happened?  And please

15  clarify if I got it wrong.

16  A    I guess I'm confused on why you'd say Fort McCoy

17  wouldn't be enough.  I guess I don't understand.

18  Q    That you would want someone with special training to

19  interview the children and so you waited until that

20  person got in.  Someone from Fort McCoy police would not

21  be proper procedure.

22  A    Per our policy, we have to go through our CAFI, and

23  then also from our CAFI, they give us -- these are the

24  approved interviewers you would use.  And we did not have

25  someone from Fort McCoy, no.

MARK MEYERS - CROSS

1  Q    And obviously someone arrived before the children

2  were interviewed on that Sunday.

3  A    Yes.

4  Q    My question is, though, did the children give any

5  statement to anyone that you're aware of before that

6  forensic interview?

7  A    Not that I can recall.

8  Q    You have been present the entire time we've had the

9  hearing, correct, as the case agent?

10  A    Correct.

11  Q    And so do you recall when Officer Schwartz was

12  speaking?

13  A    Correct.

14  Q    And Officer Schwartz gave testimony to the effect

15  that Mr. Noori had given a statement to him saying that

16  in his country, it may be legal to do this with children,

17  after Mr. Noori asked him a question about why am I here.

18  Do you recall that testimony?

19  A    Yes, I do.

20  Q    And during that time, Officer Schwartz also told him

21  that you're here for a sexual assault of those children.

22  A    Yes.

23  Q    Okay.  When was the first time you heard that

24  statement?

25         MS. KRAUS:  I'm going to object to relevance

1  here.

2  THE COURT:  I'm going to let her make a record

3  here.  We can always strike it later.

4  THE WITNESS:  Weeks later.

5  BY MS. BLAIR:

6  Q    In what context?

7  A    It wasn't until, I want to say prepped for this that

8  we -- that I was told about those statements by Officer

9  Schwartz.

10  Q    During prep when you heard this statement, was the

11  Assistant United States Attorney present?

12  A    Yes, I believe -- yes.

13  Q    Were any other statements made allegedly from

14  Mr. Noori, aside from that --

15  A    Not that I'm --

16  Q    -- recorded interview?

17  A    Not that I'm aware of.

18  Q    Regarding that statement, was a report generated as

19  far as -- to your knowledge?

20  A    No, not to my knowledge.

21  Q    Why wouldn't a report be generated?

22  A    I wasn't present at the time.  Officer Schwartz was

23  and he could have done a supplement.

24  Q    I'm sorry, I think I misunderstood.  I thought that

25  you were present in the room at the same time Officer

MARK MEYERS - CROSS

1  Schwartz gave a statement.  But that's incorrect.

2          THE COURT:  You're talking past each other.

3          MS. BLAIR:  Yes.

4          THE COURT:  You're asking about the prep

5  meeting.  Why was -- why did you not make a report of

6  what you learned from Sergeant Schwartz at the prep

7  meeting?  Am I asking the question correctly?

8          MS. BLAIR:  Yes.

9          THE WITNESS:  Oh.  Because Officer Schwartz is a

10 sworn law enforcement officer.  He could have completed a

11 report.

12 BY MS. BLAIR:

13 Q    That wouldn't be your job.

14 A    Correct.  I mean he could have followed up with a

15 report.

16         MS. BLAIR:  I have no further questions.  Thank

17 you.

18         THE WITNESS:  Thank you.

19         THE COURT:  Did you wish to redirect?

20         MS. KRAUS:  I want to clarify for the record.

21 When you say CAFI, are you referring to a Child

22 Adolescent Forensic Interviewer?

23         THE WITNESS:  Yes.

24         MS. KRAUS:  Okay.  I don't have any further

25 questions.

                    MARK MEYERS - CROSS

1          THE COURT:  Agent, you're done.  You may resume
2   your seat.
3          THE WITNESS:  Thank you, Your Honor.  What would
4   you like done with this?
5          THE COURT:  Just leave it right there.
6          MS. KRAUS:  That's my copy.  Thank you.
7       (Witness excused at 1:01 p.m.)
8          THE COURT:  Okay.  So let's clarify where we
9   find ourselves.  Ms. Kraus, does that conclude the
10  government's presentation of witness testimony in
11  response to the motion?
12         MS. KRAUS:  Yes.
13         THE COURT:  Okay.  Understanding that you
14  reserve the right, perhaps, to call rebuttal witnesses
15  after the defense witnesses testify, are you resting for
16  the purpose of your direct response in terms of making an
17  evidentiary record?
18         MS. KRAUS:  I am.
19         THE COURT:  Very well.  All right.  So
20  Ms. Blair, looking ahead to tomorrow, we're going to
21  proceed as planned.  You've got your witnesses lined up.
22  I believe we've starting at nine.  Probably finish in the
23  morning?
24         MS. BLAIR:  I hope we will finish in the
25  morning, Your Honor.  I think there might be some

translation issues, both with the judge as he's

testifying and if Mr. Noori decides to testify.  It just

might be a little slower than how it is here, but yes, we

should finish.

THE COURT:  I only ask for calendaring purposes.

You get as much time as you need.  We won't end

artificially, we'll just see how it goes and if the Court

has to change other things, we will do that.  But we are

not going to look for trouble today.

And then tomorrow, we will set the rest of the

schedule, assuming that we complete the evidentiary

record and close the record on the motion tomorrow

afternoon.  But let's wait and make sure that actually

happens.

With that, I believe we're done for today, but let's

double-check.  It's a defense motion.  Anything else

today on any topic before we adjourn today?

MR. BUGNI:  Two things, Your Honor.  Can we just

talk?  Can I talk with Ms. Blair for a minute?

THE COURT:  Yes.

(Pause          1:03-1:04 p.m.)

MR. BUGNI:  Your Honor, just two brief things.

So we had never heard Officer Schwartz's statement, as

was pretty evident.  We need to reevaluate if we want to

put Mr. Noori on the stand.  You know, normally it would

just be is this your affidavit, did you review it, did

you go over it, did you sign it, da-da-da. And we would

let the Court know and Ms. Kraus by 7 p.m. tonight if we

decide to call off our portion of the evidentiary

hearing. We just want to make sure that we make a valid

decision and an informed decision. We also want to talk

to Mr. Noori about what the ramifications of those

decisions are. So that's the first thing, Your Honor.

We'll let the Court know if we're not going to go forward

with that.

The second thing is I don't know if we have to

supplement for a motion to suppress a statement that we

only heard from the first time -- for the first time

today at court. You know, there's no 302 made of it. No

report made of it. So I think that's one small thing

that we'd have to do. It's very clear he's in custody at

that point, it doesn't seem as clear whether or not it

was of a interrogatory statement, you know, given the

fact that it's not -- sorry, not in Pashto and we don't

really know what was communicated. But that's something

I want to flag for the Court that we would make a quick

decision on. But I'm just putting it out there for you.

THE COURT: Sure, you're entitled to that. I

mean there are potential Rule 16 problems here as well.

A lot of wheels have started to turn. Where they take us

1  we can determine, but I appreciate the heads up on that.

2  And as for whether or not to call your client, Mr. Noori,

3  tomorrow, I'll leave that to you to let Ms. Kraus know.

4  And that doesn't really affect the Court. As I already

5  said to Ms. Blair, we go until you're done.

6          MR. BUGNI: Sure.

7          THE COURT: Either that involves Mr. Noori's

8  testimony or it does not. You're the masters of your own

9  case in that regard.

10         MR. BUGNI: Sure. Same. We're going to give

11  everybody, including Ms. Kraus and the Court so that way

12  for calendaring purposes, you'll know tonight what you

13  can plan for --

14         THE COURT: Okay.

15         MR. BUGNI: -- as far as that goes.

16         THE COURT: Fair enough. Just to make clear,

17  it's not a big deal to the Court. We throw civil

18  telephonic pretrials off the calendar all the time. I

19  would be happy to do that tomorrow if I had to.

20         MR. BUGNI: Thank you, Your Honor.

21         THE COURT: Anything else?

22         MR. BUGNI: No, Your Honor.

23         THE COURT: All right. Anything else today on

24  behalf of the government?

25         MS. KRAUS: No. Thank you.

1    THE COURT:  Then we're done for today.  Thank

2 you all.  Please stay well.

3    (Proceedings concluded at 1:06 p.m.)

4

5                    *  *  *  *  *

6    I, LYNETTE SWENSON, Certified Realtime and Merit

7 Reporter in and for the State of Wisconsin, certify that

8 the foregoing is a true and accurate transcription of the

9 proceedings held on the 24th day of October 2022 before

10 the Honorable Stephen L. Crocker, District Magistrate

11 Judge for the Western District of Wisconsin.

12 Dated this 13th day of November 2022.

13

14                    /s/__Lynette Swenson_____

15                    Lynette Swenson, RMR, CRR, CRC
                       Court Reporter

16

17

18

19

20 The foregoing certification of this transcript does not
   apply to any reproduction of the same by any means unless

21 under the direct control and/or direction of the
   certifying court reporter.

22

23

24

25